UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant
______________________________/

CRIMINAL NO. 6:25-CR-00285-01
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION TO SHIELD THE IDENTITY OF CERTAIN WITNESSES AND FOR OTHER PROTECTIVE MEASURES TO ENSURE WITNESS SAFETY**

## TABLE OF CONTENTS


INTRODUCTION .......... 1
BACKGROUND .......... 4
SPECIFIC PROTECTIVE MEASURES REQUESTED BY GOVERNMENT .......... 7
ARGUMENT .......... 8
I. This Circuit and Others Have Held that the Right to Confront Witnesses Can Be Overcome by the Need to Protect Witness Safety. .......... 8
II. The Requested Protective Measures Are Tailored To Specific Security Concerns and are Grounded in Law .......... 10
A. ISA Witnesses .......... 10
1. The Identities of the ISA Witnesses are Classified. .......... 11
2. There Are Concrete and Specific Threats to the Safety of the ISA Witnesses .......... 12
3. The Defense Will Have Ample Opportunity to Cross Examine the Witnesses and Place Them in Their Proper Setting .......... 15
B. Israeli Defense Force Witness .......... 16
C. FBI Undercover Employee .......... 17
D. FBI Linguists .......... 19
CONCLUSION .......... 20

## TABLE OF AUTHORITIES

### CASES

*Clark v. Ricketts*,
958 F.2d 851 (9th Cir. 1991)....................9

*Pelinkovic v. Ashcroft*,
366 F.3d 532 (7th Cir. 2004)....................2

*Press -Enterprise Co. v. Superior Court of California*,
464 U.S. 501 (1984)....................14

*Roviaro v. United States*,
353 U.S. 53 (1957)....................9

*Siegfriiedt v. Fair*,
982 F.2d 14 (1st Cir. 1992)....................9, 16, 20

*United States v. Abu Marzook*,
412 F. Supp. 2d 913 (N.D. Ill. 2006)....................8, 14

*United States v. Ansari*,
48 F.4th 393 (5th Cir. 2022)....................14

*United States v. Atkinson*,
No. 21-40470, 2022 WL 2383867 (5th Cir. July 1, 2022).................... 13, 14, 17, 19

*United States v. Celis*,
608 F.3d 818 (D.C. Cir. 2010)....................9, 12, 15

*United States v. Cervantes*,
706 F.3d 603 (5th Cir. 2013).................... 13, 14, 19

*United States v. Diaz*,
637 F.3d 592 (5th Cir. 2011)....................9

*United States v. El-Mezain,*
664 F.3d 467 (5th Cir. 2011).................... 2, 8, 9, 12, 14, 15, 16

*United States v. Guiterrez de Lopez*,
761 F.3d 1123 (10th Cir. 2014)....................10, 18

*United States v. Hernandez*,
No. S1 12 Cr. 809 (PKC)., 2013 WL 3936185 (S.D.N.Y. Jul. 29, 2013)....................19

*United States v. Holy Land Found. for Rel. & Dev.*,
No. 3:04-cr-0240-P, 2008 WL 11355369 (N.D. Tex.) (Aug. 13, 2008) ....9

*United States v. Machado-Erazo*,
951 F. Supp. 2d 148 (D.D.C. 2013) ....18

*United States v. Maldonado-Benitez,*
23-cr-00315 (SRN/DTS), 2025 WL 1166515 (D. Minn. 2025) ....10

*United States v. Mohamed*,
727 F.3d 832 (8th Cir. 2013) ....9, 19

*United States v. Naseer*,
No. 10 CR 19(S-4) (RJD), 2015 WL 13843166 (E.D.N.Y Jan. 26, 2015)....18

*United States v. Osborne*,
68 F.3d 94 (5th Cir. 1995) ....14

*United States v. Palermo*,
410 F.2d 468 (7th Cir. 1969) ....10

*United States v. Ramos-Cruz*,
667 F.3d 487 (4th Cir. 2012) .... 10, 12, 18

**STATUTES**

50 U.S.C. § 3121(a)....17

**OTHER AUTHORITIES**

18 U.S.C. App. 3, § 4 ....11
18 U.S.C. App. §§ 1-16, Section 4 ....1
Exec. Order No. 13,526, § 1.6(e) ....11

**REGULATIONS**

75 Fed. Reg. 707, 710 (Dec. 29. 2009) ....11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant
______________________________________/

CRIMINAL NO. 6:25-CR-00285
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION TO SHIELD THE IDENTITY OF CERTAIN WITNESSES AND FOR OTHER PROTECTIVE MEASURES TO ENSURE WITNESS SAFETY**

## INTRODUCTION

The United States respectfully files this memorandum in support of its motion for measures to protect the identity of certain witnesses who are expected to testify at trial and to impose certain security protocol to ensure these witnesses' safety. Pursuant to the Classified Information Procedures Act, Title 18 App., United States Code, §§ 1-16 ("CIPA"), Section 4, the government requests that the Court enter an order protecting the true names and identities of three witnesses from the Government of Israel and a Federal Bureau of Investigation undercover employee (the "FBI UC" and, collectively, the "Protected Witnesses"). The government requests that the Protected Witnesses be permitted to testify under an alias. The government further asks that the courtroom be closed to the public during the Protected Witnesses' testimony, with audio broadcasting in another courtroom, and that the

Protected Witnesses enter and leave the courtroom through a separate, non-public entrance.

These proposed security measures are narrowly tailored to protect classified information and witness safety without interfering with the defendant's right to confront witnesses under the Sixth Amendment. The Fifth Circuit has already approved of these measures under nearly identical circumstances. *See United States v. El-Mezain,* 664 F.3d 467, 490-94 (5th Cir. 2011).

The government intends to call in its case in chief two witnesses from the Israel Security Agency ("ISA"), also known as the General Security Services. The ISA is the domestic intelligence agency for the State of Israel that by law is entrusted with the primary responsibility for the internal security of the Israeli people. Israel exists in a perpetual state of risk due to extremist organizations that oppose Israel's right to exist and are dedicated to its destruction.[1] The government may also call a witness from the Israeli Defense Forces ("IDF"). The IDF is responsible for the physical security of the State of Israel by defending its borders and confronting its enemies.

The first witness that the government intends to call, known as "Avi" in prior filings, *see, e.g.,* [Doc. 45] is an ISA expert on HAMAS and the Democratic Front for the Liberation of Palestine ("DFLP") who will authenticate and opine upon specific documents recovered during recent Israeli military operations that evidence the defendant's association with the DFLP. The second witness, also from the ISA and

[1] The Court may take judicial notice of the ongoing conflict between Israel and Gaza. *See, e.g. Pelinkovic v. Ashcroft*, 366 F.3d 532 (7th Cir. 2004) (court may take judicial notice of current country conditions.)

referred to here as "Maya," will authenticate audio recordings demonstrating the defendant's awareness of the ongoing attack on Israel and his intent to join the fighting. The phone calls will also demonstrate that the defendant traveled from Gaza to Israel on October 7, 2023; ordered others to gather weapons, ammunition, and gear; and urged others to join the defendant in Israel and participate in the massacres that occurred that day. The government may also call a third witness, from the IDF, to authenticate documents recovered from the battlefield. The fourth witness is an FBI undercover agent with a skillset and personal background that is unique within the FBI who communicated with the defendant while in the United States and who will authenticate the defendant's voice on the phone call recordings.

The identities of ISA personnel are classified in Israel and therefore classified under the laws of the United States. Israeli law similarly protects the identities of IDF personnel who testify in court. And the identity of the FBI UC is classified under United States law.[2] The requested protective measures are necessary to ensure the protection of classified information and the safety of the testifying witnesses but are also narrowly tailored to protect the defendant's constitutional rights. Accordingly, pursuant to CIPA Section 4 and governing precedent, the court should enter an order shielding the witnesses' identities and entering the requested protected measures.

[2] As explained herein, the Government is also requesting that FBI linguists testify publicly using only their first names, although their full names and CVs will be available to the defense. In addition, the Government is currently working through logistical and security concerns with the Department of State regarding the appearance of a witness and may supplement this motion to include requests related to that witness.

## BACKGROUND

On October 7, 2023, HAMAS carried out a brutal terrorist attack on Israeli communities and military outposts near the Gaza border in Southern Israel. Starting at approximately 6:30 a.m., HAMAS and its supporters launched a heavy barrage of rockets and mortar fire at Israel. The rockets were aimed primarily at civilian populations, including kibbutzim (typically agriculturally based communities) in Southern Israel and major population centers. Operatives also fired projectiles at military bases close to the border housing "lookout posts," with the aim of blinding Israeli forces to the impending attack and impeding their ability to launch a military response. As Israel's Iron Dome intercepted the missiles, rocket alerts sounded in over 30 communities, masking the sound of snipers systematically eliminating cameras along the security fence separating Gaza from Israel. Operatives also used drones to drop grenades on Israel's observation towers. Under the cover of the rocket fire, operatives used explosives to blow holes in the security barrier. Large groups of HAMAS fighters infiltrated Israel through approximately 30 breach points. HAMAS operatives also flew over the security barrier using paragliders and invaded Israel by sea.

At approximately 7:17 a.m. Israeli time on October 7, a public HAMAS Telegram channel called "Al-Aqsa" posted a message that the Al-Qassam[3] Brigades' Commander, Mohammed Deif, would soon give an important statement to the Palestinian people and the Arab and Islamic nation. At approximately 7:53 a.m.

[3] The "Al-Qassam Brigades" is short for the Izz al-din al-Qassam Brigades, the military wing of HAMAS.

Israeli time, the Al-Aqsa channel posted a video of a speech by Deif. During the speech, Deif announced the start of the "Al-Aqsa Flood operation." Deif said more than 5,000 rockets had been launched by HAMAS within the first twenty minutes of the operation. Deif called for the "mujahideen" to "kill them wherever you find them and expel them from where they expelled you." Deif also called for people in the "occupied interior" to "set the ground on fire under the feet of the seizing occupiers, killing, burning, destroying, and closing roads."

As the invasion expanded beyond the first-wave, thousands of October 7 attackers drove to civilian communities in pickup-trucks and on motorcycles. The attackers entered undefended or lightly defended neighborhoods and went from home-to-home shooting unarmed individuals, throwing grenades into buildings where families were attempting to hide, and lighting homes on fire. HAMAS operatives and their allies fired into vehicles and dragged their victims' bodies out into the streets. Operatives also encircled a music festival taking place in the Negev desert and blocked all roads, then fired on the unarmed festival participants with machine guns and other weapons. HAMAS together with its co-conspirators murdered approximately 1,200 people on October 7, including dozens of U.S. citizens. They also abducted approximately 251 people ranging in age from eighty-five years to nine-months-old, also including U.S. citizens.

The Government has alleged that the defendant was a member of the DFLP's military wing, the National Resistance Brigades ("Brigades") in the Gaza strip. On the morning of October 7, 2023, the defendant heard Dief's speech announcing the

"Al Aqsa Flood operation" and calling for people to join the fight in Israel and "to kill them wherever you find them." Intercepted telephone calls will establish that the Defendant intended to join the HAMAS-led fight in Israel and did in fact enter Israel through one of the breach sites. Geolocation data places the defendant's phone near Kfar Aza, Israel, at 9:45 a.m. Israel time, consistent with his communications to others that the "borders are open," that he was traveling "east," and that others should bring weapons and join him. The evidence will also establish that the HAMAS-led conspiracy—in which the defendant joined—resulted in numerous deaths.

The defendant, whose wife is a U.S. citizen, thereafter submitted a signed application for an immigrant visa to the United States on June 26, 2024. The defendant appeared in person at the U.S. embassy in Cairo, Egypt, on or about August 6, 2024, to swear to the veracity of the statements in his application. As alleged in the Superseding Indictment, the defendant lied when he swore under oath that he belonged to no militia or paramilitary unit and had no weapons training. The defendant entered the United States through the Dallas/Fort Worth airport, moved to Tulsa, Oklahoma, and eventually re-located to Lafayette, Louisiana. While working in Louisiana, an FBI undercover agent made contact with the defendant and spent many hours conversing with him.

The prosecution will present evidence establishing the factual allegations set forth above, and in the complaint and Superseding Indictment. The evidence will include documents and phone calls provided by the State of Israel, and the ISA and/or

IDF witnesses will authenticate them. An ISA expert will also opine on the meaning of documents found on the battlefield connecting the defendant to the DFLP and DFLP's relationship with HAMAS. The FBI UC will identify the voice on the intercepted audio recordings as the voice of the defendant.

**SPECIFIC PROTECTIVE MEASURES REQUESTED BY GOVERNMENT**

The government requests the following protective measures to ensure the personal safety of the Protected Witnesses:

(1) Allowing the witnesses to testify under a pseudonym.

(2) Closure of the courtroom during the witnesses' testimony to all non-parties except for the defendants' immediate family members, and transmission of a live audio feed of the proceedings into another courtroom where interested members of the public can hear the testimony.

(3) Allowing the witnesses to enter and exit the courtroom through a non-public entrance/exit.

(4) Using a stand-alone system (*i.e.*, a separate stenotype machine) to transcribe the witnesses' testimony to ensure that no classified information is inadvertently recorded;

(5) Limiting cross-examination to the scope of direct or matters sounding in impeachment and providing that, if a question calls for a classified response, the witnesses can confer with their own legal advisor, who would be in the courtroom for the testimony. If the answer to a relevant question calls for classified information, the government would request an *ex parte*, *in camera* hearing pursuant to CIPA Section 4 so that the court can consider the information at issue and any appropriate substitute under CIPA Section 6.[4]

[4] The witnesses' testimony should not implicate classified information. The requested protective measures regarding the transcript and consultation with counsel are safeguards to prevent the witness from disclosing classified information inadvertently.

## ARGUMENT

### I. This Circuit and Others Have Held that the Right to Confront Witnesses Can Be Overcome by the Need to Protect Witness Safety.

This matter is not the first time government witnesses have sought to testify pseudonymously in a U.S. courtroom, nor the first time Israeli government witnesses have testified under these same protective measures. In *United States v. Abu Marzook*, 412 F. Supp. 2d 913, 923-24 (N.D. Ill. 2006), in which defendants were also alleged to have provided material support to HAMAS, the district court imposed the protective measures requested by the ISA to permit their agents to provide live testimony.[5] *Marzook* was the first case in which the government of Israel agreed to permit ISA witnesses to testify in a United States court. Following *Marzook*, an ISA witness testified in the case of *United States v. El-Mezain*¸ 664 F.3d 467 (5th Cir. 2011). That case alleged material support for a foreign terrorist organization (HAMAS), as well as myriad other conspiracy and tax charges related to the provision of financial support to HAMAS charities and social organizations. Two Israeli witnesses testified during that trial. One ISA expert testified about the social wing of HAMAS and its financial network, and another witness, from the IDF, authenticated documents seized during a military operation. The district judge approved of the protective measures, *see United States v. Holy Land Found. for Rel. & Dev.*, No. 3:04-

[5] Judge Amy St. Eve denied without prejudice the government's request for a witness to use light disguise, but only because the defendant, who had been incarcerated in Israel, had already seen the witness' face during his interrogation. *Marzook*, 412 F.Supp.2d at 928.

cr-0240-P, 2008 WL 11355369 (N.D. Tex.) (Aug. 13, 2008), and the Fifth Circuit affirmed on appeal. *See El-Mezain*, 664 F.3d at 490-94.

As the Fifth Circuit explained, "[a]lthough the Confrontation Clause guarantees the right of a defendant to confront his accusers, that 'right is not unlimited.'" *Id.* at 491 (quoting *United States v. Diaz*, 637 F.3d 592, 597 (5th Cir. 2011)); *see also Roviaro v. United States*, 353 U.S. 53, 62 (1957) (public interest is balanced against an individual's right to prepare a defense). In *El-Mezain*, the court found that the threat to the witness' safety was serious and real; that the witnesses' true names were classified under Israeli and American law; and that the defense had ample information with which to conduct a meaningful cross-examination and test their reliability and bias. 664 F.3d at 492-93. In short, the defense had more than an adequate "opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Id.* at 493-94 (citation omitted).

Other circuits have similarly found that concern for personal safety outweighed the defendant's confrontation rights under appropriate circumstances. Like the Fifth Circuit, courts have considered the totality of the circumstances, balancing the public interest in protecting the witness' safety against the individual's right to prepare his defense. *United States v. Celis*, 608 F.3d 818, 831 (D.C. Cir. 2010), citing *Roviaro*, 353 U.S. at 62; *see also United States v. Mohamed*, 727 F.3d 832, 838 (8th Cir. 2013) (protecting the identity of FBI linguist); *Siegfriiedt v. Fair*, 982 F.2d 14, 18-19 (1st Cir. 1992) (upholding confidential informants' use of pseudonyms at trial); *Clark v. Ricketts*, 958 F.2d 851, 854-55 (9th Cir. 1991) (holding there is no

absolute right for an accused to have a jury hear a witness's true name and address and upholding use of pseudonym for government informant).

Courts have articulated the analytic framework as follows: First, the government "must demonstrate a threat to the witness' personal safety," *United States v. Guiterrez de Lopez*, 761 F.3d 1123, 1140 (10th Cir. 2014), that is "actual and not a result of conjecture." *United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) (quoting *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). *See generally United States v. Maldonado-Benitez,* 23-cr-00315 (SRN/DTS), 2025 WL 1166515 at *2 (D. Minn. 2025) (collecting cases). Second, if the government establishes a threat to the witness' safety, the court considers "whether the lack of the witness's identifying information deprive[s] the defendant of an opportunity for effective cross-examination." *Gutierrez de Lopez*, 761 F.3d at 1141. For the reasons set forth below, the balance here falls decidedly in favor of permitting the requested protective measures.

## II. The Requested Protective Measures Are Tailored To Specific Security Concerns and are Grounded in Law

### A. ISA Witnesses

The Court should permit the ISA witnesses—Avi and Maya—to testify pursuant to the requested protective measures. First, the true identities of these witnesses are classified under Israeli and U.S. law and cannot be disclosed. Second, the ISA has established through a classified declaration that there exist real and concrete threats to the safety of these witnesses if their identities were

to be exposed. Finally, the witnesses will be available live in the courtroom and subject to effective cross-examination by the defense.

**1. The Identities of the ISA Witnesses are Classified.**

Under Israeli law, information pertaining to the work, activities and procedures of the ISA and its personnel is classified and prohibited from disclosure. Included in this prohibition is information regarding the sources and methods by which information is gathered, and the identities, including the names, identifying information and physical characteristics, of ISA personnel. Israeli authorities generally, and the ISA in particular, are legally bound to ensure that there not be any unauthorized disclosure of this classified information to the general public.

Because this information regarding the ISA is classified under Israeli law, it was provided to the United States government with the expectation that the information would be closely guarded and protected. Under the express terms of Executive Order 13,526, this same information is also classified under American law. *See* Exec. Order No. 13,526, § 1.6(e), 75 Fed. Reg. 707, 710 (Dec. 29. 2009) ("Foreign government information shall retain its original classification markings or shall be assigned a U.S. classification that provides a degree of protection at least equivalent to that required by the entity that furnished the information."). Accordingly, the handling and treatment of this information must be undertaken in accordance with the provisions of the Classified Information Procedures Act, 18 U.S.C. App. 3, § 4.[6]

[6] The Government has this same day filed, *ex parte* and under seal through the classified information security officer, a classified Memorandum of Law and Motion for a Protective Order Pursuant to Rule 16(d)(1) of the Federal Rules of Criminal Procedure and Section 4 of the Classified Information Procedures Act. The motion is supported by

Any unauthorized disclosure by a United States official potentially subjects that person to criminal prosecution under American law. Disclosure of this classified information injures the national security of not only Israel, but also the United States, as it would jeopardize the sharing of critical national security information between the two countries.

#### 2. There Are Concrete and Specific Threats to the Safety of the ISA Witnesses

The ISA has expressed serious concern about the personal safety of its personnel and the safety of their families in Israel should the witnesses' true identities become known to the public. The security threat need not come from the defendant himself. *Celis,* 608 F.3d at 832 ("The appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or from another source"); *accord Ramos–Cruz,* 667 F.3d at 501. Here, the safety and attendant national security concerns are very real because Israel's adversaries, including HAMAS, specifically seek to publicize the identities and identifying features of ISA personnel in order to compromise them and their families, and their ability to effectively carry out their sensitive national security duties. *See El-Mezain*, 664 F.3d at 492 (HAMAS and other terrorist organizations seek out the true identities of ISA agents and their families and publish descriptions

declarations from the FBI's Assistant Director, Counterterrorism Division, and officials from the ISA and IDF.

of ISA officers on websites so that they can be targeted). These threats are therefore concrete and not hypothetical.

Due to these safety and security concerns, when ISA personnel testify in Israel,[7] there is a complete sealing of the courtroom that does not allow any spectator, member of the public or press to view or hear the testimony of the ISA witness; there is no disclosure of identifying information such as employment history and biographical information; the testimony is transcribed on a stand- alone computer; and access to the transcript is restricted.

Here, the Government is not requesting the same protections that apply in Israel, but is instead requesting the least restrictive measures to protect against the disclosure of these witnesses' identities while still protecting the defendant's constitutional rights. Defense counsel will be able to cross-examine the witnesses, the defendant and immediate family can be present in the courtroom, the jury will remain in the courtroom able to observe the witnesses and make credibility decisions, and audio of the witnesses' testimony will live-stream to a nearby courtroom.

In this Circuit, a partial closing of the courtroom will be affirmed "so long as the lower court had a 'substantial reason' for partially closing a proceeding." *United States v. Atkinson*, No. 21-40470, 2022 WL 2383867, at *3 (5th Cir. July 1, 2022) (quoting *United States v. Cervantes*, 706 F.3d 603, 611–12 (5th Cir. 2013)). In *Atkinson*, the district court permitted an undercover agent to testify in disguise and

[7] ISA personnel rarely testify in civilian courts in Israel, and even more rarely testify in courts overseas. The only two cases in which ISA personnel have testified in federal district court are *Marzook* and *El-Mezain*, cited above.

closed the courtroom to the public. The court also arranged for an audio feed of the agent's testimony to an adjacent courtroom. The Fifth Circuit held that no Sixth Amendment violation occurred, because "the court had an overriding interest in protecting the undercover agent's identity; the court adopted procedures that were no broader than necessary to protect that agent's identity; the court considered alternatives; and the court provided a detailed rationale." *Atkinson*, 2022 WL 2383867, at *3; *see also United States v. Ansari*, 48 F.4th 393, 402 (5th Cir. 2022) (COVID pandemic constituted substantial reason to partially close courtroom); *Cervantes*, 706 F.3d at 612 (size of courtroom was substantial reason to partially close courtroom during voir dire); *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995) (age of testifying witness was substantial reason to partially close the courtroom).[8]

Like in *Atkinson*, the serious safety concerns for the Protected Witnesses constitute substantial reason for partially closing the courtroom in this case. As noted, the defendant's immediate family would be permitted inside the courtroom. And as in *Atkinson*, as well as *El-Mezain*,[9] audio of the witnesses' testimony would be live-streamed into another courtroom for the public to hear. *Atkinson*, 2022 WL

[8] A partial closure of the courtroom also satisfies the First Amendment standard articulated in *Press -Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984). The government's interest in protecting sensitive information and protecting witness safety constitutes a compelling interest overcoming the presumption of openness, and the partial nature of the closing and audio feed ensures that the closure is narrowly tailored. *See generally Marzook*, 412 F. Supp. 2d at 925-96.

[9] The defendants in *El-Mezain* did not challenge on appeal the partial closing of the courtroom during the testimony of the Israeli government witnesses.

2383867 at *3. Accordingly, the safety of the witnesses and their families justifies not only the use of a pseudonym, but also the partial closing of the courtroom.[10]

**3. The Defense Will Have Ample Opportunity to Cross Examine the Witnesses and Place Them in Their Proper Setting**

Finally, the defense will not be prejudiced by the requested protective measures because they will be able to effectively cross-examine the witnesses. As an initial matter, because the ISA witnesses' identities are classified, ordinary research on the witnesses' background would be unlikely to yield useful information. *See El-Mezain*, 664 F.3d at 493 ("Because the names of the witnesses were classified, unlike in *Celis,* it is unlikely that anyone who knew the witnesses' true names could or would discuss them with defense counsel"). As in *El-Mezain*, the defense will be permitted to ask the witnesses about their background, training and experience with the ISA, their education, and their potential bias in favor of Israelis. *Id*. at 492. And because the Government will of course be complying with its *Giglio*, *Brady*, and Jencks Act obligations, the defense will know well in advance of any exculpatory materials, any impeachment materials, and any prior statements made that are relevant to this case. Indeed, the defense has already been provided with significant information about Avi. Not only was the defense given an exceptionally detailed expert witness notice detailing the full contours of his expected testimony, but the government provided Avi's full testimony from *El-Mezain*. That testimony included not only

[10] The other requested protective measures–protections against the spillage of classified information and non-public ingress and egress–do not implicate the defendant's constitutional rights and are non-controversial.

multiple days of direct and cross-examination at trial, but also a full *Daubert* hearing, during which defense counsel extensively probed Avi's background and credentials.

And Maya, who will authenticate audio calls, is similarly situated to "Major Lior," who authenticated battlefield evidence in *El-Mezain*. The defense will be able to probe Maya's personal knowledge of the evidence, including whether exculpatory evidence may have been overlooked. *See El-Mezain* 664 F.3d at 492. And with respect to all Israeli government witnesses, the defense will be able probe bias based on their nationality and employment with a security agency. *Id.* (affirming use of pseudonym where defense was "able to ask questions designed to cast doubt on the witness as a biased Israeli security agent"). In short, the defense will be "well-armed with information upon which to confront and cross-examine" the ISA witnesses, *id.,* 664 F.3d at 492, such that the "use of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance." *Siegfriedt*, 982 F.2d at 18.[11]

**B. Israeli Defense Force Witness**

As the contours of trial take shape, and the Court rules on pretrial motions, the government may decide to call a witness from the IDF to authenticate the battlefield documents. If an IDF witness does testify, that witness would be entitled to the same protective measures sought for the ISA witnesses, for the same reasons. *See El-Mezain*, 662 F.3d at 492-93 (discussing Avi and Major Lior together and

[11] The Court can also instruct the jury that it can consider the witnesses' use of assumed names when assessing the credibility and weight of the testimony. *El- Mezain*, 664 F.3d at 494.

upholding protective measures). This matter is further addressed in the Government's classified CIPA 4 motion.

**C. FBI Undercover Employee**

As recounted above, the FBI UC, who spent many hours visiting with and speaking to the defendant, will identify at trial the defendant's voice on the audio tapes. The FBI UC, known to the defendant as Samir Khader, is entitled to the same protective measures as the Israeli government witnesses. Under U.S. law, like under Israeli law, disclosing classified information that identifies covert agents, informants and sources constitutes a crime. *See* 50 U.S.C. § 3121(a). As the statute recognizes, there are both serious safety and law enforcement reasons for not disclosing the FBI UC's true name. Disclosure of the FBI UC's true identity and appearance would compromise any prior or ongoing investigations. Moreover, due to the politics of the regional conflict, were the FBI UC's true identity discovered, it would expose the FBI UC and his family to grave danger.

Courts routinely permit undercover agents and confidential informants to conceal their identities under similar circumstances. In *Atkinson,* the Fifth Circuit countenanced the undercover agent and confidential informant testifying in a partially closed courtroom and in disguise due to safety concerns for the witnesses and their families. 2022 WL 2383867 at *3. In another case alleging racketeering offenses involving the MS-13 gang, the district court permitted an El Salvadoran police officer to testify under a pseudonym and limited the background information about him that could be disclosed. The court balanced the competing interests and

determined that the need to know the police officer's true identity was outweighed by the danger to El Salvadorans who testify against MS-13 and the threat that the officer's investigative work would lead to retaliation against him. *See United States v. Machado-Erazo*, 951 F. Supp. 2d 148, 155-156 (D.D.C. 2013); *see also Ramos-Cruz*, 667 F.3d at 500-01 (same); *Gutierrez de Lopez*, 761 F.3d at 1146 (finding failure to identify concrete threat harmless because defendant confronted the confidential informant before the jury and was provided with impeachment material).

In other terrorism cases the Government has flagged similar concerns and courts have granted similar relief. In a prosecution alleging material support to al-Qaeda and conspiracy to provide material support, the Government requested that six MI-5 officers from the United Kingdom testify solely using numbers rather than names, and that they appear in light disguise. Like the FBI UC here, the MI-5 officers operated covertly and were continuing to work on sensitive national security matters. The court approved, finding that disclosure of their identities would compromise their safety and the integrity of ongoing investigations. The court further noted the government's submission showing that terrorist organizations such as al-Qaeda seek out the true identities of MI-5 agents and view them as attractive targets. *United States v. Naseer*, No. 10 CR 19(S-4) (RJD), 2015 WL 13843166 (E.D.N.Y Jan. 26, 2015).

Nor will the defense suffer any prejudice from an order allowing the FBI UC to testify under the name he used with the defendant. The government will provide the defense with any *Giglio* materials, and "nothing about the Agent's real name goes

to the Agent's credibility or knowledge regarding the subject of the Agent's testimony. *United States v. Hernandez*, No. S1 12 Cr. 809 (PKC)., 2013 WL 3936185 (S.D.N.Y. Jul. 29, 2013) (permitting undercover agent to testify under a pseudonym in a courtroom closed to the public except for the defendant's girlfriend). And the conversations between the FBI UC and the defendant were all recorded and have been provided to the defense. It is clear that there exists "substantial reason" to apply the relevant, requested protective measures (a pseudonym and a partially closed courtroom) in connection with the testimony of the FBI UC. *See Atkinson*, 2022 WL 2383867, at *3 (quoting *Cervantes*, 706 F.3d at 611-12).

### D. FBI Linguists

The government intends to call one or two FBI Arabic language linguists to attest to the accurate translations of Arabic language voice calls and documents. Due to the sensitivity of the matter, withholding public disclosure of the linguists' last names provides the best protection for these linguists and their families. The Government is not requesting other protective measures for the linguists, and because their names are not classified, the Government will share their true names with defense counsel pursuant to protective order.[12] *See Mohamed*, 727 F.3d at 838 (finding that linguist's use of a pseudonym did not deny the defendant the opportunity to effectively conduct cross-examination). Defendants are not prejudiced by this modest request, as they will have their names and can investigate them, and because their

[12] The Government has already noticed one linguist as an expert witness and provided defense counsel with his full name and curriculum vitae. [Doc. 94].

role as interpreters makes their names "a mere curiosity, possessing no constitutional significance." *Siegfriedt*, 982 F.2d at 18.

## CONCLUSION

For all the foregoing reasons, the Court should grant the government's motion for protective measures for each of the Protected Witnesses.

Date: Sept. 15, 2026

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: */s/ Elizabeth J. Shapiro*

ZACHARY A. KELLER
JOHN W. NICKEL
U.S. Attorney's Office – WDLA
Special Bar No. 803262 (Keller)
LA Bar No. 37819 (Nickel)
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Tel: (337) 262-6618
Email: Zachary.keller@usdoj.gov

ELIZABETH J. SHAPIRO
D.C. Bar No. 418925
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-5302
Email: Elizabeth.Shapiro@usdoj.gov

D. ANDREW SIGLER
Ala. Bar No. 5175-I72D
Trial Attorney, Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: 202-514-0849
Email: Andrew.sigler@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 15, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Zachary A. Keller*
Zachary A. Keller
United States Attorney