UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

# DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO ADMIT BATTLEFIELD EVIDENCE

[Page intentionally left blank]

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT IN OPPOSITION .......... 3

A. The Confrontation Clause bars admission of Exhibits 1, 2, 3, and 4 as to Mr. Al-Muhtadi .......... 3

1. Exhibits 1, 2, 3, and 4 are testimonial .......... 4

2. Avi cannot satisfy the Confrontation Clause through surrogate testimony .......... 7

B. The exhibits cannot be authenticated under Federal Rule of Evidence 901 .......... 11

C. Exhibits 1 through 6 do not qualify as non-hearsay co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) .......... 15

1. The conspiracy charged is the conspiracy on or about October 7, 2023; every proffered exhibit predates it .......... 16

2. The government has identified the Joint Operations Room as the predicate alleged joint venture; two of the proffered exhibits still fall outside its temporal scope .......... 17

3. Even within the alleged joint venture, the exhibits do not advance the conspiracy .......... 17

4. The government has not proven declarant membership in the alleged joint venture .......... 20

D. The residual exception of Federal Rule of Evidence 807 cannot rescue the exhibits .......... 23

III. RESERVATION OF OBJECTIONS .......... 26

CERTIFICATE OF SERVICE .......... 27

# TABLE OF AUTHORITIES

CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987) .......... 15-16

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) .......... 7-10

*Crawford v. Washington*, 541 U.S. 36 (2004) .......... 3-4, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 26

*Davis v. Washington*, 547 U.S. 813 (2006) .......... 4

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) .......... 4, 6

*Ohio v. Roberts*, 448 U.S. 56 (1980) .......... 3

*Smith v. Arizona*, 602 U.S. 779 (2024) .......... 11

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) .......... 14-15

*United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005) .......... 13

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) .......... 9-10, 16, 20, 23-24, 26

*United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011) .......... 11, 15

*United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022) .......... 19, 21-22

*United States v. Okulaja*, 21 F.4th 338 (5th Cir. 2021) .......... 11

*United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000) .......... 15, 26

*United States v. Postal*, 589 F.2d 862 (5th Cir. 1979) .......... 16-17

*United States v. Saimiento-Rozo*, 676 F.2d 146 (5th Cir. 1982) .......... 16

*United States v. Snyder*, 930 F.2d 1090 (5th Cir. 1991) .......... 17

*United States v. Solis*, 299 F.3d 420 (5th Cir. 2002) .......... 15

*United States v. Sudeen*, 434 F.3d 384 (5th Cir. 2005) .......... 16

*United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009) .......... 11-14

*United States v. Walker*, 410 F.3d 754 (5th Cir. 2005) .......... 25-26

### CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. VI ........................................................ 2-3, 5, 7-8, 15, 26

### STATUTES

18 U.S.C. § 2339B ........................................................ 16, 19, 21

Immigration and Nationality Act § 219 ........................................................ 16

### RULES

FED. R. EVID. 403 ........................................................ 26

FED. R. EVID. 702 ........................................................ 26

FED. R. EVID. 705 ........................................................ 26

FED. R. EVID. 801(d)(2)(E) ........................................................ 15-17

FED. R. EVID. 803(6) ........................................................ 7

FED. R. EVID. 803(8) ........................................................ 7

FED. R. EVID. 807 ........................................................ 23, 25-26

FED. R. EVID. 807(a)(1) ........................................................ 25

FED. R. EVID. 901 ........................................................ 11

FED. R. EVID. 901(a) ........................................................ 11, 14

### OTHER AUTHORITIES

FED. R. EVID. 807 advisory committee's note to 2019 amendment ........................... 25

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

**DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO ADMIT BATTLEFIELD EVIDENCE**

NOW INTO COURT, through undersigned counsel, comes the defendant, Mahmoud Al-Muhtadi, who files this opposition to the government's motion in limine to admit battlefield evidence.

## I. Introduction

The government has filed a memorandum in support of admitting six documents allegedly recovered by the Israeli Defense Forces from devices seized from the theater of war in Gaza. Four of those documents purport to identify Mr. Al-Muhtadi by name, by birth date, and by Palestinian ID number. The government asserts that they are formal investigative reports prepared by Hamas internal-security officers whose identities are unknown, addressed to senior Hamas commanders, and conveying the writers' findings about who did what and what should be done about it. The government proposes to put those documents in front of

the jury through the testimony of an anonymous Israeli intelligence officer, identified only as "Avi," who did not seize them, did not scan them, did not translate them, and did not read them in the original language. The government's memorandum does not address the Confrontation Clause once.

The superseding indictment charges that Mahmoud Al-Muhtadi, who everyone agrees is not and has never been a member of Hamas, conspired to provide material support to Hamas on or about October 7, 2023, and that he made false statements in connection with his application for a United States visa in 2024. The government does not allege that he personally harmed anyone. Five of the six exhibits the government proposes to introduce predate the conspiracy charged in the indictment by years, and the government gives no date for the sixth beyond the year its file was saved. The government can certainly try to prove the charges in the indictment. As explained below, the Sixth Amendment, the Federal Rules of Evidence, and the controlling decisions of this Circuit limit how it may do so.

The Confrontation Clause omission is the heart of the matter. The government cannot supply through Avi the cross-examination the Constitution guarantees of the unknown Hamas internal-security officer who supposedly wrote "Mahmud Amin Al-Muhtadi … active operative in the military wing of the Democratic Front." The hearsay rules and the authentication rules supply parallel, sufficient grounds for exclusion. The Sixth Amendment supplies an independent and dispositive ground. The motion should be denied.

## II. Argument in opposition

### A. The Confrontation Clause bars admission of Exhibits 1, 2, 3, and 4 as to Mr. Al-Muhtadi

The Confrontation Clause was directed against a specific historical practice: the use of *ex parte* examinations and dossiers compiled by investigators about specific individuals as evidence in later proceedings against those individuals. *Crawford v. Washington*, 541 U.S. 36, 50 (2004). The "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* That history shapes everything that has followed. *Crawford* rejected the "particularized guarantees of trustworthiness" framework that had developed under *Ohio v. Roberts*, 448 U.S. 56 (1980), because that framework "admits statements that [do] consist of ex parte testimony upon a mere finding of reliability," reproducing the civil-law practice the Clause forbids. *Crawford*, 541 U.S. at 60-69.

The rule that follows is straightforward. Out-of-court testimonial statements are barred from admission against the accused unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine. *Id.* at 53-54. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. The reliability of the statement, the credentials of the declarant, the corroborating evidence available to the trier of fact: none of those is a substitute for confrontation. *Id.* The four exhibits that name Mr. Al-Muhtadi are

testimonial. The government has not identified or made available the unknown declarants who authored them, and the government cannot satisfy the Clause through Avi's surrogate testimony.

### 1. Exhibits 1, 2, 3, and 4 are testimonial

A statement is testimonial when it is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact," *Crawford*, 541 U.S. at 51, or, as the Supreme Court has more recently put it, when it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009). The "core class of testimonial statements" includes "extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" and statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52. The Supreme Court has framed the inquiry around the "primary purpose" of the statement. *See Davis v. Washington*, 547 U.S. 813, 822 (2006).

Exhibits 2 and 3 are precisely that. Exhibit 2 is captioned "Intelligence report regarding Faraj 'Asaliya" and is addressed by name and title to "Colonel Abu Muhammad" of Hamas internal security. Gov't Memo at 4. The report describes a February 10, 2020, mortar incident, identifies suspects, and lists the "measures … taken in response" by Hamas. Exhibit 3 is addressed to "Brigadier General Abu

Yassir Al-Masri" and recites that, "[a]fter investigating the matter, it turned out that the Democratic Front was the entity that carried out the mortar firing." Gov't Memo at 9. It identifies five participants by photograph, date of birth, and Palestinian ID number, including the line, "The aforementioned is an active operative in the military wing of the Democratic Front," next to what is purported to be Mr. Al-Muhtadi's biographical information. Gov't Memo at 10-11.

That is the form and the function of an investigative report. The investigative purpose is expressly stated. The named recipients are senior commanders in a position to act. The identification of suspects is precise and individualized. Hamas internal-security officers, who the government's expert says were "gathering and collecting facts for Hamas's internal use that allow Hamas to exercise and maintain its authority," Expert Discl. at 12, would have understood that the documents would be used to make decisions affecting the liberty and safety of the persons named. The Confrontation Clause protects against precisely that kind of one-way accusation.

The reports are more than investigative summaries. They are summaries of statements taken from men held by the investigating agency. Exhibit 2 recites that Faraj 'Asaliya "came to our office on Thursday 02/20/2020, and he gave a full statement regarding his violation of the national consensus." Exhibit 3 sets out a personal data form for each of five men, each followed by a heading announcing a summary of that man's statement, and records under the heading "Arrests" the entry "Internal Security" for three of them, including Mr. Al-Muhtadi. The report closes by

stating that the men "were transferred to central custody and then they were received by the Democratic Front after coordination and their release." Statements taken by an armed faction's security service from men in its custody sit at the center of what the Clause forbids.

Exhibit 4 is the same. It is a formal letter on official letterhead reading "National Resistance Brigades / The Army Wing of the Democratic Front for the Liberation of Palestine," addressed to a senior Hamas officer identified by name and title. It identifies Mr. Al-Muhtadi by name as the person who handed over five weapons, identifies each weapon by serial number, and reports that DFLP "punished the comrade and taken the necessary organizational measures against him." Gov't Memo at 13-14. The form, content, and named recipient establish that the document was written to be acted on by its named addressee. *See Melendez-Diaz*, 557 U.S. at 317-18 (rejecting the argument that affidavits recording "neutral, scientific testing" are non-testimonial).

Exhibit 1, the spreadsheet that purports to show Mr. Al-Muhtadi as part of the "Democratic Front," is part of the same internal-security record-keeping function. The government's expert will testify that the spreadsheet was found on a Hamas internal-security laptop with "thousands of other documents about Palestinian organizations, entities, individuals, and factions" and that Hamas keeps such lists "as part of its efforts to track and control these groups." Gov't Memo at 19. A formal record of names, affiliations, and identifying information compiled by an internal-

security apparatus to track and control persons is the modern analog of the dossier that historically motivated the Confrontation Clause. *See Crawford*, 541 U.S. at 50, 52 (the Confrontation Clause was directed against the dossier-and-affidavit practices of the civil-law inquisitorial tradition).

The government's own description of how Exhibit 1 was created confirms its investigative character. The expert will testify that Hamas built such lists "through interviews and other investigative or intelligence activities." Expert Discl. at 12. That is investigation. It is not contemporaneously dictated business activity of the kind a court has historically been willing to admit without confrontation under Rules 803(6) and 803(8).

**2. Avi cannot satisfy the Confrontation Clause through surrogate testimony**

The government's motion proposes to admit each of the six exhibits through Avi. Gov't Memo at 17-22. Avi "will testify" to a long list of foundational facts about each document: when and where each device was seized, who at AMSHAT processed each device, what the device's file structure shows, who at Hamas appears to have used each device, and what each document means. *Id.*[1] Avi did none of those things. *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), holds that surrogate testimony of that order does not satisfy the Confrontation Clause. *Id.* at 661-63. In *Bullcoming*, the prosecution offered a forensic blood-alcohol report through a second analyst who

[1] The government has not produced any of these things to the defense despite its requests and a motion to compel.

had not performed or observed the testing. The Supreme Court held that "surrogate testimony of the kind [the second analyst] was equipped to give could not convey what [the certifying analyst] knew or observed about the events he certified, nor expose any lapses or lies on [the certifying analyst's] part." *Id.* at 661-62. The Confrontation Clause demands cross-examination of the declarant who made the testimonial statement, not of a generally knowledgeable substitute. *Id.* at 663.

Avi is, by his own description in the expert disclosure, a substitute on every link in the chain that produced these documents. The government has not identified, and has not made available to the defense, any of the actual witnesses whose statements underlie what Avi will testify to. The government has not identified or made available the seizing units; the expert disclosure says only that "a combat unit" enters a location to clear threats and then gives each seized item "an initial mark for tracking purposes." Expert Discl. at 8. The government has not identified or made available the AMSHAT analysts who scanned and catalogued the devices; the expert disclosure describes "AMSHAT" in general terms only. Expert Discl. at 8-9. The government has not identified or made available the Hamas internal-security officers who authored the documents; the motion concedes that "[s]ome of the specific authors of the documents are not known." Gov't Memo at 28. The cross-references to other databases that, on the government's account, validate the identifying details in Exhibits 2 and 3 are not in evidence and have not been produced. Gov't Memo at 20.

Cross-examining Avi would tell Mr. Al-Muhtadi nothing about whether the

unknown Hamas officer who wrote "active operative in the military wing of the Democratic Front" next to a photograph of him had any reliable basis for that identification. *Bullcoming*, 564 U.S. at 661-62. It would tell him nothing about whether the unknown AMSHAT analyst altered the file path metadata Avi will rely upon, or whether the unidentified seizing unit removed the device from where Avi says it was located.

The government's motion relies on this Circuit's decision in *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011), as authority for allowing Avi to play both expert and authentication roles for foreign-organization documents seized on the battlefield. *El-Mezain* does not support that proposition; it does the opposite. The case is a careful study in division of labor between two witnesses, neither of whom did what the government is asking Avi to do here.

In *El-Mezain*, the prosecution called two Israeli witnesses under pseudonyms. The first, "Avi" (the same witness here), was a "legal advisor for the Israeli Security Agency" who "testified as an expert witness about Hamas financing and control of the zakat committees." 664 F.3d at 485. He was an expert; he was not a fact witness, and he did not authenticate seized documents. The second witness, "Major Lior," was "employed by the Israeli Defense Forces" and "testified as a fact witness to authenticate documents that IDF had seized during a military operation known as Operation Defensive Shield." *Id.* at 485-86. Major Lior, not Avi, was the authentication witness for the IDF-seized documents. The Elbarasse and Ashqar

documents (a separate category not seized by IDF) were authenticated through the FBI agents who executed the search warrants at the homes of the unindicted co-conspirators. *Id.* at 489. The substantive context for those documents was provided by Mohamed Shorbagi, a former HLF representative who had pleaded guilty in a separate case and testified to the inner workings of the Palestine Committee from his own personal knowledge. *Id.* at 489-90. At no point did *El-Mezain* approve a single Israeli witness performing both the expert and the fact-authentication function for foreign-organization documents seized on the battlefield.

The government in this case is asking Avi to do both. Under the expert disclosure he is to testify as an expert about Hamas record-keeping practices, organizational structures, and the meaning of the documents' contents. Expert Discl. at 1-7. He is also to testify as the fact witness who authenticates each exhibit, identifies the device on which each exhibit was found, and vouches for AMSHAT's cataloging procedures. *Id.* at 8-13. He is to do this, on the expert disclosure, without having seized any of the documents, scanned them, translated them, or even read them in the original language. *Id.* at 2, 8-9. *Bullcoming* is the controlling decision on the point. *Bullcoming* made the surrogacy bar explicit: even where the testifying witness is qualified in general terms, surrogate testimony cannot convey what the absent declarant knew, observed, or might have lied about. *Bullcoming*, 564 U.S. at 661-63. That bar applies whether the substitute witness is characterized as a fact witness or as an expert.

*Smith v. Arizona*, 602 U.S. 779 (2024), closes the remaining route. Avi's authentication opinion rests on what the seizing unit did, what AMSHAT did, and what other Israeli databases show. He observed none of it, and none of it is in evidence. Those absent statements support his opinion only if they are true. The Supreme Court held that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795. Calling Avi's account of the collection chain the basis of his opinion rather than proof of the facts it recites does not change what it is.

### B. The exhibits cannot be authenticated under Federal Rule of Evidence 901

Federal Rule of Evidence 901(a) requires the proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." The standard is forgiving, *United States v. Okulaja*, 21 F.4th 338, 344-45 (5th Cir. 2021), but it is not absent. The proponent still must come forward with foundation testimony from someone with knowledge, or with circumstantial evidence specific enough to permit a reasonable inference that the document is what it is claimed to be. *Id.*; *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011).

The closest factual analog in the federal courts is *United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009), where the government sought to admit Bosnian Serb military records seized during a NATO operation. The Fourth Circuit affirmed admission on a foundation that had three concrete components.

*First*, the records were seized at a known military headquarters that was still in operation. The opinion explains that the documents "were discovered in a place where they would be expected to be found — the Zvornik Brigade headquarters that was still functioning at the time of the search." *Vidacak*, 553 F.3d at 351. *Second*, the records bore unique indexing numbers that made them traceable as records of the brigade dating to the period of the offense conduct. *Id.* (the records "bore unique indexing numbers that rendered them readily identifiable as VRS records that dated to the period of the Bosnian Civil War"). *Third*, the brigade that authored the records had a vested institutional interest in keeping them accurate; the records were used internally for accountability and benefits. *Id.* (the brigade, "like most military entities, had a vested interest in keeping records on its soldiers for accountability purposes and to determine eligibility for benefits").

The government here cannot meet that bar on any of the three. First, the exhibits were not seized at any Hamas headquarters. They were seized in the theater of war at hospitals (Al-Rantisi and Shifa) where Hamas was supposedly storing devices after October 7. Gov't Memo at 19-21. The government does not identify which Hamas internal-security office, if any, produced any of the documents. Second, the exhibits do not bear internal Hamas indexing numbers connecting them to any specific Hamas office or any specific date of authorship. Third, the government has not offered evidence that any specific Hamas office had a duty to record information accurately for any internal-accountability or benefits purpose. The closest the

government comes is the general assertion that internal-security investigative documents are "generally reliable because they are gathering and collecting facts for Hamas's internal use." Expert Discl. at 12. That is not the accountability-and-benefits foundation *Vidacak* required. Also, Mr. Al-Muhtadi is not a soldier in Hamas (the record keeping authority here). *Compare with Vidacak*, 553 F.3d at 351 (the defendant was a soldier in the Zvornik Brigade, the entity that created the documents).

*United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005), tells the same story. There, Iraqi Intelligence Service files were authenticated by a former IIS employee who recognized the handwriting, codes, abbreviations, and signatures on the documents and testified that IIS officers had a duty to record information accurately. *Id.* at 575-77. The government has no comparable witness here. Avi has never worked for Hamas, recognizes no one's handwriting, identifies no specific signatures, and cannot speak to any internal Hamas duty to record accurately.

The authentication problem is not abstract. The exhibits themselves show why the foundation the government offers is inadequate.

Exhibit 1 illustrates the problem. The government filed three pages and describes them as a list of DFLP members. The native file it produced in discovery has 19,993 data rows and 26 columns, and every row records the same payment amount, one hundred dollars. The columns cover name, identity number, governorate, city, neighborhood, mobile number, amount, four agency-employee fields

including date of death, five fields belonging to a program the file calls National Program 4-2018 covering form stage, kinship, and home ownership, five government-employee fields including salary class and employment-stop reason, and a life-status field. Not one column records organizational membership. One English-language header reads "Test_idno."

The words "Democratic Front" appear as to Mr. Al-Muhtadi in one place, the column headed "City." But that same column otherwise holds Gaza place names for most other persons listed. A hundred-dollar payment roster in which a faction name appears in a city field is not a membership list, and Rule 901(a) asks whether the item is what the proponent claims it is.

The English text the government has filed presents its own authentication problem. Each of Exhibits 2 and 3 contain separate English renderings. In Exhibit 3 the sentence that assigns responsibility reads, "specifically by the so-called Faraj 'Asaliya (Democratic Front-without-Good-Good)."

Exhibits 5 and 6 are undated, carry no author identifier, and bear no metadata visible on the face of the document. Exhibit 5 is a satellite map; Exhibit 6 is a photograph of a small dome-topped structure in a field. Nothing on the face of either exhibit identifies the location, the date, or the photographer. *Vidacak* required document-specific provenance. The government has none.

Foreign-organization possession is not authentication. *United States v. Doyle*, 130 F.3d 523, 545-47 (2d Cir. 1997), rejected the proposition that privately-generated

records become authenticated merely because they were certified by a foreign agency as accurate copies of items in its possession. The Second Circuit explained that the "official does not need to attest to the truth or trustworthiness of the facts contained in the document; accuracy of its content is the concern of other Federal Rules." *Id.* at 545-46. The Fifth Circuit has previously held authentication insufficient on a much shorter chain. In *United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011), the government attempted to authenticate a co-conspirator's notebooks through an investigating officer alone; the Fifth Circuit reversed, holding the authentication failure also defeated admission as a non-testimonial business record under the Confrontation Clause. 636 F.3d at 692-95. The chain here is longer, more attenuated, and less specific than the chain in *Jackson*.

### C. Exhibits 1 through 6 do not qualify as non-hearsay co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E)

The government must prove four predicate facts by a preponderance of the evidence to admit a statement under Federal Rule of Evidence 801(d)(2)(E): (1) a conspiracy existed; (2) the statement was made by a co-conspirator of the party-opponent; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. *United States v. Solis*, 299 F.3d 420, 443 (5th Cir. 2002); *United States v. Phillips*, 219 F.3d 404, 418 n.21 (5th Cir. 2000); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The government may rely on the contents of the proffered statement as part of the analysis, but it must also come forward with independent evidence of the predicate facts. *Bourjaily*,

483 U.S. at 181; *United States v. Sudeen*, 434 F.3d 384, 390 (5th Cir. 2005).

**1. The conspiracy charged is the conspiracy on or about October 7, 2023; every proffered exhibit predates it**

The superseding indictment charges Count 1 as occurring "on or about October 7, 2023." Doc. 60, at 2. Every proffered exhibit that bears a date predates that date. Exhibit 4 is dated January 29, 2017. Gov't Memo at 14. Exhibit 1, the government's expert will testify, is from a 2018 file. Gov't Memo at 31. Exhibits 2 and 3 are dated February 20 and February 24, 2020, respectively. Gov't Memo at 4, 8. Exhibits 5 and 6 bear no date; the government states that the file holding Exhibit 6 was saved to its device in 2011 and the file holding Exhibit 5 in 2023, without saying when in 2023. Gov't Memo at 31-32.[2]

That alone is grounds to exclude under the conspiracy charged in the indictment. The defense recognizes, however, that Rule 801(d)(2)(E) also permits admission of statements made in furtherance of a non-criminal joint venture of which the defendant was a part, even where that venture is not the conspiracy charged. *United States v. El-Mezain*, 664 F.3d 467, 502-04 (5th Cir. 2011); *United States v. Saimiento-Rozo*, 676 F.2d 146, 149 (5th Cir. 1982); *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979). The government invokes that doctrine in its motion,

[2] The DFLP was designated a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act in October 1997 and delisted in October 1999. Since then, the DFLP has been listed only as a Specially Designated Global Terrorist Organization by the Department of the Treasury. Compl. ¶ 17. The DFLP is therefore not a designated Foreign Terrorist Organization on the date of the conduct charged in the indictment. The charge under 18 U.S.C. § 2339B necessarily runs through Hamas, the only Foreign Terrorist Organization in this case.

identifying the "joint enterprise" it asks the Court to find as the predicate. Gov't Memo at 22-27. The alleged joint venture the government posits is addressed in Section II.C.2.

**2. The government has identified the Joint Operations Room as the predicate alleged joint venture; two of the proffered exhibits still fall outside its temporal scope**

The government argues that the predicate Rule 801(d)(2)(E) joint venture is the longstanding coordination among Hamas, the DFLP, the National Resistance Brigades, and other Gaza-based armed factions. Gov't Memo at 22-27. The complaint affidavit identifies the formal vehicle of that coordination as the Joint Operations Room, "created in 2018" to formalize coordination among the military wings of Hamas, the DFLP, and the Palestinian Islamic Jihad. Compl. ¶ 21. Even on the government's own framing, two of the proffered exhibits fall outside the temporal scope of that supposed joint venture. Exhibit 4 is dated January 29, 2017, before the Joint Operations Room was created. Gov't Memo at 14. The file holding Exhibit 6 was saved to its device in 2011. Gov't Memo at 32.

**3. Even within the alleged joint venture, the exhibits do not advance the conspiracy**

A statement is "in furtherance" of a conspiracy or joint venture only if it advances the ultimate objectives of that enterprise. *United States v. Snyder*, 930 F.2d 1090, 1095 (5th Cir. 1991). Mere relevance is not enough, and idle chatter or after-the-fact narrative does not qualify. *Id.* The government has not made the in-furtherance showing as to any of the six proffered exhibits.

Take Exhibit 4, which is a January 2017 letter in which DFLP itself reports to Hamas that DFLP has "punished the comrade and taken the necessary organizational measures against him" for an unauthorized weapons transfer. Gov't Memo at 13. A document in which one organization tells another that it has punished one of its own members for an unauthorized act is not in furtherance of any supposed joint venture between them. It is in furtherance of the writing organization's discipline of its own ranks. The letter further reports that the unauthorized transfer was for non-operational reasons (Mr. Al-Muhtadi supposedly handed five Kalashnikovs and a blank-firing pistol to a Hamas operative "in order to participate in his friend's party") and that DFLP's own General Directorate of Investigations seized the weapons. *Id.* On its face, the document is internal DFLP discipline.

Exhibits 2 and 3 are formal Hamas internal-security investigative reports about a 2020 mortar incident in which DFLP fighters fired mortars without Hamas's authorization, "contrary to the national consensus," and were investigated and named for the violation. Gov't Memo at 7-9. On their face, those documents reflect Hamas policing DFLP for acting *outside* the alleged joint venture. The government argues that the reports show Hamas "strictly enforces its authority" over its co-conspirators and so are themselves in furtherance of the joint enterprise to manage operational discipline. Gov't Memo at 32. That response collapses two distinct undertakings. The conspiracy charged is the conspiracy to provide material support to Hamas on or about October 7, 2023. The enterprise the government invokes to

defend Exhibits 2 and 3 is a separate, decades-long running enterprise to manage Gaza-based armed operations. A statement that documents an internal investigation of a co-venturer's departure from one set of rules is not in furtherance of a different conspiracy that began three years later. *Cf. United States v. Musaibli*, 42 F.4th 603, 617-18 (6th Cir. 2022) (statements made by an organization's adversary or by a person who has withdrawn from the conspiracy are not "in furtherance").

Exhibit 1 is, by the government's own description, a list of "families, individuals and organizations for the allocation of financial support." Gov't Memo at 19. Hamas governed Gaza from 2007 forward and served as the de facto governing authority over the territory at the time these records were created. Hamas's record-keeping about the persons and organizations residing within the territory it governed is the ordinary administrative function of a governing body, no more in furtherance of a § 2339B conspiracy than the records of any government's civil registry. The government argues that Hamas's record-keeping "asserts ultimate control over its partners," Gov't Memo at 32, and on that basis advances the conspiracy charged. But under that argument every record a governing authority keeps about anyone within its territory could be said to "assert control." That cannot be the in-furtherance test. *Musaibli*, 42 F.4th at 617-18. Governance of Gaza is not furtherance of a conspiracy to provide material support to Hamas in October 2023. The two undertakings are not the same.

Exhibits 5 and 6 do not name Mr. Al-Muhtadi at all. They are supposed

evidence of Hamas's targeting interests, and the government argues that they tie to Mr. Al-Muhtadi only because there is an October 7, 2023 phone call that referenced the "Malaka" region where the map and photograph might relate. Gov't Memo at 32-33. Even crediting that argument fully, these documents do not "advance the ultimate objectives" of any alleged joint venture involving Mr. Al-Muhtadi. They are evidence about Hamas.

**4. The government has not proven declarant membership in the alleged joint venture**

Five of the six exhibits are authored anonymously. The government concedes the point: "[s]ome of the specific authors of the documents are not known." Gov't Memo at 28. The government argues that anonymity is not fatal, citing *El-Mezain*, 664 F.3d at 505. Gov't Memo at 28-30. The government is correct that anonymity is not categorically fatal. *El-Mezain* permits anonymous statements to be admitted where "the facts and circumstances surrounding the making of the statement indicate that the speaker is a member of the conspiracy or joint venture." 664 F.3d at 505. The Fifth Circuit found the inference "inescapable" because the documents were of a kind unlikely to be in the hands of persons outside the Palestine Committee enterprise: bylaws, organizational charts, internal meeting agendas, and annual reports. *Id.* at 506-07. The exhibits here are not of that kind, and the government has not made the showing the rule requires.

Hamas's internal-security apparatus, as the government describes it, conducts investigations of persons and groups whose conduct is not coordinated with Hamas.

Gov't Memo at 19. The expert disclosure makes the point twice. Exhibit 1 was compiled "through interviews and other investigative or intelligence activities," Expert Discl. at 12, and Exhibits 2 and 3 are Hamas internal-security investigations of an unauthorized DFLP mortar firing that the reports themselves describe as "contrary to the national consensus." Gov't Memo at 7. The investigative character of the documents undermines the inference that the unknown authors were declaring within an alleged joint venture involving Mr. Al-Muhtadi. They were investigating actions *outside* of it.

The government's motion presses *Musaibli* as authority that anonymous battlefield documents are admissible in a § 2339B prosecution. Gov't Memo at 28-31. *Musaibli* does not stand for that proposition on the foundation the government has offered here. The Sixth Circuit reversed exclusion of ISIS records only because the government had presented a foundation there that the government cannot match here.

First, in *Musaibli*, the government called as a witness Abdelhamid Al-Madioum, "the administrator to whom Musaibli had complained about not receiving a marital stipend." 42 F.4th at 611. Al-Madioum was, in his own admitted role, an ISIS member: he "had been taken into custody by the United States, had pleaded guilty to providing material support to a foreign designated terrorist organization, and had since agreed to cooperate with the government." *Id.* During his time inside ISIS, Al-Madioum "served as a database administrator for the Tariq Bin Ziyad

battalion," and as part of his job "helped to collect and manage information about members of the battalion, including fighters' names, families' names, birthdates, ISIS-issued identification numbers, and the number of wives and children that they had." *Id.* He recognized specific entries in the proffered ISIS documents as belonging to Musaibli. *Id.* at 615-16. He had personally interacted with Musaibli inside the organization about a database entry that affected Musaibli's benefits. *Id.* Second, in *Musaibli*, the defendant had confessed to his own involvement with ISIS. *Id.* at 616. That inside-the-organization, inside-the-database testimony, paired with the defendant's own confession, is what supplied the "inescapable" inference. The government has neither feature here. It has no cooperating Hamas member who can recognize specific entries; it has no Hamas equivalent of Al-Madioum; it has no inside witness at all.

The exhibits themselves make the joint-venture inference even harder to draw. Exhibit 2 identifies Mr. Al-Muhtadi as "Mahmud Amin Ya'qub Al-Muhtadi" in its participant table and as "Mahmud Al-Muhtadi" when it describes his arrival, but in the single sentence describing what happened at the launching site it reports that "the aforementioned subject along with Muhammad al-Muhtadi and Mahmud 'Awadallah left the place." The English renderings the government filed read that way, and so does the copy produced at FBI-535745. The one sentence in the report that describes conduct at the site is the one sentence that does not use Mr. Al-Muhtadi's given name. The same narrative identifies a different person, "Mahmud

'Awadallah," as the operational leader rather than Mr. Al-Muhtadi.

The record supplies a different man by that name. The marriage contract in Mr. Al-Muhtadi's immigration file identifies the husband as "Mahmoud Amin Yacoub Almuhtadi" and the first witness as "Mohammed Amin Yacoub Almuhtadi — from Gaza." FBI-462932 through 463015. The complaint affidavit quotes a National Resistance Brigades form in which "Mahmud Amin Ya'qub Al-Muhtadi" states that he "received it from Comrade Mahmud Amin Al-Muhtadi." Compl. ¶ 31. The government's own affidavit treats the long and the short form of the name as two people, and Exhibit 3 uses the short form, and only the short form, throughout. A document set in which the supposed declarants cannot keep straight who they are talking about is not a document set from which the Court can draw the "inescapable" inference that *El-Mezain* requires.

### D. The residual exception of Federal Rule of Evidence 807 cannot rescue the exhibits

The government invokes Federal Rule of Evidence 807 as an alternative theory for the four exhibits that name Mr. Al-Muhtadi. Gov't Memo at 33-35. The Fifth Circuit has rejected this theory on materially identical facts.

In *El-Mezain*, the government sought to admit three documents seized by the Israeli military from the Palestinian Authority headquarters in Ramallah. 664 F.3d at 497-501. The government argued the documents were trustworthy because they were similar to public records produced by an entity with an interest in monitoring Hamas. *Id.* at 498-99. The Fifth Circuit rejected the theory. The court explained that

"[N]othing is known about the circumstances under which the documents were created, the duty of the authors to prepare such documents, the procedures and methods used to reach the stated conclusions, and, in the case of two of the documents, the identities of the authors." *Id.* at 500. "We know only that the PA documents were found in the possession of the PA." *Id.* Without further information, "we are faced with conclusory assertions amounting to classic hearsay and no facts from which to divine the documents' reliability." *Id.*

That description is the description of the exhibits here. The government does not know who wrote Exhibits 1, 2, 3, or 4. It does not know Hamas's record-keeping practices for documents of this kind, the duty under which those authors wrote, or the methods they used to reach the conclusions stated. The government claims to know only that the documents were found on devices Hamas was using. The internal inconsistencies in Exhibits 2 and 3 described in Section II.C.4 add a further trustworthiness problem: the documents do not agree among themselves about who participated in what.

Two features of Exhibit 3 make the point concrete. The report sets out a personal data form for Mr. Al-Muhtadi, then a heading announcing a summary of his statement, and then a single sentence: "The aforementioned is an active operative in the military wing of the Democratic Front." No statement follows, because the report records none. The identical sentence appears in the identical position beneath the form for Hani Nabil Azzam. In the second rendering the report lists all five men under

the heading "Summary of Participants' statements" with no text beneath any of them. The sentence the government quotes for the proposition that Mr. Al-Muhtadi belonged to the DFLP military wing is a form entry used twice.

The government's trustworthiness argument also rests on the premise that "no motive exists to fabricate such documents or to implicate al-Muhtadi in a criminal conspiracy." Gov't Memo at 35. Exhibit 2 reports that an official of the declarant's own organization "asked him to lie to the Internal Security Forces." Exhibit 3 reports that the men whose statements it summarizes were held in custody and released to the DFLP. A report that records on its face both the custodial setting in which the statements were taken and an instruction to lie to the agency taking them supplies no guarantee of trustworthiness.

The 2019 amendment to Rule 807 does not change the analysis. The amendment substituted "sufficient" for "equivalent" and authorized courts to consider "evidence, if any, corroborating the statement" as part of the totality of the circumstances. Fed. R. Evid. 807(a)(1); *id.* advisory committee's note to 2019 amendment. The advisory committee explained that the amendment was directed at the Circuits' disagreement over whether corroborating evidence could be considered, not at relaxing the proponent's burden to demonstrate trustworthiness from the totality of circumstances. *Id.* The Fifth Circuit articulated the "lodestar of the residual hearsay exception analysis" in *United States v. Walker*, 410 F.3d 754, 758 (5th Cir. 2005), and *Phillips*, 219 F.3d at 419 n.23, before the 2019 amendment:

trustworthiness is drawn from the circumstances of the statement's making, the exception is to be "used only rarely, in truly exceptional cases," and the proponent bears "a heavy burden to come forward with indicia of both trustworthiness and probative force." *Id.* The 2019 amendment runs alongside that lodestar; it does not displace it. The government cannot identify the authors of the exhibits. It cannot identify the duty under which they wrote. It cannot identify the methods they used. *El-Mezain* controls. Rule 807 does not apply.

**III. Reservation of objections**

The defendant expressly reserves the right to challenge admission of the proffered exhibits at trial on the grounds of (1) Federal Rule of Evidence 403, including unfair prejudice, based upon the development of the evidence and the record going forward; (2) Federal Rules of Evidence 702 and 705 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and (3) the use of a pseudonym for the witness identified as "Avi." This opposition is limited to the Confrontation Clause, hearsay, and authentication grounds raised in the government's motion.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
First Assistant / Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of Louisiana

102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 15, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

***s/ Dustin C. Talbot***