UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

# MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS THE PRODUCTS OF ISRAELI WARRANTLESS SURVEILLANCE

[Page intentionally left blank]

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 4

A. The Court may consider the public reporting on which the government's own disclosure relies ........ 4

B. Israel records and stores the telephone calls of millions of Palestinians without suspicion, without judicial authorization, and without limit ........ 4

C. Mr. Al-Muhtadi's lines in the archive ........ 5

D. The FBI's placement of agents inside the Israeli counterterrorism apparatus ........ 6

E. The June 2025 request and the selection of six calls ........ 7

F. The summary of the communications for which no audio was produced ........ 7

III. MR. AL-MUHTADI IS AMONG "THE PEOPLE" THE FOURTH AMENDMENT PROTECTS ........ 8

IV. THE JUNE 2025 RETRIEVAL WAS A SEARCH ATTRIBUTABLE TO THE UNITED STATES ........ 10

A. The governing standard ........ 10

B. Retrieving stored communications from an archive is a search in its own right ........ 11

C. The Israeli Security Agency acted as agent for the FBI in performing the retrieval ........ 12

D. American agents participated in the search by defining what would be selected ........ 13

E. The decisions denying joint venture on treaty requests do not govern an embedded relationship ........ 14

F. The arrangement accomplished what the Fourth Amendment forbids ........ 16

V. THE RETRIEVAL WAS UNREASONABLE, AND THE EXCLUSIONARY RULE REACHES IT ........ 17

VI. IN THE ALTERNATIVE, ISRAEL'S WARRANTLESS RECORDING OF AN ENTIRE CIVILIAN POPULATION'S TELEPHONE CALLS SHOCKS THE CONSCIENCE ................ 18

A. The shocks the conscience exception is an independent ground for suppression, and the decisions rejecting it addressed the treatment of individual suspects rather than the surveillance of a population ................ 18

B. Israel records the telephone calls of an entire civilian population and keeps them indefinitely in a searchable archive used to arrest, to detain, and to kill ................ 20

C. Suspicionless recording of an entire subject population, retained indefinitely and legally unreviewable, is different in kind from the foreign conduct the cases have tolerated ................ 21

VII. SUPPRESSION EXTENDS TO THE ISRAELI SUMMARY AND TO THE OTHER PRODUCTS OF THE SURVEILLANCE ................ 22

VIII. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING AND ORDER THE GOVERNMENT TO PRODUCE WITNESSES WITH FIRSTHAND KNOWLEDGE ................ 23

IX. CONCLUSION ................ 24

CERTIFICATE OF SERVICE ................ 25

## TABLE OF AUTHORITIES

CASES

*Alderman v. United States*, 394 U.S. 165 (1969) ........ 23

*Elkins v. United States*, 364 U.S. 206 (1960) ........ 14

*Lustig v. United States*, 338 U.S. 74 (1949) ........ 13

*Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) ........ 9

*Nardone v. United States*, 308 U.S. 338 (1939) ........ 22

*Rochin v. California*, 342 U.S. 165 (1952) ........ 18, 22

*Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) ........ 22

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157 (2d Cir. 2008) ........ 17

*United States v. Allen*, 864 F.3d 63 (2d Cir. 2017) ........ 14

*United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995) ........ 18

*United States v. Degollado*, 696 F. Supp. 1136 (S.D. Tex. 1988) ........ 19

*United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) ........ 14

*United States v. Gogic*, 808 F. Supp. 3d 416 (E.D.N.Y. 2025) ........ 16, 19

*United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983) ........ 23

*United States v. Hasbajrami*, 945 F.3d 641 (2d Cir. 2019) ........ 11

*United States v. Hawkins*, 661 F.2d 436 (5th Cir. Unit B 1981) .... 2, 10-11, 14, 16, 18

*United States v. Heller*, 625 F.2d 594 (5th Cir. 1980) ........ 11

*United States v. Marzook*, 435 F. Supp. 2d 708 (N.D. Ill. 2006) ........ 19, 24

*United States v. Omar*, 2012 WL 2277821 (D. Minn. June 18, 2012) ........ 14-15

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ........ 18

*United States v. Poe*, 462 F.2d 195 (5th Cir. 1972) ........ 23

*United States v. Rojas*, 812 F.3d 382 (5th Cir. 2016) ............ 9, 11

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ............ 8, 10

CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. IV ............ *passim*

RULES

FED. R. EVID. 104(a) ............ 4

OTHER AUTHORITIES

Yuval Abraham, *Microsoft storing Israeli intelligence trove used to attack Palestinians*, +972 Magazine (Aug. 6, 2025) ............ 5, 20

Harry Davies & Yuval Abraham, *'A million calls an hour': Israel relying on Microsoft cloud for expansive surveillance of Palestinians*, The Guardian (Aug. 6, 2025) ............ 4

Harry Davies & Yuval Abraham, *Revealed: Microsoft deepened ties with Israeli military to provide tech support during Gaza war*, The Guardian (Jan. 23, 2025) ............ 5

Brad Smith, *Update on ongoing Microsoft review*, Microsoft On the Issues (Sept. 25, 2025) ............ 5, 21

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS THE PRODUCTS OF ISRAELI WARRANTLESS SURVEILLANCE**

---

NOW INTO COURT comes the defendant, Mahmoud Al-Muhtadi, through undersigned counsel, who, for the reasons set forth below, respectfully moves the Court under the Fourth Amendment to suppress any recordings, summaries of his own communications, and the other products of Israeli warrantless surveillance.

## I. INTRODUCTION

The government intends to introduce six recorded telephone calls and an Israeli summary of at least six more communications for which no recording was produced. None of it came from a wiretap. No court authorized the interception, no probable cause preceded it, and Mr. Al-Muhtadi did not consent. All of it came out of a standing archive in which the State of Israel records the telephone traffic of Palestinians in bulk.

What turned that archive into proposed evidence happened in June 2025.

Having received Mr. Al-Muhtadi's name from Israel in May 2025, the Federal Bureau of Investigation asked the Israeli Security Agency for the calls it had saved of him. Listeners in the branch went into the archive, filtered it, and pulled six, and a branch manager reviewed them against a word-for-word Hebrew translation before release.

That request did not cross an arm's-length diplomatic channel. The Israeli National Bureau for Counter Terror Financing furnished the battlefield documents the government has noticed for trial, and employs the expert disclosed to authenticate them, who serves there as the Israeli Security Agency's representative. Beginning in March 2025, three months before the request, FBI agents have been *embedded inside* that Israeli intelligence Bureau.

The June 2025 retrieval is the constitutional event. In this circuit the Fourth Amendment applies to a foreign search where American officials participated in it or where the foreign authorities acted as agents for their American counterparts, or where the foreign conduct shocks the conscience of an American court. *United States v. Hawkins*, 661 F.2d 436, 455-56 (5th Cir. Unit B 1981). No Israeli investigation generated these recordings. An American request did, and a search of stored communications conducted without a warrant, without suspicion, and without judicial supervision anywhere is unreasonable by any measure applied to searches abroad.

The question that produces is largely unanswered in American law. The decisions construing the foreign-search exceptions address how a foreign service

treated a suspect it had already identified. None addresses what an American criminal court should do with evidence drawn from a foreign state's mass warrantless surveillance of a civilian population, retrieved at the request of American agents working *inside* that state's counterterrorism apparatus. The answer should be that the Fourth Amendment reaches the retrieval and that the product of such a program has no place in an American federal criminal trial.

The collection that made the selection possible is no ordinary foreign wiretap. It is a program of recording an entire civilian population's telephone calls, without warrant, without suspicion, and without limit, on a decision described from inside the unit as a choice to start "tracking everyone, all the time." The government has told this Court that the audio sat in the cloud storage Microsoft disabled in September 2025 after Microsoft concluded it would not "provide technology to facilitate mass surveillance of civilians."

Mr. Al-Muhtadi asks the Court to suppress the six recordings, the Israeli summary of his October 7, 2023 communications transmitted with the August 3, 2026 discovery letter, every derivative translation, transcription, or account of them, any testimony describing their contents, and all other evidence derived from the surveillance. He further asks for an evidentiary hearing and an order requiring the government to produce witnesses with firsthand knowledge of the program and of the June 2025 search.

## II. BACKGROUND

### A. The Court may consider the public reporting on which the government's own disclosure relies

Part of what follows rests on published investigative reporting. It is properly before the Court because the government's own disclosure invokes public reporting, and because on a preliminary question of admissibility the Court "is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). The August 3, 2026 discovery letter states that "[t]he Israeli government does not have the underlying audio calls from the telephone line ending in 8708," because "[a]s widely reported in the media, in September 2025 Microsoft disabled access to the cloud storage where the phone calls were held." (Defense Exhibit 2). That is the government's own representation that these calls were held in the storage Microsoft disabled.

### B. Israel records and stores the telephone calls of millions of Palestinians without suspicion, without judicial authorization, and without limit

A joint investigation by *The Guardian*, +972 Magazine, and *Local Call* reported that Unit 8200, the Israeli military's signals intelligence service, "has transferred audio files of millions of calls by Palestinians in the occupied territories onto Microsoft's cloud computing platform, Azure, operationalizing what is likely one of the world's largest and most intrusive collections of surveillance data over a single population group."[1] Section VI.B sets out what the reporting establishes.

[1] The joint investigation was published in three places, each last accessed September 15, 2026: Harry Davies & Yuval Abraham, *'A million calls an hour': Israel relying on Microsoft cloud for expansive surveillance of Palestinians*, The Guardian (Aug. 6, 2025),

Microsoft reviewed its own role and, on September 25, 2025, terminated the unit's access to the specified cloud storage. Smith, *supra* note 1. That termination is the event the government's letter invokes to explain why the audio of six of the twelve described communications no longer exists. The reporting concerns a military signals intelligence unit; the service that held and searched these calls was the Israeli Security Agency; which Israeli component operated the storage has not been disclosed; and neither has the physical location of the servers that held his calls. The link between the reporting and this case is the government's own account of where these calls were held and why they are gone.

### C. Mr. Al-Muhtadi's lines in the archive

What the reporting describes in general, the discovery describes as to Mr. Al-Muhtadi in particular. The government has produced an FBI report of the interview of the Israeli Security Agency branch manager who approved the six recordings. (Defense Exhibit 1 [2]). That document establishes that Israel was monitoring his telephone lines as early as August 2023, more than a month before

---

https://www.theguardian.com/world/2025/aug/06/microsoft-israeli-military-palestinian-phone-calls-cloud; Yuval Abraham, *Microsoft storing Israeli intelligence trove used to attack Palestinians*, +972 Magazine (Aug. 6, 2025), https://www.972mag.com/microsoft-8200-intelligence-surveillance-cloud-azure/; and, for the earlier reporting on the same collaboration, Harry Davies & Yuval Abraham, *Revealed: Microsoft deepened ties with Israeli military to provide tech support during Gaza war*, The Guardian (Jan. 23, 2025), https://www.theguardian.com/world/2025/jan/23/israeli-military-gaza-war-microsoft.

The quotations in this memorandum are taken from the +972 Magazine version, cited below as Abraham, supra note 1. The Microsoft statement is Brad Smith, *Update on ongoing Microsoft review*, Microsoft On the Issues (Sept. 25, 2025), https://blogs.microsoft.com/on-the-issues/2025/09/25/update-on-ongoing-microsoft-review/ (last accessed Sept. 15, 2026), cited below as Smith, supra note 1.

[2] Exhibits to this motion are filed under seal

October 7; that there were a combined fifty records across both lines on October 7 alone; and that the branch listeners filtered the calls and provided six for accuracy review. *Id.* One of the two lines is the number the complaint affidavit identifies as listed for a business Mr. Al-Muhtadi operated in Gaza. (Doc. 1-1 at 28 ¶ 46). Nothing suggests that any warrant, court order, or individualized finding preceded the monitoring, and Israel did not give his name to the United States until May 2025, nearly two years later. (Doc. 1-1 at 16 ¶ 28).

### D. The FBI's placement of agents inside the Israeli counterterrorism apparatus

The relationship between the FBI and the Israeli agencies that supplied the evidence here is not the arm's-length relationship of two governments trading treaty requests. Beginning in March 2025, FBI agents have been embedded inside the Israeli National Bureau for Counter Terror Financing (NBCTF). They are not legal attachés at the United States Embassy, and they are not liaison officers transmitting requests from outside an Israeli agency. They work from within one. The FBI agent who testified at the August 4, 2026 hearing confirmed that at least one FBI agent was embedded within the NBCTF by March 2025.[3] No reported decision addresses a foreign search obtained through such a relationship.

The NBCTF is not a bystander to this prosecution. It is the source of the documents the government intends to introduce, described as "found on HAMAS

[3] Counsel has ordered a transcript of the August 4, 2026 hearing. It had not been received at the time of this filing.

devices seized by Israeli Defense forces in Gaza," (Doc. 45-1 at 16), and it employs the expert noticed to authenticate them, who directs its Research and Assessment Division and holds that post "as the representative for the Israeli Security Agency." (Doc. 45-1 at 3); (Doc. 46 at 1-2). The Israeli Security Agency is the same service that held Mr. Al-Muhtadi's recorded calls and selected the six the government produced.

**E. The June 2025 request and the selection of six calls**

In May 2025 the Government of Israel provided the United States with Mr. Al-Muhtadi's name and alleged affiliation. (Doc. 1-1 at 16 ¶ 28). In June 2025 the FBI asked the Israeli Security Agency for the telephone calls it had saved of him. (Defense Exhibit 1). Listeners in the branch filtered the saved calls and selected six, and the branch manager ensured the audio matched the word-for-word Hebrew translation before approving them. *Id.* The six produced recordings are the calls at 08:12, 08:42, 08:55, 09:07, 09:10, and 09:33 on October 7, 2023, precisely the six the government quoted in its complaint affidavit. On May 13, 2026, FBI agents interviewed the branch manager at the Israeli Ministry of Justice in Jerusalem, with Department of Justice attorneys and Ministry representatives present. *Id.*

**F. The summary of the communications for which no audio was produced**

The tenth supplemental discovery letter of August 3, 2026, transmits what the government calls a verbatim summary, furnished by the Israeli government, of Mr. Al-Muhtadi's communications on October 7, 2023, across both lines: 03:08, 08:12, 08:38, 08:42, 08:46, 08:55, 09:07, 09:10, 09:30, 09:33, 10:00, and 18:18. Six recordings

were produced. At least six of the described communications therefore exist in this case only as an Israeli narrative without the audio. The letter states that "[t]he audio calls that have been produced, and the summaries above, are the entirety of what exists for Al-Muhtadi's communications for October 7, 2023." No declaration, certification, or witness supports it.

## III. Mr. Al-Muhtadi is among "the people" the Fourth Amendment protects

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990), decided "whether the Fourth Amendment applies to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country," and held that it does not. The holding rests on membership rather than geography alone. "[T]he people" is "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," *id.* at 265, and aliens receive the Amendment's protections "when they have come within the territory of the United States and developed substantial connections with this country," *id.* at 271.

Situs figured in the result, but it was not the defect that decided the case. The defendant in *Verdugo-Urquidez* was in custody in San Diego when the DEA searched his Mexican residences, and his presence did not help him because it was "lawful but involuntary" and so "not of the sort to indicate any substantial connection with our country." *Id.* What he lacked was "previous significant voluntary connection with the United States." *Id.*

Mr. Al-Muhtadi has what the respondent lacked. He entered on an immigrant visa on September 12, 2024, settled in Tulsa, Oklahoma, and held an Oklahoma driver's license. (Doc. 1-1 at 40-41 ¶¶ 77, 79). In early June 2025, the month of the request, FBI agents located him in Lafayette, Louisiana, residing there and working at a local restaurant. (Doc. 1-1 at 43 ¶ 82). He had lived here voluntarily for nine months when his communications were searched. In *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006), the Fifth Circuit held that "the nature and duration of Martinez-Aguero's contacts with the United States . . . are sufficient to confer Fourth Amendment rights," where the plaintiff crossed the border monthly to accompany her aunt to a Social Security office. Nine months of lawful residence is a greater connection.

*United States v. Rojas*, 812 F.3d 382 (5th Cir. 2016), does not hold otherwise. Its defendants were foreign nationals living abroad when the Colombian National Police recorded their calls, and they were brought to this country only for prosecution. *Id.* at 396-98. The court held that "[n]or is it relevant that the defendants are invoking Fourth Amendment protections in the United States with respect to their prosecution here," because "a violation of the [Fourth] Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion." *Id.* at 398. Mr. Al-Muhtadi does not rest on his presence in custody or at trial. He rests on his voluntary residence here in June 2025, when the search occurred, and the retrieval is an event the Fourth Amendment treats as its own. See *infra* section IV.B.

In the alternative, the record does not establish that the June 2025 search was foreign at all. The government has not disclosed where the servers holding these calls were located, and its own explanation for the missing audio is that they were held in commercial cloud storage operated by Microsoft. If that storage was in the United States, American agents obtained a search of a resident's stored communications, held on a server in this country, without a warrant, and *Verdugo-Urquidez* does not speak to it. Where the archive physically sat is a fact within the government's reach and not within Mr. Al-Muhtadi's, and the hearing should establish it.

The search was in any event not wholly foreign. The request that defined it was made in the United States, the criteria governing the selection were fixed by what an American prosecution would need, and the product crossed into this country to the agents who asked for it. *Verdugo-Urquidez* addressed a search executed abroad on property that had never had any connection to this country. A search set in motion from the United States, conducted to answer an American request, and delivered here for use against a resident is not that event.

## IV. THE JUNE 2025 RETRIEVAL WAS A SEARCH ATTRIBUTABLE TO THE UNITED STATES

### A. The governing standard

The Fifth Circuit stated the rule in *Hawkins*:

> The general rule is that the Fourth Amendment does not apply to arrests and searches made by foreign authorities in their own country and in enforcement of foreign law. Two exceptions to this rule are recognized: first, if the conduct of the foreign authorities in conducting the search "shocks the conscience" of the American court; and second, if American officials participated in the foreign search, or if the foreign authorities

were acting as agents for their American counterparts.

*Hawkins*, 661 F.2d at 455-56; *accord Rojas*, 812 F.3d at 397. The second exception is disjunctive, so a defendant who establishes agency need not also show that American officers were present for the execution, and where either branch is satisfied "the exclusionary rule should be invoked." *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980). Neither branch has been applied to a foreign intelligence service retrieving a person's communications from a bulk archive of a civilian population at the request of an American agency whose personnel work inside that state's counterterrorism apparatus.

**B. Retrieving stored communications from an archive is a search in its own right**

The constitutional question did not close in 2023, leaving nothing afterward but a transfer. In *United States v. Hasbajrami*, 945 F.3d 641, 670 (2d Cir. 2019), the Second Circuit held that even where communications were lawfully acquired and stored, "querying that stored data does have important Fourth Amendment implications, and those implications counsel in favor of considering querying a separate Fourth Amendment event that, in itself, must be reasonable." There the collection was statutorily authorized and judicially supervised, and the query was still a distinct event requiring its own justification. Here the collection had no warrant, no suspicion, and no judicial supervision, and the query was performed because American agents asked for it. The collection in *Hasbajrami* was authorized by statute and supervised by a court, and the query was still a separate event

requiring its own justification. The principle applies with more force to an archive that had no authorization and no supervision at any point.

### C. The Israeli Security Agency acted as agent for the FBI in performing the retrieval

The elements of agency appear in this case. An American request was made in June 2025 for a specifically identified category of material, the calls the agency had saved of one named person. A foreign search followed, in which listeners filtered the archive and reduced it to six recordings for the requesting agency's purpose, followed by an accuracy check against a Hebrew translation to make the product usable. American agents later interviewed the reviewing official abroad. (Defense Exhibit 1).

The request was made from inside the relationship rather than across it. The NBCTF was supplying the documentary evidence in this prosecution, and its Research and Assessment Division was directed by the Israeli Security Agency's own representative. (Doc. 45-1 at 3, 16); (Doc. 46 at 1-2). FBI agents had been embedded in that Bureau since March 2025. The service that searched the archive and the agency hosting the FBI's personnel are joined at the level of personnel, and the search served a prosecution already under way.

What is absent matters as much. No Israeli investigation generated these recordings, and nothing indicates that anyone had listened to them for an Israeli purpose before the FBI asked. Israel furnished his name in May 2025, the request came the following month, and the calls were then located, filtered, and selected. Every act of searching postdates the American request and answers it. The

representation that the FBI "conducted the investigation itself, only requesting from Israel information as necessary," (Doc. 82 at 9), answered a challenge concerning cell-tower reports from a commercial carrier. It does not address the June 2025 request, the filtering of the archive, or the selection of the six.

### D. American agents participated in the search by defining what would be selected

In *Lustig v. United States*, 338 U.S. 74 (1949), a federal agent called into a hotel room during an unlawful local search shared in examining what it turned up and selecting the items bearing on a federal offense. The plurality held the evidence inadmissible, reasoning that a "search is a functional, not merely a physical, process," not "completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense." *Id.* at 78. What controls is "the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means." *Id.* at 79.

*Lustig* requires a federal share in the enterprise, and distinguishes the case in which "evidence secured by state authorities is turned over to the federal authorities on a silver platter." *Id.* The share here is the request that defined the enterprise. The plurality accepted that the federal agent had not requested the search, was not its moving force, and that the police had not undertaken it to enforce federal law. *Id.* at 78. Suppression followed anyway. Each of those facts is reversed here. The FBI requested this search, was its moving force, and defined the universe to be searched and the purpose the selection would serve. A federal court should not receive on a

silver platter what federal agents could not lawfully have obtained themselves. *Elkins v. United States*, 364 U.S. 206, 223 (1960).[4]

### E. The decisions denying joint venture on treaty requests do not govern an embedded relationship

Two decisions hold that an American request, standing alone, does not create a joint venture, and each involved a request between separate institutions rather than American agents embedded inside the foreign agency. In *United States v. Getto*, 729 F.3d 221, 230-31 (2d Cir. 2013), the Second Circuit held that "[A]merican officials must play some role in controlling or directing the conduct of the foreign parallel investigation," that "[i]t is not enough that the foreign government undertook its investigation pursuant to an American MLAT request," and that it had "long allowed foreign authorities to share the fruits of an investigation with their American counterparts without suggesting or assuming that the latter controlled the investigation." Each formulation presupposes a foreign parallel investigation whose fruits are shared. These recordings are not its fruits, because no such investigation produced them. There was an archive and a request.

In *United States v. Omar*, the district judge declined to adopt a magistrate

[4] The principle is not confined to the Fourth Amendment. In *United States v. Allen*, 864 F.3d 63, 82 (2d Cir. 2017), the Second Circuit held that "compelled testimony cannot be used to secure a conviction in an American court," and that "[t]his is so even when the testimony was compelled by a foreign government in full accordance with its own law." *Allen* arose under the Self-Incrimination Clause and distinguished the two Amendments expressly, *id.* at 81-82, so it supplies no independent Fourth Amendment rule. It establishes that a foreign sovereign's compliance with its own law does not by itself determine what an American court may receive, which is the premise the *Hawkins* exceptions share.

judge's joint venture finding and held that where the United States requests information from a foreign government, or requests that it conduct surveillance of a particular person, "that fact alone will not support a finding of a joint venture," and "there must be facts which show a more substantial involvement by United States officials in the foreign investigation and/or surveillance." 2012 WL 2277821, at *2 (D. Minn. June 18, 2012). Mr. Al-Muhtadi satisfies that standard. What happened here is not a request alone. It is a request that defined the target and the category, made by an agency with personnel inside the Israeli counterterrorism apparatus since March 2025, followed by a selection performed to answer it, an accuracy review to make the product usable in an American courtroom, and an American interview of the reviewing official abroad with prosecutors present. *Omar* turned on facts that are absent here. The Dutch officer testified that he obtained a Dutch warrant to tap the telephone, then obtained arrest and search warrants, and that the investigation to locate, arrest, and search the defendant was done with no input from the United States. No Israeli warrant, court order, or independent Israeli purpose has been identified for anything that happened in this case.

The premise running through these decisions is institutional separation, the understanding that the foreign service acts on its own account, which is why a request to it is only a request. That premise fails when American agents work inside the foreign agency, that agency supplies the documentary case, and the officer who will authenticate it at trial represents the service that searched the archive.

### F. The arrangement accomplished what the Fourth Amendment forbids

*Hawkins*, immediately after stating the rule, observed that "[t]here is no indication the DEA agents persuaded the Panamanian authorities to conduct the search on their behalf in an attempt to evade the strictures of the Fourth Amendment." 661 F.2d at 456. *United States v. Gogic*, 808 F. Supp. 3d 416, 426-27 (E.D.N.Y. 2025), turned in part on the same absence, finding no intent to evade the Constitution even assuming American officials had agreed to delay arrests in exchange for intercepted messages.

Evasion is not a state of mind the defense must prove. It describes what an arrangement accomplishes. The FBI could not lawfully have recorded Mr. Al-Muhtadi's telephone calls without a warrant and then searched those recordings for evidence against him. It obtained the same product by asking a service that had, from a position inside that Israeli counterterrorism apparatus. Whatever the agents intended, the United States acquired by request what it could not have acquired by process. *Gogic* is distinguishable in any event. The European operation there was "wholly designed and carried out by members of the JIT to advance their own countries' intelligence efforts—not at the behest of the United States," and it proceeded on a French judge's authorization. 808 F. Supp. 3d at 423, 426. Here no foreign investigation was under way, no foreign process authorized anything, and the archive sat dormant for twenty months until an American request set the search in motion.

## V. The retrieval was unreasonable, and the exclusionary rule reaches it

As explained above, the Fourth Amendment applies to the June 2025 search. To the extent the Court treats that search as a foreign search, the Warrant Clause does not govern it, and such searches "are subject only to the Fourth Amendment's requirement of reasonableness," measured by the "totality of the circumstances" and balancing "the degree to which it intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 171-72 (2d Cir. 2008) (addressing searches of United States citizens).

That balance does not come out the same way here. The court in *In re Terrorist Bombings* weighed "the search's limited intrusion on El-Hage's privacy against the manifest need of the government to monitor the activities of al Qaeda, which had been connected to El-Hage through a year of surveillance." *Id.* at 174. There the surveillance followed a year of investigation of an identified man. Here, nothing identified Mr. Al-Muhtadi. His lines had been captured since at least August 2023, one of them the number listed for a business he operated in Gaza, and Israel did not give his name to the United States until May 2025. (Defense Exhibit 1); (Doc. 1-1 at 28 ¶ 46); (Doc. 1-1 at 16 ¶ 28). The calls the FBI asked for had been sitting in the archive for twenty months. No antecedent finding by anyone marked him out, and nothing limited what the search could produce. A search whose scope is defined only

by what a suspicionless archive happens to contain is not reasonable.[5]

Exclusion also serves its purpose. The rule deters American officers, and the conduct to be deterred is domestic: an American agency's decision to reach into a foreign suspicionless archive for evidence it could not lawfully gather. That decision will be repeated if its product is received.

## VI. IN THE ALTERNATIVE, ISRAEL'S WARRANTLESS RECORDING OF AN ENTIRE CIVILIAN POPULATION'S TELEPHONE CALLS SHOCKS THE CONSCIENCE

### A. The shocks the conscience exception is an independent ground for suppression, and the decisions rejecting it addressed the treatment of individual suspects rather than the surveillance of a population

Mr. Al-Muhtadi advances this ground in the alternative. If the Court concludes that the Israeli Security Agency was not the FBI's agent and that American officials did not participate in the June 2025 search, the first *Hawkins* exception independently requires suppression. It asks whether the conduct of the foreign authorities "shocks the conscience" of the American court, the standard drawn from *Rochin v. California*, 342 U.S. 165 (1952), where the Court condemned methods "too close to the rack and the screw to permit of constitutional differentiation." *Id.* at 172. The exception is invoked often and succeeds almost never. A district court in this

[5] Where a joint venture exists, some courts consult foreign law as part of the reasonableness inquiry and then ask whether American agents relied in good faith on foreign assurances of legality. *United States v. Barona*, 56 F.3d 1087, 1090-93 (9th Cir. 1995) (quoting *United States v. Peterson*, 812 F.2d 486, 490, 492 (9th Cir. 1987)). Neither step helps here. No Israeli warrant, court order, or legal process has been identified, so there is no foreign authorization whose validity a court could consult. And good faith is reliance on something: the agents in *Barona* and *Peterson* had been told by foreign officials that the wiretaps were lawful. Nothing shows that anyone told the FBI these calls were lawfully acquired, or that the FBI asked.

circuit observed that although the Fifth Circuit "has at least assumed that under certain circumstances, governmental conduct may be so outrageous as to justify dismissal of the indictment," neither the parties nor the court had found "any case actually granting that relief." *United States v. Degollado*, 696 F. Supp. 1136, 1137 (S.D. Tex. 1988). And in *United States v. Marzook*, 435 F. Supp. 2d 708, 776 (N.D. Ill. 2006), after thirteen days of testimony from two Israeli Security Agency interrogators and others, the court credited their accounts and held that "[t]he Israeli officials' conduct does not shock the conscience." Those decisions concern how a foreign service treated a suspect it had already identified: an interrogation, an arrest, a search of a house.

The nearest decision is *Gogic*, 808 F. Supp. 3d at 427, which rejected a claim that suspicionless mass collection of communications violates fundamental norms of decency, reasoning that the exception "primarily concerns evidence obtained through interrogation or coercion, rather than through covert surveillance." The interception there reached users of one encrypted platform, who had chosen it, during an investigation of that platform. This unprecedented surveillance program targets a captive population defined by its ethnicity and confined by barbed-wire fences and military checkpoints; Gazans no more choose to be surveilled than they choose confinement to a strip of land roughly the size of Detroit.

**B. Israel records the telephone calls of an entire civilian population and keeps them indefinitely in a searchable archive used to arrest, to detain, and to kill**

The conduct at issue is not the treatment of a suspect. It is the decision to treat an entire civilian population as a permanent object of surveillance and to do so based on its ethnicity. The limit of suspicion was abandoned on purpose. A service that had stored "the calls of tens of thousands of Palestinians defined as 'suspects' on its internal servers" dropped that limit when cloud storage removed the constraint, and began saving the calls of millions defined as nothing at all, on what an officer who served under the unit's commander described as a decision to start "tracking everyone, all the time." Abraham, *supra* note 1. A source described the consequence: "Suddenly, the public became our enemy." *Id.*

The archive is an instrument of control rather than an investigative case file. An intelligence officer explained that "[t]hese people get entered into the system, and the data on them just keeps growing," and that "almost no one in the [occupied] territories is 'clean,' in terms of what intelligence has on them." *Id.* Israeli intelligence sources said the stored material had been used "to plan lethal airstrikes in Gaza" and "often serves as a basis for arrests and other military operations in the West Bank," and that it allows Israel to find information usable "for all manner of purposes — including blackmail, administrative detention, or retroactively justifying killings." *Id.*

A commercial provider with every reason to keep a large government customer read that account and shut the service off, stating that it does "not provide technology

to facilitate mass surveillance of civilians." Smith, *supra* note 1.

### C. Suspicionless recording of an entire subject population, retained indefinitely and legally unreviewable, is different in kind from the foreign conduct the cases have tolerated

The first distinguishing feature is the absence of any predicate. A foreign wiretap on a foreign suspect, authorized by foreign process, is an exercise of recognizable sovereign power whose adequacy an American court can decline to review. There is none here. Nothing identifies why Mr. Al-Muhtadi's lines were captured beginning in August 2023, one of them a business number, and Israel named him to the United States only in May 2025. The reported basis for capturing them is that he is a Palestinian with a telephone. That is not a weaker form of suspicion. It is the deliberate replacement of suspicion with population.

The second is permanence. An ordinary search ends. This archive is purposefully unending. It retains everything, indefinitely, so that whenever a person becomes interesting to someone in power, his past is already in a searchable file. Twenty months after these calls were recorded, an agency opened the file and pulled out six.

The third is that the person recorded has no forum anywhere in which to object. Mr. Al-Muhtadi and the people of Gaza had no tribunal, no notice, no minimization, and no remedy. The recording was not merely warrantless; it was situated where no warrant requirement and no judicial supervision could ever attach. If this Court turns a blind eye, the product of unlimited suspicionless recording of a civilian population

will enter a criminal trial having never received judicial review.

That is where the conscience of an American court is properly engaged. *Rochin* turned not on physical pain but on the recognition that some methods of obtaining evidence are incompatible with the character of the proceeding that would receive them. A prosecution of the United States, in an Article III court, resting on recordings drawn from a warrantless archive of an entire people's telephone calls, is such a case. There is an exception for a reason. This case is that reason.

## VII. SUPPRESSION EXTENDS TO THE ISRAELI SUMMARY AND TO THE OTHER PRODUCTS OF THE SURVEILLANCE

The recordings are not the only evidence this surveillance produced. The government's August 3, 2026 discovery letter transmits an Israeli summary of twelve communications, only six of which were recorded. (Defense Exhibit 2). That summary exists because the same archive was searched, and it describes communications the government cannot otherwise put to a jury. Suppression reaching the audio but not the summary would return in narrative form what the Fourth Amendment excluded in recorded form. The exclusionary rule has never been so confined.[6]

The relief is bounded by that rule and by Mr. Al-Muhtadi's own rights. Fourth Amendment rights "are personal rights which, like some other constitutional rights,

[6] The essence of a provision forbidding the acquisition of evidence in a certain way is that "not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Nardone v. United States*, 308 U.S. 338, 340-41 (1939) (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). Where the accused proves that a substantial portion of the case is the "fruit of the poisonous tree," it is excluded unless the government convinces the court "that its proof had an independent origin." *Id.* at 341.

may not be vicariously asserted," *Alderman v. United States*, 394 U.S. 165, 174 (1969), and he asks the Court to suppress only communications to which he was a party: the six recordings; the portions of the summary describing his own communications; every translation, transcription, or written account of them; any testimony describing their contents; and any other evidence obtained by exploiting the searched archive. The record identifies domestic search warrants, grand jury subpoenas, physical surveillance, and an undercover agent. (Doc. 82 at 6). Nothing here reaches what those independent means produced.

## VIII. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING AND ORDER THE GOVERNMENT TO PRODUCE WITNESSES WITH FIRSTHAND KNOWLEDGE

A hearing is required where the factual allegations in the defendant's motion, including any accompanying affidavits, are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) (quoting *United States v. Poe*, 462 F.2d 195, 197 (5th Cir. 1972)). The allegations come from the government's own discovery: the monitoring from August 2023, the fifty records from a single day, the June 2025 request, the filtering, and the accuracy review, all recorded in FBI-535725, attached as an exhibit. The embedding was testified to in open court on August 4, 2026.

The hearing should establish what the FBI asked for in June 2025 and in what terms; by what channel and personnel; where the servers holding his communications were located; who selected the six recordings and on what criteria; what the archive

held for him, over what period, and on what basis his lines were captured; whether any Israeli process authorized the collection or the retrieval; and whether any United States component participated in the collection, targeting, or acquisition of his communications.

Those questions cannot be answered by a proffer or by an agent reciting what he was told. The Court should order the government to produce witnesses with direct, firsthand knowledge of the surveillance program, of the storage and retention of Mr. Al-Muhtadi's communications, and of the June 2025 request. A federal court has done as much before, hearing testimony over thirteen days in *Marzook*, including six days from two Israeli Security Agency interrogators, and suppressing part of what the government offered. 435 F. Supp. 2d at 713-14, 764, 777.

## IX. CONCLUSION

Mr. Al-Muhtadi respectfully asks the Court to set a hearing on this motion and to suppress the recordings, the summary of his own communications, and the other products of the unconstitutional and unconscionable Israeli surveillance of himself and his fellow Palestinian citizens.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
First Assistant / Appellate Chief

***s/ Aaron A. Adams***

AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 15, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*