UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

---

# MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS THE FRUITS OF THE GOOGLE GEOFENCE WARRANTS AND TO COMPEL DISCLOSURE OF THE ORIGIN OF THE IDENTIFICATION

---

[Page intentionally left blank]

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 3

A. The charges and the procedural posture .......... 3

B. The five geofence warrants and one key that ties them together .......... 4

C. What the fifth warrant told Google to do .......... 5

D. The overlap rule, and what the issuing judge was told about it .......... 5

E. What Google produced, and what the government has said about what followed .......... 8

III. MR. AL-MUHTADI HAS STANDING TO CHALLENGE THE SEARCH .......... 9

A. The standard for asserting Fourth Amendment rights .......... 9

B. The government's own allegations establish the interest invaded .......... 10

C. The search occurred in the United States .......... 11

IV. THE GEOFENCE WARRANTS ARE GENERAL WARRANTS FORBIDDEN BY THE FOURTH AMENDMENT .......... 13

A. The Warrant Clause and the general warrant .......... 13

B. Acquiring Location History is a search, and the third-party doctrine does not apply .......... 13

C. A warrant that describes no suspect is a general warrant .......... 14

D. Presence is not probable cause .......... 16

V. THE GOOD-FAITH EXCEPTION DOES NOT APPLY .......... 17

A. The standard .......... 17

B. The affidavit omitted the step at which identification occurs .......... 17

C. No judicial officer reviewed any identification on any route this record describes .......... 18

D. The state of the law in February 2025 .......... 19

VI. THE GOVERNMENT MUST STATE WHETHER THE GEOFENCE PRODUCTIONS IDENTIFIED MR. AL-MUHTADI .......... 20

**A.** The answer controls this motion ........ 20

**B.** The Court has authority to require the answer ........ 20

**C.** If the answer is yes, the taint reaches nearly everything that followed ........ 22

**VII. CONCLUSION** ........ **23**

**CERTIFICATE OF SERVICE** ........ **24**

# TABLE OF AUTHORITIES

## CASES


*Berger v. New York*, 388 U.S. 41 (1967) ........ 13

*Brady v. Maryland*, 373 U.S. 83 (1963) ........ 21

*Carpenter v. United States*, 585 U.S. 296 (2018) ........ 13

*Chatrie v. United States*, 609 U.S. ___, 146 S. Ct. 2193 (2026) ........ 1, 13-15

*In re Four Applications for Search Warrants Seeking Information Associated with Particular Cellular Towers*, 2026 WL 2260371 (S.D. Miss. Aug. 5, 2026) ........ 14

*Kyllo v. United States*, 533 U.S. 27 (2001) ........ 14

*Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) ........ 12

*Nardone v. United States*, 308 U.S. 338 (1939) ........ 23

*Rakas v. Illinois*, 439 U.S. 128 (1978) ........ 9-10

*Reid v. Covert*, 354 U.S. 1 (1957) ........ 11

*Roviaro v. United States*, 353 U.S. 53 (1957) ........ 21

*In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025) ........ 16

*Steagald v. United States*, 451 U.S. 204 (1981) ........ 13

*Taglianetti v. United States*, 394 U.S. 316 (1969) (per curiam) ........ 22

*United States v. Campbell*, 2026 WL 1894330 (E.D.N.Y. June 30, 2026) ........ 14

*United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022) ........ 15

*United States v. Cherry*, 759 F.2d 1196 (5th Cir. 1985) ........ 22

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ........ 21

*United States v. Johnson*, 2026 WL 2605896 (W.D. La. Aug. 18, 2026) ........ 14

*United States v. Leon*, 468 U.S. 897 (1984) .......... 17

*United States v. Rojas*, 812 F.3d 382 (5th Cir. 2016) .......... 12

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) .......... 1-3, 14-16, 19

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .......... 10-12

*United States v. Wilson*, 36 F.3d 1298 (5th Cir. 1994) .......... 22-23

*United States v. Woerner*, 709 F.3d 527 (5th Cir. 2013) .......... 17

*United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008) .......... 22

CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. IV .......... *passim*

STATUTES

18 U.S.C. § 1001(a)(2) .......... 4

18 U.S.C. § 1546(a) .......... 4

18 U.S.C. § 2339B(a)(1) .......... 3

18 U.S.C. § 2703 .......... 8, 11

RULES

FED. R. CRIM. P. 16(a)(1)(E) .......... 20

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 25-00285-1** |
| **VERSUS** | **JUDGE JOSEPH** |
| **MAHMOUD AMIN YA'QUB AL-MUHTADI** | **MAGISTRATE JUDGE WHITEHURST** |

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS THE FRUITS OF THE GOOGLE GEOFENCE WARRANTS AND TO COMPEL DISCLOSURE OF THE ORIGIN OF THE IDENTIFICATION**

---

NOW INTO COURT comes the defendant, Mahmoud Al-Muhtadi, through undersigned counsel, who, for the reasons set forth below, respectfully moves the Court under the Fourth Amendment to hold the geofence warrants unconstitutional, to order the government to state whether the geofence productions identified him, and to suppress the March 4, 2025 production and the evidence obtained by exploiting it.

## I. INTRODUCTION

Geofence warrants are unconstitutional in this circuit. *United States v. Smith*, 110 F.4th 817, 840 (5th Cir. 2024). The Supreme Court has since held that acquiring Location History is a Fourth Amendment search and that the third-party doctrine does not reach it, while expressly reserving particularity, probable cause, and good faith for the lower courts. *Chatrie v. United States*, 609 U.S. ----, 146 S. Ct. 2193, 2199, 2204 n.4, 2216 (2026). *Chatrie* vacated the Fourth Circuit's judgment and

remanded; it neither cites nor disturbs *Smith*, and it leaves untouched the ground on which *Smith* rests. Five geofence warrants issued in this investigation, the last of them on February 20, 2025, six months after *Smith*. None names Mr. Al-Muhtadi. None names anyone. The fifth describes the persons whose data it sought as "unknown person(s)." (Defense Exhibit 2 at 3).

The dates are what makes this motion necessary. The fifth warrant issued February 20, 2025. Google produced on March 4, 2025. By both dates Mr. Al-Muhtadi had entered the United States on an immigrant visa and was living in this country. (Doc. 1-1 at 40 ¶ 77). The government says it first became aware of him in May 2025. (Doc. 82 at 5). Two months separate the production from the identification, and the affidavit supporting the fifth warrant reports that this same process had already "led to the identification of approximately 50 Google accounts assessed to have been used by potential suspects in this investigation." (Defense Exhibit 1 at 13).

Whether those facts are connected is the question this motion turns on, and only the government can answer it. If any part of the five geofence productions identified Mr. Al-Muhtadi, by name, by Google account, by subscriber information, by device identifier, or by any other information Google returned, the Court should suppress the March 4, 2025 production and the evidence obtained by exploiting it and Mr. Al-Muhtadi will then move for a taint hearing. If the government maintains instead that it learned of Mr. Al-Muhtadi from the Government of Israel and not from the geofence process, the Court should order it to say so on the record and to produce

to the defense the evidence of that Israeli disclosure.

When defense counsel asked the case agent at the August 4, 2026 motion hearing how the government first became aware of Mr. Al-Muhtadi, the government objected that the answer is classified and would be taken up under the Classified Information Procedures Act.[1] The consequence of that position, left unqualified, is that the government may use evidence at trial while declining to say whether it is the product of a search that was unconstitutional.

This memorandum proceeds in four parts. Part III shows that Mr. Al-Muhtadi may assert the Fourth Amendment against a search that American agents executed against an American company on American soil. Part IV shows that a warrant identifying its targets only by two rectangles and a clock is the general warrant this circuit condemned in *Smith*. Part V shows that good faith cannot rescue a warrant whose affidavit omitted the one step at which anonymity ends. And Part VI explains why the Court cannot resolve any of it until the government states whether the geofence productions identified Mr. Al-Muhtadi.

## II. BACKGROUND

### A. The charges and the procedural posture

A grand jury returned a four-count Superseding Indictment on June 17, 2026, charging conspiracy to provide material support to a designated foreign terrorist

1 The transcript of the August 4, 2026 hearing has been ordered from the court reporter but had not been provided as of the date of this filing.

organization and providing material support, both under 18 U.S.C. § 2339B(a)(1); visa fraud under 18 U.S.C. § 1546(a); and a false statement in a matter involving international terrorism under 18 U.S.C. § 1001(a)(2). [Doc. 60]. Trial is set for January 25, 2027. (Doc. 66 at 4).

**B. The five geofence warrants and one key that ties them together**

Between November 2023 and February 2025 the government obtained five warrants from the United States District Court for the District of Columbia directing Google LLC to search its Location History records. The fifth warrant specifically identifies the four that came before it: the first issued November 2, 2023; the second November 30, 2023; the third January 26, 2024; and the fourth March 15, 2024. (Defense Exhibit 2 at 1-2). This memorandum refers to them by that order. The fifth, issued February 20, 2025, is the warrant at issue.

Google's response to such a warrant supplies no names. It assigns each device a Reverse Location Obfuscated ID, so that the government can trace the device's movements without learning whose it is. The fifth warrant directed Google to use the same identifiers it had used for the four earlier warrants (Defense Exhibit 2 at 1-2), so that "if the same account identifier appears in multiple Target Locations, the same RLOI will be used for that identifier in each Target Location," (Defense Exhibit 1 at 21). A phone appearing in the fifth search could therefore be matched to the same phone in any of the first four.

None of the five warrants names Mr. Al-Muhtadi. The affidavit for the fifth

warrant describes the earlier warrants as "beneficial in identifying potential victims, witnesses, and suspects." (Defense Exhibit 1 at 12).

**C. What the fifth warrant told Google to do**

United States Magistrate Judge Zia M. Faruqui signed the fifth warrant on February 20, 2025, on the application of FBI Special Agent William Buffington. (Defense Exhibit 3 at 1-2). The warrant does not describe a person. It describes two rectangles on a map. The first surrounds the Kisufim kibbutz, is defined by four corner coordinates, and covers the five hours from 1:00 p.m. to 6:00 p.m. local time on October 7, 2023. (Defense Exhibit 4 at 2). The second surrounds the Kfar Aza kibbutz, is likewise defined by four corner coordinates, and covers the twelve hours from 6:00 a.m. to 6:00 p.m. local time that day. (Defense Exhibit 4 at 3).

Google was directed to produce Location History data "reflecting devices that Google calculated were or could have been (as indicated by margin of error, i.e., 'maps display radius') located within" those rectangles, together with "identifying information for Google Accounts associated with the responsive Location History data." (Defense Exhibit 4 at 1). The affidavit describes the object of the search the same way: it will reveal "the identity and movement of known and unknown victims, witnesses, and persons involved in committing the October Attacks." (Defense Exhibit 1 at 20).

**D. The overlap rule, and what the issuing judge was told about it**

Attachment B to the fifth warrant sets out what Google must hand over, in

steps. Three of them matter. At step one Google finds the phones that were inside the rectangles. At step two Google gives the government a code number for each phone, with contextual information such as coordinates, timestamps, language settings, and country of residence or origin, but no names. (Defense Exhibit 2 at 1). At the last step, if the government wants to know whose phone a code number belongs to, it must go back to the judge: it "will identify to the Court, through a supplemental affidavit, the anonymized identifiers for which the government seeks additional information." (Defense Exhibit 2 at 2-3).

Between those steps sits another, which Attachment B numbers third and which this memorandum calls the *overlap rule*. If a phone turned up in more than one rectangle, Google was to identify its owner without anyone returning to the judge:

> Third, Google shall produce to the government account identifier and basic subscriber information, device identification information, language settings, country of residence (or origin) and any other accounts linked by cookie, for any users whose devices appear in more than one of the identified search parameters.

(Defense Exhibit 2 at 2). What triggers that disclosure is not evidence about a person. It is the coincidence of a phone appearing in two places. What it discloses is the account, the subscriber information, the device, and every other account Google could connect to the same person through a cookie.

The affidavit's narrative description of the process does not contain that step. Paragraph 50 walks the judge through the process in four lettered subparagraphs. Subparagraph (a) describes Google's production of code numbers and contextual data,

and closes with the assurance that "Google will not, in this step, provide the Google account identifiers (e.g., example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government." Subparagraph (b) describes no step at all; it directs Google to reuse the identifiers assigned under the four earlier warrants. Subparagraph (c) is the government's review: "Second, the government will then review the list of anonymized identifiers." And subparagraph (d) is the return to court: "Third, if the government seeks to identify any of the anonymized accounts, users, or devices, the government will identify to the Court, through a supplemental affidavit," the identifiers it seeks to unmask. (Defense Exhibit 1 at 20-21). Paragraph 50 therefore describes three steps, production of code numbers, government review, and unmasking by supplemental affidavit, while Attachment B contains four. The step paragraph 50 omits is Attachment B's third.

Paragraph 50 opens by telling the judge that the process is "[c]onsistent with the search warrant authorized" in the first warrant from November 2023. (Defense Exhibit 1 at 20). The affidavit supporting that warrant did describe an overlap step, and described one materially narrower:

> Second, the government shall identify to Google any users whose devices appear in more than one of the identified search parameters. Google shall then produce to the government account identifier and basic subscriber information, device identification information, and language settings. . . . This step is appropriate because your affiant believes that a person's presence at or near more than one attack is additional indicia of being involved with, or a witness to, the unique attacks under investigation.

(Defense Exhibit 5 at 33). Under that description the government identified the

overlapping users to Google, which kept a government officer in the sequence; the step reached account identifier, subscriber information, device identification, and language settings and stopped there; and the affiant explained and justified it to the judge. The affidavit supporting the fourth warrant describes no overlap step at all. (Defense Exhibit 6 at 29-30).

### E. What Google produced, and what the government has said about what followed

Google responded on March 4, 2025. Its transmittal letter states that "[t]he enclosed file produced is responsive to step 1 of your Search Warrant," and that the production contains only a Reverse Location Obfuscated ID for each device, which "cannot be mapped to an Android ID or an IMEI/MEID, and is not a valid target identifier that can be used to search for information separately from this Reverse Location History warrant." (Defense Exhibit 8 at 1-2). The case agent's report records the same thing: "Google provided masked identifiers for those Google Accounts that were identified in the aforementioned Search Parameters." (Defense Exhibit 7 at 3). The place of the investigative activity is recorded as Manassas, Virginia. (Defense Exhibit 7 at 1).

The same letter describes how identification was in fact to be obtained. "For the devices that you have narrowed and determined to be relevant, law enforcement may request identifying information by emailing [redacted]@google.com with the Google reference number in the Subject Line and with the Reverse Location Obfuscated ID(s) requested. . . . Google may provide basic subscriber information (as

defined in 18 U.S.C. § 2703(c)(2)) in response. The request for identifying information must be received within 60 days of this letter . . . ." (Defense Exhibit 8 at 2). That window closed in early May 2025.

The government has told this Court that it "did not become aware of the Defendant until May of 2025," citing paragraph 28 of the complaint affidavit. [Doc. 82 at 5]. That paragraph states that "[i]n May 2025, the Government of Israel . . . provided information to the United States Government that an individual named Mahmoud Amin Ya'qub Al-Muhtadi was a DFLP operative and member of DFLP's military wing, the NRB, who participated in the October 7, 2023, attack and fled Gaza." (Doc. 1-1 at 16 ¶ 28). It reports what a foreign government told the United States. It does not say how that government came to identify Mr. Al-Muhtadi, what the United States gave it before it did, or whether any of the roughly fifty Google accounts the geofence process had produced was among what the United States shared.

Finally, the government has given notice that it intends to introduce Google LLC account records from two Google accounts at trial. (Doc. 87 at 3). Whether those accounts are among the roughly fifty the geofence process had already produced is a fact the government has not disclosed.

## III. MR. AL-MUHTADI HAS STANDING TO CHALLENGE THE SEARCH

### A. The standard for asserting Fourth Amendment rights

Fourth Amendment rights are personal, and a defendant must establish that

the challenged search invaded his own reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Where the movant is an alien, the Amendment protects "the people," which means "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), and aliens receive its protections "when they have come within the territory of the United States and developed substantial connections with this country," *id.* at 271.

**B. The government's own allegations establish the interest invaded**

The government alleges that Mr. Al-Muhtadi possessed a Nokia cellular telephone running Google's Android operating system. Location History is a feature of the Google account associated with such a device, and the records the fifth warrant commanded Google to search are the Location History records of Google accounts. (Defense Exhibit 4 at 1). The government further alleges that at 10:01 a.m. on October 7, 2023, that telephone "utilized the west-facing sector of an Israeli-based Cellcom cell tower located at the coordinates 31.475310, 34.528825 which is approximately 1.9 miles east of the border and 0.4 miles from Kfar Aza," and that the phone "was within the coverage area of this tower." (Doc. 1-1 at 37 ¶¶ 70-71). Search Parameter 2 is a rectangle surrounding Kfar Aza covering the twelve hours from 6:00 a.m. to 6:00 p.m. that day. (Defense Exhibit 4 at 3)

On the government's own account, then, Mr. Al-Muhtadi used a device tied to

a Google account, and that device was in the vicinity of Kfar Aza during the window the warrant covered. If the government is right, his Location History was among the records Google was ordered to search. Whether Location History was enabled on the account associated with that device is a fact only Google's production can establish, and only the government has seen it. That is one more reason the disclosure Part VI requests is necessary: the government is in sole possession of the facts bearing on Mr. Al-Muhtadi's standing to challenge its own search.

**C. The search occurred in the United States**

*Verdugo-Urquidez* framed its inquiry as "whether the Fourth Amendment applies to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country," and held that it does not. 494 U.S. at 261. The defendant there was in custody in San Diego when agents searched his residence in Mexicali, and his presence in this country did not change the result, because the search was abroad. Justice Kennedy, concurring, added that the conditions of that case "would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous." *Id.* at 278 (Kennedy, J., concurring) (quoting *Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring in the result)).

The search challenged here was not abroad. It was executed against an American provider by American compulsory process. The warrant issued from a United States district court under 18 U.S.C. § 2703. (Defense Exhibit 3 at 1) Google

conducted the search and answered from Mountain View, California. (Defense Exhibit 8 at 1). An American agent received the production in Manassas, Virginia. (Defense Exhibit 7 at 1). Nothing is impracticable or anomalous about requiring a valid warrant before American agents compel an American company to search its own records and report the results to Virginia.

*United States v. Rojas,* 812 F.3d 382 (5th Cir. 2016), applies *Verdugo* in this circuit and measures a defendant's connections against the time of the challenged surveillance. *Id.* at 397-98. The challenged event here is the compelled search of Google's records, which occurred in the United States in March 2025. Mr. Al-Muhtadi entered the United States on an immigrant visa on September 12, 2024, having stated on his DS-260 form that he "intended to live in Tulsa, Oklahoma." (Doc. 1-1 at 40 ¶ 77). He remained in this country thereafter, and by May 2025 a search of the National Crime Information Center database had returned an Oklahoma driver's license bearing his name and date of birth, and physical surveillance had confirmed his residence in Tulsa. (Doc. 1-1 at 41 ¶ 79). In *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006), a Mexican national who entered the United States regularly and lawfully on a border-crossing card, and who acquiesced in this country's immigration system, could invoke the Fourth Amendment, because "the nature and duration of Martinez-Aguero's contacts with the United States, however, are sufficient to confer Fourth Amendment rights." *Id.* at 625. Mr. Al-Muhtadi did not visit. He immigrated. The allegations in Counts Three and Four do not retroactively dissolve connections

that existed when the government searched.

## IV. THE GEOFENCE WARRANTS ARE GENERAL WARRANTS FORBIDDEN BY THE FOURTH AMENDMENT

### A. The Warrant Clause and the general warrant

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The general warrant is the paradigm of what the Warrant Clause forbids: "[t]he general warrant specified only an offense—typically seditious libel—and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981). A warrant that leaves "too much to the discretion of the officer executing the order" confers a "roving commission." *Berger v. New York*, 388 U.S. 41, 59 (1967).

### B. Acquiring Location History is a search, and the third-party doctrine does not apply

"An individual has a reasonable expectation of privacy in records about his cell phone's location, and police intrude on that constitutionally protected interest when they demand the information—even though for only a limited time, and from a third-party tech company." *Chatrie*, 146 S. Ct. at 2199. Location History falls outside the third-party doctrine because it is "not truly shared." *Id.* at 2213 (quoting

*Carpenter v. United States*, 585 U.S. 296, 315 (2018)). The length of the window is immaterial: the Amendment applies regardless of "the quality or quantity of information" the government obtains, and the contrary position would arm the government with "a virtual panopticon with which to scrutinize its citizens' activities." *Id.* at 2210 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)). A five-hour window and a twelve-hour window are searches.

*Chatrie* vacated and remanded and did not disturb *Smith*, which it does not cite. Courts have applied *Smith* since. *In re Four Applications for Search Warrants Seeking Information Associated with Particular Cellular Towers*, 2026 WL 2260371, at *8 (S.D. Miss. Aug. 5, 2026), applied *Smith* to tower dumps after *Chatrie* and rejected the government's attempt to distinguish *Smith* on the ground that tower-dump data is less precise. Other post-*Chatrie* decisions have denied suppression, but on grounds that do not reach this warrant: *United States v. Campbell*, 2026 WL 1894330, at *3 (E.D.N.Y. June 30, 2026), resolved a tower-dump challenge "entirely on the basis of the good-faith exception," and a magistrate judge of this district recommended denying suppression of location data obtained under a warrant that named its target, reasoning that *Smith* condemned a warrant issued "without any description of the particular suspect or suspects to be found," *United States v. Johnson*, 2026 WL 2605896, at *3 (W.D. La. Aug. 18, 2026) (report and recommendation).

**C. A warrant that describes no suspect is a general warrant**

*Smith* holds that "geofence warrants are modern-day general warrants and are unconstitutional under the Fourth Amendment." 110 F.4th at 840. The defect arises at the first step, where Google must search "the entirety of its Sensorvault—all 592 million individual accounts." *Id.* at 837. A narrow return does not cure a broad search: "While the results of a geofence warrant may be narrowly tailored, the search itself is not. A general warrant cannot be saved simply by arguing that, after the search has been performed, the information received was narrowly tailored to the crime being investigated." *Id.* And the defect is stated in a sentence that describes this warrant: "[T]he quintessential problem with these warrants is that they never include a specific user to be identified, only a temporal and geographic location where any given user may turn up post-search. That is constitutionally insufficient." *Id.*

The affidavit describes Google's Location History repository to the issuing judge by reference to "the Declaration of Marlo McGriff . . . filed as an attachment to Google's response to a Rule 17 subpoena in *United States v. Okello T. Chatrie*," (Defense Exhibit 1 at 5).[2] the declaration on which the district court in that case relied in making its findings about how Location History and the Sensorvault operate, *United States v. Chatrie*, 590 F. Supp. 3d 901, 908-09 (E.D. Va. 2022). The fifth warrant identifies its targets by corner coordinates and a clock, (Defense Exhibit 4 at 2-3), and describes the persons whose data it seeks as "unknown person(s),"

2 The Rule 17 subpoena response the affiant references was filed in the district court proceedings in *United States v. Chatrie*, the same case the Supreme Court decided in 2026 as Chatrie v. United States, 609 U.S. ___, 146 S. Ct. 2193.

(Defense Exhibit2 at 3). There is no suspect described in this warrant because producing one was its purpose.

The prohibition is not confined to Google. A magistrate judge in this circuit refused an application last year, notwithstanding that it identified specific individuals the government had probable cause to believe were unlawfully present, because as drafted "the Government's proposed warrant is styled as an impermissible, non-particularized general warrant." *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 971 (S.D. Tex. 2025). A warrant that names no one at all is further from the line, not closer to it.

**D. Presence is not probable cause**

Probable cause as to a crime is not probable cause as to everyone near it. *Smith* endorsed, in footnote 11, the argument that probable cause is required for "each person's obtained records," concluding that "[t]he same argument applies with full force to Google accounts containing Location History data." 110 F.4th at 837 n.11. This affidavit offers presence as the whole of its probable cause: "Due to the large-scale nature of the attack at Kisufim, any individuals near or within the Kisufim kibbutz during the attack would be witnesses, potential hostages, or other victims of the Subject Offenses and there is probable cause to believe that the devices in this area contain evidence, fruits, or instrumentalities of those crimes." (Defense Exhibit 1 at 16). A substantially parallel sentence appears for Kfar Aza. (Defense Exhibit 1 at 19-20).

The affiant told the issuing court that the search would not distinguish a perpetrator from a hostage, representing that it "will identify few if any individuals who are not Hamas Attackers, their hostages, other victims, or witnesses to the attacks." (Defense Exhibit 1 at 13). A warrant designed to reach the victims and witnesses of the offense under investigation is not supported by probable cause as to those victims and witnesses, and the Fourth Amendment does not permit the government to search a population in order to sort it.

## V. THE GOOD-FAITH EXCEPTION DOES NOT APPLY

### A. The standard

Evidence obtained under a warrant later held invalid is admissible where officers relied on it in objectively reasonable good faith. *United States v. Leon*, 468 U.S. 897, 922 (1984). The Fifth Circuit has identified four situations in which the exception does not apply, two of which are engaged here: "(1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; . . . and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid." *United States v. Woerner*, 709 F.3d 527, 533-34 (5th Cir. 2013) (citing *Leon*, 468 U.S. at 921-25).

### B. The affidavit omitted the step at which identification occurs

The omission is material in the sense that matters here. It does not bear on whether there was probable cause to search the two rectangles. It bears on the scope

of what the judge authorized to be seized, and on whether he retained the supervisory role the affidavit told him he would have. That is the concern of the fourth situation rather than the first, and the two converge on this record: an affiant who describes a three-step process ending in judicial review, in support of an attachment containing a fourth step that ends in identification without judicial review, has produced a warrant whose scope the issuing judge was not asked to approve.

It is true that Attachment B was incorporated into the warrant by reference. (Defense Exhibit 3 at 2). But the Fourth Amendment requires a neutral and detached magistrate, and the affidavit is the instrument by which the affiant discharges his duty to tell that magistrate what he is being asked to authorize. An affidavit that walks through a process step by step, assures the judge that no account will be identified at the production stage, tells him that identification will require a supplemental affidavit, and silently omits the one step that dispenses with that requirement, does not discharge that duty. Whether the omission was deliberate or was the product of copying paragraph 61 of the prior affidavit forward without conforming it to a changed attachment, (Defense Exhibit 6 at 28-29), the affiant reasonably should have known that the description he gave did not match the instrument he tendered.

### C. No judicial officer reviewed any identification on any route this record describes

The affidavit promised the issuing judge that a code number would become a name only through a supplemental affidavit to the court. (Defense Exhibit 2 at 2);

(Defense Exhibit 1 at 21). Neither route the record describes worked that way. Under Attachment B's overlap rule, Google was to identify multi-rectangle users with no return to the court at all. (Defense Exhibit 2 at 2). And under the process Google itself described in its transmittal letter, identification for any device was to be obtained by emailing a request to Google, within sixty days, with no return to the court either. (Defense Exhibit 8 at 2).

Whether either route was used as to Mr. Al-Muhtadi is a fact the government has not disclosed. What the record establishes is that the supervisory mechanism the affidavit described to the issuing judge appears nowhere in the instructions Google received or in the instructions Google gave. Reliance on a warrant is objectively reasonable when officers execute the process a judge approved. It is not objectively reasonable when the process described to the judge and the process actually available diverge at precisely the point where anonymity ends.

**D. The state of the law in February 2025**

The government will surely point out that the fifth warrant issued in the District of Columbia, where *Smith* does not bind. But this should not be dispositive. *Smith* excused the officers before it because of "the novelty of the technique and the dearth of court precedent to follow," *id.* at 840, and because the affidavit there described the process the warrant contained. The defect asserted here is not that the affiant misjudged unsettled law. It is that he did not accurately describe his own warrant. Furthermore, the government seeks to use this evidence here, in a

prosecution it brought in the Fifth Circuit. The lawfulness of a search is measured by the law of the forum in which its fruits are offered, and the government cannot obtain process in a district where the controlling precedent is favorable to it and then import the results into a circuit that has held the instrument unconstitutional. Otherwise, the government can simply choose its law by choosing its courthouse for warrants to social media and cellphone companies.

## VI. THE GOVERNMENT MUST STATE WHETHER THE GEOFENCE PRODUCTIONS IDENTIFIED MR. AL-MUHTADI

### A. The answer controls this motion

If the geofence productions never returned Mr. Al-Muhtadi's account, his device, or any information leading to him, this motion resolves nothing and can be mooted. Mr. Al-Muhtadi must nevertheless file this motion to meet the Court's motions deadline, (Doc. 66 at 3), because the government has thus far declined to make the disclosures this motion requests. If the productions did return such information, the consequences reach most of this prosecution. The affidavit reports that the process had already produced "approximately 50 Google accounts assessed to have been used by potential suspects," (Defense Exhibit 1 at 13); the sixty-day identification window opened on March 4, 2025 and closed in early May 2025, (Defense Exhibit 5 at 17); the government says it identified Mr. Al-Muhtadi in May 2025, (Doc. 82 at 5); and it now intends to offer records of two Google accounts at trial, (Doc. 87 at 3).

### B. The Court has authority to require the answer

Federal Rule of Criminal Procedure 16(a)(1)(E) requires the government to disclose documents and data within its possession, custody, or control that are material to preparing the defense. Whether an unconstitutional search produced the defendant's identity is material in the most direct sense: it determines whether a suppression motion has a subject. *Brady v. Maryland*, 373 U.S. 83 (1963), reaches the same information if it is favorable, and the government alone can know whether it is. A district court also retains authority to require the parties to supply the facts necessary to decide a motion properly before it, and to manage the sequence in which contested pretrial issues are resolved.

The Classified Information Procedures Act "is procedural and neither creates nor limits a defendant's right of discovery." *United States v. El-Mezain*, 664 F.3d 467, 519-20 (5th Cir. 2011). What section 4 supplies is a procedure for protecting information that is independently discoverable, measured by whether it is relevant and helpful to the defense of an accused. *Id.* at 519-23 (applying *Roviaro v. United States*, 353 U.S. 53 (1957)).

Mr. Al-Muhtadi asks that the answer be given on the record. A statement whether the geofence productions returned information identifying him reveals no source, no method, and no capability that the warrant, the affidavit, and Google's transmittal letter have not already disclosed in discovery. If the Court concludes otherwise as to any part of the answer, it should require the government to submit that part ex parte and in camera, which is the course the Fifth Circuit approved in

*El-Mezain*, *id.* at 565-69, and which the Supreme Court approved for the analogous question in *Taglianetti v. United States*, 394 U.S. 316, 317 (1969) (per curiam).

**C. If the answer is yes, the taint reaches nearly everything that followed**

This is not a case in which an unlawful search produced one item of evidence alongside others gathered independently. If the geofence process is how the government learned who Mr. Al-Muhtadi is, it is the origin of the investigation itself, and every subsequent step proceeded from knowing his name. The exclusionary rule reaches that derivative material, including the resulting agent knowledge: it "prohibits the introduction of testimony concerning knowledge acquired during an unlawful search." *United States v. Zavala*, 541 F.3d 562, 568 (5th Cir. 2008).

Inevitable discovery would require the government to show a reasonable probability that the evidence would have been found lawfully, that "the leads making the discovery inevitable were possessed by the police at the time of the misconduct," and that the police "also prior to the misconduct were actively pursuing the alternate line of investigation." *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985). *Cherry* relaxes the third requirement where "the hypothetical independent source comes into being only after the misconduct" and "the absence of a strong deterrent interest" makes active pursuit unnecessary. *Id.* at 1206. That carve-out is unavailable here, because the deterrent interest is at its highest where the asserted defect is an affiant's failure to describe his own warrant accurately. And no version of the showing can be made by assertion: "Inevitable discovery cannot rest upon speculation; it must

be supported by historical facts that can be verified or impeached." *United States v. Wilson*, 36 F.3d 1298, 1305 (5th Cir. 1994).

Mr. Al-Muhtadi does not ask the Court to trace that taint now. Under *Nardone v. United States*, 308 U.S. 338, 341 (1939), the accused carries the first step, and a taint claim must "satisfy the trial court with [its] solidity and not be merely a means of eliciting what is in the Government's possession before its submission to the jury." *Id.* at 341-42. He therefore asks the Court to decide the lawfulness of the search first, and to require the disclosure that would let him carry the second step if the search is held unlawful. He reserves a motion for a taint hearing, and for an evidentiary hearing, until the government has answered.

## VII. Conclusion

Mr. Al-Muhtadi respectfully asks the Court to hold the warrants unconstitutional; to order the government to state whether the geofence productions identified him, on the record or, as to any part the Court finds requires it, ex parte and in camera; and to suppress the March 4, 2025 production and the evidence obtained by exploiting it.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: *s/ Dustin C. Talbot*
DUSTIN C. TALBOT
First Assistant / Appellate Chief

*s/ Aaron A. Adams*

AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 15, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

***s/ Dustin C. Talbot***