UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant

CRIMINAL NO. 6:25-CR-00285-01
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**USA'S OPPOSITION TO DEFENSE MOTION TO SUPPRESS INTERCEPTED CALLS**

In compliance with Local Rule 7.1, the Government respectfully submits the following table of contents and table of authorities as to this Opposition to the Defendant's motion to suppress, [Doc. 109].

**TABLE OF CONTENTS**

I. RELEVANT HISTORY AND THE INSTANT MOTION .... 2
II. LEGAL STANDARD .... 4
A. The Fourth Amendment and Suppression Generally. .... 4
B. The Fourth Amendment's Application Outside the United States. .... 6
III. ARGUMENT .... 7
A. The Date of Search is October 7, 2023, When the ISA Intercepted the Calls, Not When the FBI Requested Them Nearly Two Years Later, as the Defense Would Have It. .... 9
B. The Court Should Not Permit the Defense to Relitigate Its Baseless Claim that the ISA Acted as an Agent of the FBI .... 14
C. The Defendant Did Not Have the Substantial Connections to the United States Required for Him to Enjoy Fourth Amendment Protections in June 2025 When the Defense's So-Called "Search" Occurred. .... 17
D. The ISA's Intercepting of Gazan Phone Calls Does Not Shock the Conscience. .... 21
E. No Evidentiary Hearing is Warranted. .... 22
IV. CONCLUSION .... 24

# TABLE OF AUTHORITIES

***CASES***

*Davis v. United States*, 564 U.S. 229 (2011) .......... 4, 5, 20
*Heien v. North Carolina*, 574 U.S. 54 (2014) .......... 4
*Herring v. United States*, 555 U.S. 135 (2009) .......... 4, 20
*Hudson v. Michigan*, 547 U.S. 586 (2006) .......... 4
*In re Terrorist Bombings of the United States Embassies in E. Afr.*, 552 F.3d 157, 169 (D.C. Cir. 2008) .......... 10, 11
*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) .......... 17
*Lustig v. United States*, 338 U.S. 74 (1949) .......... 12
*Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) .......... 18
*United States v. Adler*, 605 F. Supp. 2d 829 (W.D. Tex. 2009) .......... 15, 16
*United States v. Baboolal*, No. 05-215, 2006 U.S. Dist. LEXIS 40645 (E.D. Wisc. Jun. 16, 2006) .......... 19
*United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995) .......... 10, 12, 21
*United States v. Behety*, 32 F.3d 503 (11th Cir. 1994) .......... 5
*United States v. Cardenas, 9 F.3d* 1139 (5th Cir. 1993) .......... 11
United States v. *Chavez,* 281 F.3d 479 (5th Cir. 2002) .......... 5
*United States v. Degollado*, 696 F. Supp. 1136 (S.D. Tex. 1988) .......... 20
*United States v. Escobar-Temal*, 161 F.4th 969 (6th Cir. 2025) .......... 20
*United States v. German*, 486 F.3d 849 (5th Cir. 2007) .......... 4
*United States v. Getto*, 729 F.3d 221 (2d Cir 2013) .......... 6, 15, 20, 21
*United States v. Hasbajrami*, 945 F.3d 641 (2d Cir. 2019) .......... 11, 12
*United States v. Hawkins*, 661 F.2d 436 (5th Cir. 1981) .......... 6
*United States v. Heller*, 625 F.2d 594 (5th Cir. 1980) .......... 7, 9, 13, 15
*United States v. Jackson*, No. 20-30778, 2022 U.S. App. LEXIS 13147 (5th Cir. May 16, 2022) 4
*United States v. Janis*, 428 U.S. 433 (1976) .......... 9
*United States v. Johnson*, 63 F.3d 242 (3d Cir. 1995) .......... 22
United States v. *Jordan,* 635 F.3d 1181 (11th Cir. 2011) .......... 4
*United States v. Juda*, 46 F.3d 961 (9th Cir. 1995) .......... 10
*United States v. Lau*,778 F. Supp. 98 (D.P.R. 1991) .......... 10
*United States v. Marzook*, 425 F. Supp. 2d 708 (N.D. Ill. 2006) .......... 21
*United States v. Mitro*, 880 F.2d 1480 (1st Cir. 1989) .......... 6
*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) .......... 4
*United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976) .......... 5, 6, 7, 9, 13, 15, 16
*United States v. Odoni*, 782 F.3d 1226 (11th Cir. 2015) .......... 9
*United States v. Payner*, 447 U.S. 727 (1980) .......... 5, 21
*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) .......... 10
*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) .......... 20

*United States v. Randle*, 966 F.2d 1209 (7th Cir. 1992) .......... 22
*United States v. Rojas*, 812 F.3d 382 (5th Cir. 2016) .......... 5, 7, 9, 13
*United States v. Sarkissian*, 841 F.2d 959 (9th Cir. 1988) .......... 23
*United States v. Sharpe*, 470 U.S. 675 (1985) .......... 4
*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .......... 5, 8, 9, 10, 11, 17, 18, 19, 20

***STATUTES***

18 U.S.C. § 2331(1)(B) .......... 19
18 U.S.C. § 2331(5)(B) .......... 19

***OTHER AUTHORITIES***

Foreign Surveillance Intelligence Act .......... 11

***CONSTITUTIONAL PROVISIONS***

U.S. Const. amend. IV .......... 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19, 21

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant
______________________________/

CRIMINAL NO. 6:25-CR-00285-01
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**USA'S OPPOSITION TO DEFENSE MOTION TO SUPPRESS INTERCEPTED CALLS**

The United States respectfully submits the following Opposition to the Defense's Motion to Suppress the Products of Israeli Warrantless Surveillance, [Doc. 109] ("Motion"):

While the defense spends 24 pages arguing for the extreme step of suppression, the argument sits atop a three-legged stool of assumptions that collapses with the slightest push. And while any one defective leg would suffice for the Motion to topple over, the reality is that all three legs buckle under the weight of the law cutting against them. *First*, the defense fails to connect the Defendant's Fourth Amendment rights to the Israelis' search temporally, with the search having occurred when the Israeli government intercepted the phone calls in October 2023, while the defendant was a foreign national on foreign soil being investigated by foreign agents, not in 2025, when the FBI requested records from the Israelis. *Second*, even had a search occurred in 2025 as the defense contends, the defense premises its suppression argument on the same imagined cooperation between the Israeli government and FBI that the Court already considered and rejected after an evidentiary hearing when the defense filed its motion to compel, with the FBI's record request not enough for the Israelis to have been acting as agents of the FBI. And *third*, even had a search occurred in 2025 and the State of Israel been acting as agents for the FBI, the Motion would

still fail because the Defendant cannot claim the "substantial connections" to the United States necessary for him to have Fourth Amendment rights to a foreign search by American agents. That's so because unlike those who voluntarily take on "societal obligations" to gain those rights, the Defendant defrauded the United States Government twice to get into the country—once on his visa application and again to a Department of State official—and only resided here a few months before his claimed date of search. Indeed, the Motion fails to cite *a single case* suppressing foreign evidence in the way it proposes; as a result, the defense spends its pages attempting to duck and weave around precedent that squarely forecloses its unprecedented relief. And on top of all that, the defense's concluding Hail Mary hurl into the endzone, claiming that the Israeli's intercepting the Defendant's phone calls should shock the Court's judicial conscience, has no grounding in law or fact—a remedy that the defense vastly overstates even in saying it "is invoked often and succeeds almost never." Mot. at 18. These factors are why courts have uniformly declined to suppress evidence like that at issue here—collected in foreign lands, collected by foreign governments, as to foreign nationals, and this Court should do the same here. The Court should therefore deny the Motion without a hearing.

## I. RELEVANT HISTORY AND THE INSTANT MOTION

On October 7, 2023, the Defendant crossed into Israel alongside his National Resistance Brigades compatriots and perpetrated one of the most harrowing terrorist attacks this century. The defense Motion concerns intercepted phone calls showing him to have done so. The Israeli Security Agency ("ISA") intercepted these calls on October 7, 2023, as part of their routine data collection authorized by Israeli law—the details of which are unknown to American law enforcement or the prosecution team in this case. In 2025, after the FBI received intelligence that the Defendant appeared to have fled to the United States after participating in the attack, it requested records from

the ISA relating to the Defendant, receiving battlefield documents that are the subject of another motion, *see* [Doc. 45], as well as six audio recordings of intercepted phone calls and summaries of other calls. The Government charged the Defendant by criminal complaint and then indicted him in October 2025, and trial is set in January 2027.

The import of these intercepted calls is hard to overstate: they find the Defendant hearing the call to arms that sparked the terrorist attack, coordinating with associates to cross into Israel, collecting arms to slaughter innocent Israelis, and announcing that he was inside Israel. Since receiving discovery that included those six intercepted phone calls, the defense has relentlessly and desperately attempted to litigate the provenance and admissibility of the intercepted calls. It filed two improper discovery demands, *see* [Docs. 47 and 70], and then it filed a Motion to Compel in which it wrongly claimed, as it does here, that the ISA was working as an agent for the FBI by spinning yarns tinged with the color of certainty, such as that "[t]he Israeli agencies that seized, processed, and analyzed the battlefield evidence acted in cooperation with the FBI and the Department of Justice," [Doc. 74-1 at 6] and that "[t]he government's case rests almost entirely on evidence gathered, processed, and interpreted by Israeli agencies and a foreign carried that acted in cooperation with, and at the direction of, the United States," [Doc. 74-1 at 2]. In that prior motion, the defense described the intercepted calls as a "category [of evidence that] deserves emphasis," [Doc. 74-1 at 3], with an entire "Part two" of extensive requests for records such as "any Israeli wiretap order," *see* [Doc. 74-1 at 14], which came after two pages of improper requests in the defense discovery demand, *see* [Doc. 70 at 4-5]. The Court considered the defense's baseless claims, even holding an evidentiary hearing with an FBI agent flown in to testify about the FBI's relationship with the ISA, *see* [Docs. 84 and 89], and the Court rightly found the defense's claims

lacking, denying the motion as to anything having to do with the ISA being part of the FBI team. *See* [Doc. 114 at 87].

The Motion concerns the six phone calls and summaries provided to the Government by Israeli authorities. As the defense would have it, the calls and summaries should be suppressed based on the Defendant's presence in the United States in 2025, when the FBI requested the records of the Israeli government. According to the defense, the Defendant had Fourth Amendment rights to a foreign search in 2025, *see* Mot. at 8-9, a search actually occurred in 2025, when the FBI requested records, as well as 2023, when the actual search and seizure occurred, *see* Mot. at 10-12, and the ISA "acted as an agent for the FBI in performing the retrieval," Mot. at 12-18. These claims, the defense contends, make the records suppressible. Mot. at 17-18. In the alternative, the defense claims that the surveillance the State of Israel conducted in this case should "shock the judicial conscience" to the extent that this Court should use its inherent powers to take the extreme measure of suppressing the evidence even if the Defendant has no Fourth Amendment claim. Mot. at 18-23. The defense concludes by requesting an evidentiary hearing to explore matters such as "where the servers holding [the Defendant's] communications were located," "who selected the six recordings," and "on what basis lines were captured." Mot. at 23-24.

## II. LEGAL STANDARD

### *A. The Fourth Amendment and Suppression Generally.*

The Fourth Amendment guarantees, among other things, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. But the Amendment is "not, of course, a guarantee against *all* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (emphasis in original). Rather, it protects "only against *unreasonable* searches and seizures." *Id.* (emphasis in original). As a result,

a search or seizure's propriety turns on whether it was reasonable, and whether a search or seizure is reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). In deciding this, "the ultimate touchstone … is reasonableness," *Heien v. North Carolina*, 574 U.S. 54, 60 (2014), and "[t]o be reasonable is not to be perfect," *id*.

Searches that violate the Fourth Amendment sometimes result in suppressing the fruits of the search. *See, e.g.,* U*nited States v. Jordan,* 635 F.3d 1181, 1185 (11th Cir. 2011). That said, the Supreme Court has stressed that this "judicially created rule" is an "extreme sanction," *Herring v. United States*, 555 U.S. 135, 139-40 (2009), and the Fifth Circuit has similarly stressed that "suppression is a 'last resort' that generates 'substantial social costs.'" *United States v. German*, 486 F.3d 849, 853 n.7 (5th Cir. 2007) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). And as the Fifth Circuit and Supreme Court have recognized, "[e]xclusion almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence,'" *United States v. Jackson*, No. 20-30778, 2022 U.S. App. LEXIS 13147, at *4-5 (5th Cir. May 16, 2022) (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)), with the ultimate effect of the exclusionary rule "in many cases, [being] to suppress the truth and set the criminal loose in the community without punishment." *Davis*, 564 U.S. at 237; *see also United States v. Payner*, 447 U.S. 727, 734 (1980) (rejecting exclusionary rule to foreign searches while explaining "suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case" and that "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury").

***B. The Fourth Amendment's Application Outside the United States.***

Aliens have some Fourth Amendment protections while here, such as when being stopped in a car. *See, e.g.,* U*nited States v. Chavez,* 281 F.3d 479 (5th Cir. 2002). But that is not so for searches abroad. For foreign searches involving American law enforcement, "the Fourth Amendment does not apply to searches and seizures of nonresident aliens who have 'no previous significant voluntary connection with the United States.'" *United States v. Rojas*, 812 F.3d 382, 397 (5th Cir. 2016) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). And for foreign searches conducted purely by foreign law enforcement, as the Fifth Circuit explained a half-century ago, "the fourth amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law," *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976), with "reasoning usually tendered in support of this limitation [being] the doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court," *id.* As a result, "[e]vidence obtained by foreign police officials from searches conducted in their country is generally admissible in federal court regardless of whether the search complied with the Fourth Amendment." *United States v. Behety*, 32 F.3d 503 (11th Cir. 1994) (citing *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976).

That principle has two narrow exceptions: "first, if the conduct of the foreign authorities in conducting the search 'shocks the conscience' of the American court; and second, if American officials participated in the foreign search, or if the foreign authorities were acting as agents for their American counterparts." *United States v. Hawkins*, 661 F.2d 436, 456 (5th Cir. 1981). Because no court (as far as the undersigned is aware) has ever held that a foreign state's practices warranted suppression under the "shocks the conscience" standard in the Fourth Amendment

context,[1] courts have only speculated about what might qualify. The Second Circuit, for its part, has "held that conduct did not shock the judicial conscience when, for example, there was no act of torture, terror, or custodial interrogation of any kind, or when there was "no claim of rubbing pepper in the eyes, or other shocking conduct," *Getto*, 729 F.3d at 229 (quotations omitted). "Circumstances that will shock the conscience are limited to conduct that not only violates U.S. notions of due process, but also violates fundamental international norms of decency." *United States v. Mitro*, 880 F.2d 1480, 1483-84 (1st Cir. 1989). As for being an American agent "participating in the foreign search" or the "foreign authorities [] acting as agents for their American counterparts," *Hawkins*, 661 F.2d at 456, courts "have as a statistical matter been virtually unanimous in rejecting claims of undue participation." *Morrow*, 537 F.2d at 140. Rather, although few courts have ever applied this doctrine, courts have given hypothetical examples such as "agents persuad[ing] the Panamanian authorities to conduct the search on their behalf in an attempt to evade the strictures of the Fourth Amendment." *Hawkins*, 661 F.2d at 456. Courts routinely reject claims of joint venture where, for example, the United States authorities provide a tip, interview a defendant, or advise on a search. *See, e.g., Morrow*, 537 F.2d at 140; *Rojas*, 812 F.3d at 397; *United States v. Heller*, 625 F.2d 594, 600 (5th Cir. 1980).

## III. ARGUMENT

This Court should deny the Motion's request for suppressing the six phone calls and related matters at issue[2] for four reasons. *First*, the Motion fails because the defense's preferred "search"

[1] To be clear, the standard "shocks the conscience" stems not from the Fourth Amendment, but instead from a federal court's authority to exercise its supervisory powers over the administration of federal justice," *United States v. Getto*, 729 F.3d 221, 229 (2d Cir. 2013). Colorable arguments generally arise in the context of compelled speech through interrogation, not searches for evidence.

[2] The Motion covers both the six intercepted phone calls that the Government has received and produced and several summaries of phone calls that the Government never received from the ISA, with the ISA instead producing summaries. *See* Mot. at 22-23. The Government agrees that the

date of June 2025 is nearly two years later than the date of the actual search—October 7, 2023, when the Defendant was squarely a foreign national on foreign soil having his phone calls intercepted by a foreign government. Because the defense's proposed June 2025 date isn't the date of the search, the Motion finds itself fighting on the wrong hill. *Second*, even if a search had occurred in 2025, his Motion also fails because his suppression request is based on the defense's insistent conspiracy theory that the FBI and Israeli authorities were working together as a joint venture, which this Court already heard and correctly rejected after an evidentiary hearing. *Third*, even were both those things not true, the Defendant entire suppression claim is premised upon the notion that he had Fourth Amendment rights for a foreign search by American agents in June 2025, when even then he did not. That's so because Fourth Amendment rights for an alien requires "substantial connection" to the United States forged through adhering to "societal obligations" when the Defendant's defrauding the United States *twice*—once in his visa application and again in his Department of State interview—dooms any notion that his nine months stateside would be enough to wash away his tainted, fraudulent entry. And finally, the defense's last-ditch "shocks the conscience" argument is untethered to any law whatsoever, is grounded in the notion that the Defendant's phone calls implicate the entire Gazan population's privacy, and do not remotely approach the types of torture and other barbarism that courts speculate might meet the extraordinarily high bar that the "shocks the conscience" standard requires. Because the Motion fails on these grounds, because the defense thereby fails to make a prima facie case for suppression, and because the Court has already held an evidentiary hearing on the primary issues of fact the defense raises, the Court should deny the Motion without a hearing.

---

Court should treat all this evidence equally, with this Opposition explaining why the Court should deny the Motion on all fronts.

### *A. The Date of Search is October 7, 2023, When the ISA Intercepted the Calls, Not When the FBI Requested Them Nearly Two Years Later, as the Defense Would Have It.*

As a threshold matter, the Motion would still fail because of the timing of the actual search that occurred here—October 7, 2023, well before the FBI began investigating. The defense does not dispute (1) that the Defendant was on foreign soil and had no substantial connections to the United States on October 7, 2023, (2) that the ISA seized the phone calls at issue at that time, or (3) that American authorities were not even investigating the Defendant, much less in contact with the State of Israel about the Defendant, until 2025, *see* Mot. at 14 ("There was an archive and a request"). And the defense does not appear to dispute, nor could it, that the Defendant's phone calls did not enjoy Fourth Amendment protections on October 7, 2023, when the ISA seized the information. *See, e.g.,* Mot. at 11-12 (focusing argument on 2025 while claiming that "[t]he constitutional question did not close in 2023"); *see Verdugo-Urquidez*, 494 U.S. at 264. For that reason, the defense rests much of its argument on the unintuitive notion that a search and seizure occurred not only at the initial search and seizure by Israeli authorities but also again a second time when American authorities requested it. That's why, in the defense's view, "[t]he June 2025 retrieval is the constitutional event," Mot. at 2, based on the Government "ask[ing] the [ISA] for the telephone calls it had saved." Mot. at 7.

But that is not the law. Rather, the law is much more commonsense, even tautological: a search and seizure of a person's data by the government occurs when the search and seizure occurs, not every time the evidence passes hands after. In *Rojas*, the Fifth Circuit evaluated the defendants' Fourth Amendment rights "at the time of the intercepts," 812 F.3d at 397, which was when "the defendants were citizens and residents of Colombia" and had no "significant voluntary connection to the United States," *id.* That the Government later secured or used that evidence is of no moment because "[t]he Supreme Court has explained that 'a violation of the Fourth Amendment is fully

accomplished at the time of an unreasonable government intrusion,'" *id.* at 398 (quoting *Vergudo-Urquidez*, 494 U.S. at 264), not when United States authorities secure that evidence. Indeed, the Fifth Circuit has recognized the same principle even in cases where the United States authorities previously tipped the foreign investigators as to the criminal activity and later prosecuted that activity in the United States, whether it's British authorities seizing treasury bills on an American tip, *see United States v. Heller*, 625 F.2d 594, 600 (5th Cir. 1980), or Canadian authorities conducting a "warrantless raid on adjacent hotel rooms" after a "short period of surveillance" that resulted in the seizure of evidence, *see United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976). And at bottom, this gels with the entire purpose of suppression: to promote American law enforcement compliance with the Fourth Amendment. For that reason, "[t]he Fourth Amendment generally does not apply to the actions of foreign officials enforcing foreign law in a foreign country just as it does not apply to the actions of private parties," *United States v. Odoni*, 782 F.3d 1226, 1238 (11th Cir. 2015). That's why a half-century ago the Supreme Court could already hold it "well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act." *United States v. Janis*, 428 U.S. 433, 455 n.31 (1976). And beyond that, the good faith exception bars inquiries into whether the foreign law enforcement agency actually complied with law, with American agents relying upon those foreign authorities' representations sufficient for Fourth Amendment purposes.[3] For those reasons, the notion that the FBI submitting an MLAT request asking for

---

[3] *See United States v. Juda*, 46 F.3d 961, 968 (9th Cir. 1995) ("The DEA agent reasonably relied on [the representation of the Australian Federal Police], and accordingly, the good faith exception to the exclusionary rule applies."); *United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (finding it reasonable for American officials to rely on representations from law enforcement authorities that all legal requirements of Philippine law had been met, particularly where "search and seizure law in the Philippine is less than completely clear"); *United States v. Lau*,778 F. Supp. 98, 101 (D.P.R. 1991) ("[T]he evidence was admitted properly because the federal officials

information already in the possession of the Israeli government constitutes a "search" similarly has no basis in law.

Beyond the commonsense, the law undergirding that fact is grounded in the reality that American law enforcement cannot even attempt to secure Fourth Amendment process through United States courts for the evidence at issue. "As the *Verdugo-Urquidez* Court explained, '[w]hat we know of the history of the drafting of the Fourth Amendment . . . suggests that its purpose was to restrict searches and seizures which might be conducted by the United States in domestic matters.'" *In re Terrorist Bombings of the United States Embassies in E. Afr.*, 552 F.3d 157, 169 (D.C. Cir. 2008) (quoting *Verdugo-Urquidez*, 494 U.S. at 266); *see also United States v. Barona*, 56 F.3d 1087, 1092 n.1 (9th Cir. 1995) ("foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter."). And in fact, "in *Verdugo-Urquidez*, seven justices of the Supreme Court endorsed the view that U.S. courts are not empowered to issue warrants for foreign searches." *In re Terrorist Bombings*, 552 F.3d at 169. For that reason, the D.C. Circuit has held that "the Fourth Amendment's Warrant Clause has no extraterritorial application and that foreign searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth Amendment's requirement of reasonableness." *In re Terrorist Bombings*, 552 F.3d at 171. Indeed, the Fifth Circuit has squarely held that "[t]he Fourth Amendment does not apply to searches or seizures conducted on foreign soil, even if the search involves agents of the United States government." *United States v. Cardenas, 9 F.3d* 1139, 1157 n.8 (5th Cir. 1993) (citing *Verdugo-Urquidez*, 494 U.S. at 274-75, for search of United States citizen's hotel room in

---

reasonably relied [i]n good faith on the representations of Dutch officials as to the requirements of Netherlands Antilles search and seizure law.").

Mexico).[4] In this way, the case law's structure reflects not just the fact that suppression is an extreme remedy designed to incentivize American law enforcement to honor Fourth Amendment rights but also the fact that those American law enforcement officers are literally unable to go to American courts to secure the evidence in question. That's why courts always focus on the actual search and seizure performed by those foreign governments—because it's the only search and seizure there ever was.

That the defense is out-to-sea on this Fourth Amendment issue is embodied in the case law they cite. The defense pushes its contrary approach with just one out-of-circuit case, *United States v. Hasbajrami*, 945 F.3d 641, 670 (2d Cir. 2019), but that case is far afield in several respects. To start, *Hasbajrami*, involved a United States citizen living in the United States whose communications were intercepted by warrantless intercepts pursuant to Section 702 of the Foreign Surveillance Intelligence Act. *Id.* at 647. On top of that, there was no foreign actor akin to the ISA here whatsoever, with the National Security Agency, an intelligence branch of the United States Government, intercepting these communications and providing them to FBI, which then used those stored communications to develop evidence. *See id.* at 670-74. The *Hasbajrami* court's remand was fundamentally grounded in those basic aspects of the case, with the question of what FBI did with these records seized by another arm of the American government as to a United States citizen lying at the heart of the Fourth Amendment inquiry. *See id.*

---

[4] Indeed, the Government here couldn't have even secured a search warrant had it wanted one, *see In re Terrorist Bombings*, 552 F.3d at 169, and had the Government done so as the defense now suggests it should, the defense would have filed this motion to suppress that warrant based on United States courts' inability to issue such a warrant at all. This Court should decline follow the defense down this Catch-22 path, instead following other courts in recognizing that foreign searches are simply different in kind from domestic ones.

The same is true for the defense claim that "American agents participated in the search by defining what would be selected," Mot. at 13, which comes after its bizarre claim that "[n]o Israeli investigation generated these recordings" matters, Mot. at 12, while repeatedly describing it as "surveillance." Mot. at 4, 18, 20. Here again the defense misses that once the foreign government has seized its materials, the seizure is complete for Fourth Amendment analysis—the Court should look right then. The notion that the FBI "participated in the search" by requesting the calls of a specific person nearly two years later has no support in the law, which is why the defense is left attempting to align this situation into a 1949 case about a federal agent searching a location alongside state officers. *See* Mot. at 13 (discussing *Lustig v. United States*, 338 U.S. 74 (1949)). Indeed, the analogy finds the defense talking out of both sides of its mouth about whether the ISA is even law enforcement in the first place: at times the Motion would have the ISA doing nothing at all with its data, *see* Mot. at 12, then the next page the ISA is part of the investigation team conducting a joint search, *see* Mot. at 13-14. And even more to the point, the Defendant's position that American authorities requesting a specific set of records would transform virtually any MLAT request involving phone calls into a Fourth Amendment search requiring a warrant—an outcome that cannot possibly be true when "foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter." *Barona*, 56 F.3d at 1092 n.1. Thus, here again the defense's arguments are untethered to the law or the facts here.

But none of the defense morass or its incorrect claims that the legal issue here is "largely unanswered in American law," Mot. at 2, should bog down this Court in recognizing the reality: this case is like *Rojas*, like *Heller*, and *Morrow*, and so many others cited above where foreign authorities seized materials and then later provided them. Courts have considered evidence secured by foreign governments time and again, and time and again they rule that suppression is simply

not part of the framework for United States courts to evaluate that evidence. Indeed, the evidence at issue here presents lesser concerns than even those in *Rojas*, *Heller*, and *Morrow* because, unlike them, here there is no claim that American authorities were even in contact with the foreign government about the Defendant at the time that foreign government seized the data that it ultimately produced. For these reasons, this Court should follow *Rojas*'s commonsense approach to the Fourth Amendment analysis here, looking at when the evidence was seized not the later moment when the foreign government produced that evidence to American authorities. And because that search occurred in October 2023, (1) when the Defendant was undisputably in Gaza, (2) when he had no connection to the United States, (3) when the Israeli government was surveilling him and collecting his data, and (4) when the United States government had zero involvement in collecting data or investigating, there is no basis whatsoever for this Court to apply Fourth Amendment warrant requirement to the search. For that reason, the Court should deny the Motion's extreme request.

***B. The Court Should Not Permit the Defense to Relitigate Its Baseless Claim that the ISA Acted as an Agent of the FBI.***

In addition to the Defendant's lacking Fourth Amendment protections, this Court should deny the Motion's suppression request for another foundational reason: the Court has already entertained and rejected this mistaken notion that the FBI and ISA were working in concert. The Motion treats this like an open question, insisting repeatedly that their relationship was "not [] arm's length," Mot. at 6, that FBI was "embedded," Mot. at 6, that the ISA "acted as agent for the FBI," Mot. at 12, and that information "request[s] w[ere] made from inside the relationship rather than across it," Mot. at 12. The defense then delves into cloak-and-dagger conspiracy theory, claiming that because "[t]he FBI could not lawfully have recorded Mr. Al-Muhtadi's telephone

calls without a warrant," they instead "obtained the same product by asking [the Israelis] … from a position inside the Israeli counterterrorism apparatus." Mot. at 16.

But this is all old hat—arguments that this Court has already entertained and rejected. In July, the defense filed a motion to compel similarly based on the notion that "[t]he Israeli agencies that seized, processed, and analyzed the battlefield evidence acted in cooperation with the FBI and the Department of Justice," [Doc. 74-1 at 6], and the Court made findings after an evidentiary hearing that rejected those claims. And those findings were clear: "Based on the testimony today and the documents I have seen, I do not find that the Israeli intelligence or police forces were part of the prosecution team based on the manner of investigation by the FBI of this case." [Doc. 114 at 87]. Indeed, the FBI agent to testify explained that FBI does not have anybody embedded in the ISA, *see* [Doc. 114 at 60-61], and the Government explained that "the prosecution team and the task force has never had access to those [i.e., the Israeli government] computers." Which is all to say: the Court should reject the defense's second foundational premise, that the Government was "embedded" with the ISA, because it's already heard testimony on the issue and made findings.

Moreover, the law governing "joint venture" doctrine shows that the defense's fanciful facts aren't enough on their own terms either—that submitting an MLAT request and defining the terms of a search simply isn't enough for the finding the defense seeks. To the contrary, the Fifth Circuit in *Morrow* noted a half-century ago that the courts to consider the issue then "have as a statistical matter been virtually unanimous in rejecting claims of undue participation," *Morrow*, 537 F.2d at 140, and that "[n]ormal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged," *id.*, not frustrated by joint venture doctrine. Four years later, the Fifth Circuit held in *Heller* that although "but for a tip from an American official[, the defendant] probably would not have been arrested" in the U.K.

and the American agent "interviewed [the defendant], but only after first obtaining permission from the British and then only for the limited time allowed by them," the court held that participation "peripheral at most." 625 F.2d at 600. The defense attempts to distinguish this case by saying that this case involved "a request that defined the target and the category," Mot. at 15, but virtually every one of these cases involves United States agencies requesting records relating to someone they are investigating. And since *Morrow*, courts have uniformly recognize that "[i]t is not enough that the foreign government undertook its investigation pursuant to an American MLAT request," *Getto*, 729 F.3d at 230, and it was enough in *Getto* that "the American government has proffered, and Getto has not rebutted, that, although American agents were in contact frequently with their Israeli counterparts to share information, they did not participate in *any* law enforcement actions by the [Israeli National Police] in Israel," *id.* at 231.

Cases with similar facts echo this result. In *United States v. Adler*, 605 F. Supp. 2d 829, 838 (W.D. Tex. 2009), for example, the district court was confronted with an MLAT request that found "American authorities … obtain[ing] the seized evidence … a year after the search was conducted." And like here, "[a]lthough an FBI agent in Madrid was aware of the search, no American official was present at the search." Rather, "[o]verall, the record shows Spanish officers chose how to implement the search, conducted it without American input besides the MLAT request, and benefitted from the fruits of the search." *Id.* On those facts, the district court held that there was no joint venture while also noting that the Fourth Amendment "does not apply to foreign searches because an American court's action is unlikely to affect the conduct of foreign authorities." *Id*. (citing *Morrow*, 537 F.2d at 139). And while the defense claims that "[e]ach formulation [of joint venture case law] presupposes a foreign parallel investigation whose fruits are shared," Mot. at 14, and that just "[t]wo decisions hold that an American request, standing

alone, does not create a joint venture," Mot. at 14, that is not so. And to the extent the defense continues to insist upon an "embedded" agent making a difference, *see* Mot. at 15, the defense both has no case law to back that claim up and grounds it in its fanciful notion that the FBI and ISA were working together in a way that the Court has already rejected as a matter of fact. The Court should therefore hold that the Defendant's Motion fails for this reason as well.

### *C. The Defendant Did Not Have the Substantial Connections to the United States Required for Him to Enjoy Fourth Amendment Protections in June 2025 When the Defense's So-Called "Search" Occurred.*

Yet even were this Court to hold that a search occurred in 2025 and revisited its findings about the FBI-ISA relationship as well, the Court should rule against the defense in its foundational premise: that the Defendant had sufficient ties to the United States in 2025 for the issue of whether a search even occurred in 2025 to matter at all. As the defense would have it, the Defendant was not a nonresident alien in 2025 but instead had sufficient connections to the United States by then, when its purported "search" occurred. *See* Mot. at 8-10. The defense recognizes this to be required for its Motion to have any chance, noting that the Supreme Court has long recognized that the Fourth Amendment does not apply to "'search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country,'" Mot. at 8 (quoting *Verdugo-Urquidez*, 494 U.S. at 261). Yet the defense insists that the Defendant's few itinerant months in the United States, going from Tulsa to Lafayette, was enough for the "substantial connection" needed for the FBI to have needed a warrant for the phone calls intercepted abroad two years prior. This Court should reject this claim for a simple, commonsense reason: that by affirmatively defrauding the immigration authorities to enter the United States, the Defendant cannot have complied with the "societal obligations" necessary to develop the "substantial connection" to the United States required by *Verdudo-Urquidez* within those mere few months.

To see why, start with *Verdugo-Urquidez* itself: the case involved a Mexican national in the United States "'lawful[ly] but involuntary[ily]'" in federal custody, which led the Court to find that his presence was "not the sort to indicate any substantial connection with our country." *Verdugo-Urquidez*, 494 U.S. at 271. To get there, the *Verdugo-Urquidez* Court cites *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953), for the proposition that all constitutional rights attach "*once an alien lawfully enters and resides in this country*." 494 U.S. at 271 (emphasis in original). From there, the Court explained that "lawful but involuntary" presence "is not the sort to indicate any substantial connection to our country." *Id*. Rather, "substantial connection" requires at least being in the United States "voluntarily" and while accepting "societal obligations" consistent with citizenship. *Id*. at 272-73. The question for the Defendant, then, turns on whether he had those "substantial connections" despite having committed visa fraud to smuggle himself into the United States and, in the eight months after, residing in Tulsa and Lafayette before being found and arrested. For three reasons, the answer is No.

*First*, the *Verdugo-Urquidez* holding strongly suggests that a "substantial connection" to the United States cannot result from the Defendant's affirmative fraud he employed to get here. Just as Verdugo-Urquidez's "lawful but involuntary" presence was not enough for substantial connection, *id.* at 271, so too should unlawful but voluntary presence be insufficient when that unlawful presence involves defrauding the United States government. Considering the Fifth Circuit recognizing that "acquiescence in the U.S. system of immigration constitute[s] [a defendant's] voluntary acceptance of society obligations" in this context, *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006), so too must the Defendant's affirmatively defrauding the visa system—lying both on the visa application and to a Department of State employee—show a lack of accepting societal obligations. In rejecting Verdugo-Urquidez's claim of "substantial

connection," the Court "d[id] not think the applicability of the Fourth Amendment to the search of premises in Mexico should turn on the fortuitous circumstance of whether the custodian of its nonresident alien owner had or had not transported him to the United States at the time the search was made." *Id.* at 272. In other words, the *Verdugo-Urquidez* Court rejected the notion that a defendant could be rewarded with Fourth Amendment protection based on whether law enforcement happened to have moved him into the United States. By the same token, so too should this Court reject that the Defendant's Fourth Amendment interest in phone data intercepted in Israel should turn on how long he was able to evade detection by law enforcement after lying to get here in the first place. For this reason, the Court should hold that the Defendant's defrauding the U.S. immigration authorities undermines his ability to develop "substantial connection" here within the nine-month period before the defense's supposed June 2025 date of a "search." Thus as a general matter, the nature of the Defendant's entry through affirmative fraud defeats his claims to have taken on "societal obligations" that would give him "substantial connection" to the United States. *See United States v. Baboolal*, No. 05-215, 2006 U.S. Dist. LEXIS 40645, at *8 (E.D. Wisc. Jun. 16, 2006) ("The Supreme Court in *Verdugo-Urquidez* declined to find that the defendant's drug trafficking business was sufficient to establish a sufficient connection and likewise this court finds that Baboolal's alleged wire fraud business is insufficient to establish a substantial connection.").

*Second*, the scale and nature of the lie matters too. When the Defendant lied to the United States government twice to get here, he was lying about one of the most significant types of criminal activity in the world today: terrorism. This isn't a case involving a defendant lying about having filed a previous application, or misstating their employment history, or even whether he worked for a foreign government. This Defendant lied about his participation in crimes whose very

definition strikes at the heart of our ordered society. *See* 18 U.S.C. §§ 2331(1)(B) & (5)(B) (defining terrorism to require acts that "appear to be intended to intimidate or coerce a civilian population, to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination, or kidnapping"). In that sense, the Defendant's lie covers up the fact that he is involved in groups devoted to destroying our societies and the norms that govern them. In this backdrop, the notion that the Defendant went from a terrorist militia leader to John Q. Citizen in the United States would be laughable were it not deadly serious. In this respect, the Court should reject the notion that the Defendant, through lying about his terrorist connections, established "substantial connection" in the less-than-a-year he was here.

*Third*, the law cuts against the Court providing the protections abroad at issue in *Verdugo-Uriquez* to illegal aliens like the Defendant at all. The Fifth Circuit, interpreting *Verdugo-Urquidez*, has made clear that "neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally." *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011); *see also United States v. Escobar-Temal*, 161 F.4th 969, 1000 (6th Cir. 2025) ("Even now, the Supreme Court has never confirmed that the Fourth Amendment covers aliens, much less illegally present ones."), and the defense cites no case where an illegal alien enjoyed those protections for a search abroad. Its failure to cite a case is for a simple reason: there isn't any; and to the contrary, *Verdugo-Uriquez* stresses the importance of aliens "lawfully enter[ing]" in discussing the case law before it. 494 U.S. at 271. In this sense, the defense moves this Court for the "extreme sanction" of suppression, *Herring*, 555 U.S. at 139-40, and that the Court "ignore reliable, trustworthy evidence bearing on guilt or innocence," *Davis*, 564 U.S. at 237, without offering a single case supporting that relief. For all these reasons, even had a search occurred in June 2025 as the defense

supposes, and even had that search involved American agents, the Motion would still fail because the Defendant did not enjoy Fourth Amendment protections for a search of foreign records by American agents at that time.

### *D. The ISA's Intercepting of Gazan Phone Calls Does Not Shock the Conscience.*

After making its shaky suppression argument, the Motion concludes with a Hail Mary: asking this Court to make the unprecedented, extraordinary finding that the ISA intercepting phone calls at a war zone border "shocks the conscience." Mot. at 18-22. The defense cites no case law supporting this extraordinary request beyond the bare fact that the relief is technically available, acknowledging a 1988 district court case recognizing a lack of any district court making such a finding, *see* Mot. at 19 (quoting *United States v. Degollado*, 696 F. Supp. 1136, 1137 (S.D. Tex. 1988)). In fact, the defense also acknowledges that "[t]he exception is invoked often and succeeds almost never." Mot. at 18. The defense's failure to cite a case on point is understandable: no such case exists. And that's so for good reason: the remedy is reserved for conduct that rises to the level of torture, *see, e.g., Getto*, 729 F.3d 221, 229, and even a case involving torture allegations failed to meet the mark, *see* Mot. at 19 (citing *United States v. Marzook*, 425 F. Supp. 2d 708, 776 (N.D. Ill. 2006)). Courts that have confronted warrantless wiretaps—including those conducted by Israel—under the "shock the conscience" standard have dismissed them out of hand. *See, e.g., Getto*, 729 F.3d at 229 ("Defendant's allegations, at most, amount to a claim that Israeli law enforcement officials may not have obtained a warrant under Israeli law prior to conducting some searches or surveillance—a circumstance that would hardly "violate[ ] fundamental international norms of decency."); *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995) ("the wiretaps at issue cannot be said to shock the conscience" even when "secured in violation of [a] foreign law."). And the fact that the Defendant invokes the privacy rights of other Gazans to mount his

case is similarly untethered to the law, whether the Fourth Amendment or otherwise. *See, e.g.*, *Payner*, 447 U.S. at 734 (after rejecting suppression, noting "[t]he same societal interests are at risk when a criminal defendant invokes the supervisory power to suppress evidence seized in violation of a third party's constitutional rights."). Because the defense fails to provide any relevant law weighing in its favor for this extreme request, the Court should treat it with the same short shrift that district courts across the country routinely do when defendants toss the notion into their briefs. The Court should therefore deny the request without a hearing.

***E. No Evidentiary Hearing is Warranted.***

The Motion concludes with the defense proposing another wish list of highly classified and wholly irrelevant information, including "where the servers [the Defendant's] communications were located," "on what basis [the Defendant's] lines [i.e., phone calls] were captured," and "whether any Israeli process authorized the collection or the retrieval," Mot. at 23-24, with this testimony presented by "witnesses with firsthand knowledge of the [Israeli surveillance] program," Mot. at 3. This request mirrors many of those the defense requested in its so-called discovery demands and then in its motion to compel, and the Court will be right to deny the requests again for three reasons:

*First*, the Motion fails to present a "substantial claim" warranting a hearing. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Only "once the defendant has established a basis for his motion" does the burden shift to the government to show the search was reasonable. *Id.; see also United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient."). Here, as argued above, *see* Sections III.A-C, three facts foreclose relief in uncontestable ways: (1) that the Defendant's visa fraud and lying to a

Department of State employee to secure a visa in the first place vitiates his claim to Fourth Amendment protections in 2025, (2) that the FBI did not work with the Israelis in a manner that renders them a joint venture or part of the prosecution team, and (3) that no matter what, the actual search and seizure here occurred in October 2023, when the Defendant was indisputably a foreign national on foreign soil being surveilled by foreign governmental agents, forecloses his claim for relief anyway. Any one of these would be enough for this Court to deny the Motion without delving into any collateral facts, and for that reason an evidentiary hearing could serve no legitimate purpose, serving instead to let the defense continue fishing for classified information.

*Second,* the Court already held an evidentiary hearing about the sole factual question at issue here: the relationship between the FBI and Israeli law enforcement and disposed of the precise issue of fact that the defense now re-raises. While the defense is requesting an evidentiary hearing about Israel's national security footprint in the Middle East, any evidentiary hearing would need to first decide the issue of joint venture to even reach that issue. And for all the defense's insistence that the FBI and Israelis were working hand-in-glove throughout, this Court heard about the reality itself at the August 4 evidentiary hearing. The Court should thus hold to its prior finding and apply the same here without giving the defense another bite at the FBI apple, much less the carte blanche to seek Israeli national security information as it requests.

*Third*, the defense request for an evidentiary hearing, like its motion to compel forebear, is yet another attempt at an end-run around the classified nature of the information the defense seeks. Indeed, the testimony requests are nearly identical. *Compare* Mot. at 23-24 *with* [Doc. 74-1 at 19] (requesting testimony about "the scope of the cooperation between the United States and the Israeli agencies that produced the evidence, the manner in which the six recordings were selected from any larger set"). The defense has been and remains exceedingly unsubtle in this, requesting

testimony about matters that, beyond classified, even the United States Government isn't privy to, seeking someone "with direct, firsthand knowledge of the surveillance program" and asking for information such as "where the servers holding [the Defendant's] communications were located" and information about collection and retention. Mot. at 23-24. This persistent, insistent behavior by the defense—when it knows full well that the State of Israel will not divulge this information, as the Government has repeatedly advised—occurs with the backdrop of CIPA's core purpose: "Congress passed CIPA to prevent the problem of 'greymail,' where defendants pressed for the release of classified information to force the government to drop the prosecution." *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988); Senate Rep. 96-823, 96th Cong., 2d Sess. 1-4 (1980), reprinted in 1980 U.S. Code & Cong. News 4294-98. This Court should not give the defense another chance to further its improper enterprise with another evidentiary hearing about these issues that are beyond the scope of this criminal case.

## IV. CONCLUSION

For all these reasons, the Court should deny the Motion without a hearing.

Dated: September 29, 2026

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: */s/ Zachary A. Keller*

ZACHARY A. KELLER
JOHN W. NICKEL
U.S. Attorney's Office – WDLA
Special Bar No. 803262 (Keller)
LA Bar No. 37819 (Nickel)
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Tel: (337) 262-6618
Email: Zachary.keller@usdoj.gov

ELIZABETH J. SHAPIRO
D.C. Bar No. 418925
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-5302
Email: Elizabeth.Shapiro@usdoj.gov

D. ANDREW SIGLER
Ala. Bar No. 5175-I72D
Trial Attorney, Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: 202-514-0849
Email: Andrew.sigler@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 29, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Zachary A. Keller*
Zachary A. Keller
United States Attorney