UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

# DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO PERMIT VARIOUS FORMS OF EVIDENCE AT TRIAL: OCTOBER 7 VICTIM TESTIMONY, MEMRI VIDEOS, AND A.F.A.J. EVIDENCE (SECTIONS II, III.A, III.B, AND III.G)

[Page intentionally left blank]

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

III. ARGUMENT IN OPPOSITION ..... 4

A. The government bears the burden of showing admissibility, and a categorical ruling before trial would be premature ..... 4

B. *Grimes* shows that graphic violence far worse than the conduct on trial is unfairly prejudicial ..... 6

C. The carrier's coverage map does not reach Kfar Aza, so the Kfar Aza evidence should be excluded ..... 7

D. The Nahal Oz testimony should be limited to what the disputed issues require ..... 10

E. The MEMRI videos should not be approved as a category ..... 14

1. The government produced the MEMRI videos the day it filed this motion ..... 14

2. The government has not shown that the footage is what it claims to be ..... 15

3. The government's three reasons for the videos do not outweigh their prejudice ..... 17

4. Exhibits 4, 5, and 6 should be excluded now, and the rest should await identification and review ..... 18

F. The Court should defer ruling on the A.F.A.J. evidence and, on this record, exclude it ..... 19

1. The government produced the report behind the A.F.A.J. evidence the day it filed this motion ..... 19

2. The government has not offered evidence from which a jury could find what it alleges about A.F.A.J. ..... 20

3. Evidence that Mr. Al-Muhtadi knew A.F.A.J. is guilt by association ..... 22

4. Rule 403 independently requires exclusion ..... 24

IV. RESERVATION OF OBJECTIONS ..... 24

V. CONCLUSION ..... 24

CERTIFICATE OF SERVICE........................................................................................25

## TABLE OF AUTHORITIES

CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........ 4

*Burrage v. United States*, 571 U.S. 204 (2014) ........ 3

*Huddleston v. United States*, 485 U.S. 681 (1988) ........ 20, 24

*King v. Cole's Poultry, LLC*, No. 1:14-cv-00088-MPM-DAS, 2017 WL 532284 (N.D. Miss. Feb. 9, 2017) ........ 5

*Old Chief v. United States*, 519 U.S. 172 (1997) ........ 5

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) ........ 19

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ........ 7, 12-13

*United States v. Caldwell*, 586 F.3d 338 (5th Cir. 2009) ........ 17-18

*United States v. Cardenas*, 9 F.3d 1139 (5th Cir. 1993) ........ 23

*United States v. Carpenter*, 117 F.4th 841 (6th Cir. 2025) ........ 4

*United States v. Clayton*, 643 F.2d 1071 (5th Cir. Unit B 1981) ........ 16

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) (en banc) ........ 6

*United States v. Dominick*, No. 24-44, 2025 WL 1593077 (E.D. La. June 5, 2025) ........ 16

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ........ 10, 12

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) ........ 18

*United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980) ........ 23

*United States v. Grimes*, 244 F.3d 375 (5th Cir. 2001) ........ 6-7

*United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018) ........ 11

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) ........ 13

*United States v. Hernandez-Guevara*, 162 F.3d 863 (5th Cir. 1998) ........ 17, 22

*United States v. Jennings*, 527 F.2d 862 (5th Cir. 1976) ........................................ 23

*United States v. Khatallah*, 41 F.4th 608 (D.C. Cir. 2022) ...................................... 23

*United States v. Lampley*, 781 F. App'x 282 (5th Cir. 2019) (unpublished) ........ 17-18

*United States v. Lugo-Lopez*, 833 F.3d 453 (5th Cir. 2016)........................................ 4

*United States v. Ocampo-Vergara*, 857 F.3d 303 (5th Cir. 2017)............................ 23

*United States v. Pahlawan*, No. 3:24cr41 (DJN), 2025 WL 819113 (E.D. Va. Mar. 14, 2025) ...................................................................................... 13, 18

*United States v. Perry*, 35 F.4th 293 (5th Cir. 2022) ......................................... 11-12

*United States v. Polasek*, 162 F.3d 878 (5th Cir. 1998) ...................................... 22-23

*United States v. Velasquez*, 881 F.3d 314 (5th Cir. 2018) ....................................... 13

*United States v. Weaver*, No. 3:22-CR-42-SA, 2024 WL 532707 (N.D. Miss. Feb. 9, 2024) .......................................................................................................... 5

*United States v. Yi*, 460 F.3d 623 (5th Cir. 2006) .................................................... 17

CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I...................................................................................... 24

U.S. CONST. amend. V..................................................................................... 24

U.S. CONST. amend. VI ................................................................................... 24

RULES

FED. R. CRIM. P. 16......................................................................................... 15

FED. R. EVID. 104(a) ........................................................................................ 4

FED. R. EVID. 104(b) ........................................................................................ 3

FED. R. EVID. 401 ..................................................................................... 10, 19

FED. R. EVID. 402 ........................................................................................... 19

FED. R. EVID. 403 ............................................................... 4, 6-7, 17, 20, 24

FED. R. EVID. 404(b) .................................................. 4, 7

FED. R. EVID. 701 .................................................. 24

FED. R. EVID. 702 .................................................. 24

FED. R. EVID. 801(c) .................................................. 17, 19

FED. R. EVID. 802 .................................................. 19

FED. R. EVID. 901(a) .................................................. 15

FED. R. EVID. 901(b)(1), (4) .................................................. 15

FED. R. EVID. 902(11) .................................................. 15, 17

OTHER AUTHORITIES

FED. R. EVID. 902(13) advisory committee's note to 2017 amendment .................... 15

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 25-00285-1** |
| **VERSUS** | **JUDGE JOSEPH** |
| **MAHMOUD AMIN YA'QUB AL-MUHTADI** | **MAGISTRATE JUDGE WHITEHURST** |

---

# DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO PERMIT VARIOUS FORMS OF EVIDENCE AT TRIAL: OCTOBER 7 VICTIM TESTIMONY, MEMRI VIDEOS, AND A.F.A.J. EVIDENCE (SECTIONS II, III.A, III.B, AND III.G)

---

NOW INTO COURT, through undersigned counsel, comes the defendant, Mahmoud Al-Muhtadi, who opposes the government's motion in limine to permit various forms of evidence at trial, Doc. 100, as it applies to three categories of evidence: testimony from October 7 victims, videos of the attack collected by the Middle East Media Research Institute (MEMRI), and evidence about A.F.A.J., the man the government says killed a farm worker at Nahal Oz. This opposition answers Sections II, III.A, III.B, and III.G of the government's memorandum, cited here as "Gov't Memo" by its internal page numbers. Two companion oppositions answer the remaining sections.

## I. INTRODUCTION

The government asks the Court to approve, before trial and mostly without

seeing it, three categories of evidence about the October 7, 2023, attack on Israel: testimony from four victims and first responders (Section III.A), an open-ended set of MEMRI videos of killings (Section III.B), and a video of a man the government calls Mr. Al-Muhtadi's co-conspirator, A.F.A.J., attacking a farm worker at Nahal Oz (Section III.G). The government concedes that "none of these witnesses will testify to having seen the Defendant himself at the scene, much less perpetrating these attacks." Gov't Memo at 7. Mr. Al-Muhtadi does not appear in any of the six videos the government attached.

Those concessions frame this motion. At trial, the defense will not contest that the attack happened or that Hamas led it. The disputed questions are about Mr. Al-Muhtadi: whether he agreed to support Hamas, whether he provided material support, and, if the death-resulting allegations survive Doc. 107, whether any death resulted from his conduct. Graphic proof of killings by other men does little to answer those questions, and it invites a verdict based on the horror of the day. The government ties its focus on Kfar Aza and Nahal Oz to the cell tower Mr. Al-Muhtadi's phone used that morning and to an asserted border breach, but the carrier's own coverage map for that tower does not reach Kfar Aza, and it extends west across the border into Gaza. The government also asks for these rulings months before trial, when the Court cannot yet know what the evidence will show.

The Court should decline the categorical order the government requests. Some rulings can be made now because they rest on defects the record already shows: the

Court should exclude the Kfar Aza testimony and videos, exclude Exhibits 4, 5, and 6, and limit the remaining victim testimony to what a witness personally saw in Nahal Oz. The rest should await identification of each clip and witness, the Court's own review of the clips, and a hearing on authentication outside the jury's presence. Because the government produced the MEMRI videos and the report behind its A.F.A.J. evidence the day it filed this motion, the Court should defer ruling on the remaining videos and the A.F.A.J. evidence, and exclude the A.F.A.J. evidence unless the government first makes the showing Rule 104(b) requires.

## II. BACKGROUND

Counts One and Two of the superseding indictment charge Mr. Al-Muhtadi with conspiring to provide, and providing, material support to Hamas in the form of "personnel including himself, weapons, and services," and each count alleges that death resulted. Doc. 60, at 3-4. In its bill of particulars, the government explained that its theory for Count One is that "all deaths that resulted from the HAMAS-led October 7 attack qualify as deaths that resulted from the Defendant's conspiring," and that for Count Two "the deaths that occurred in Kfar Aza and Nachal Oz on October 7 as part of this HAMAS-led terrorist attack qualify." Doc. 85, at 2-3. Mr. Al-Muhtadi has moved to strike the death-resulting allegations under *Burrage v. United States*, 571 U.S. 204 (2014). Doc. 107.

The government says its victim testimony is "confined geographically to the two locales where the evidence points the Defendant to have been: the areas in or

around Kfar Aza and Nachal Oz." Gov't Memo at 8. That claim rests on cell-site records showing that between 9:49 and 10:01 a.m. on October 7, a phone attributed to Mr. Al-Muhtadi used a cell site inside Israel, and that the phone utilized the cell site sector facing west towards Gaza. The carrier lists the site by its name, "Kfar Aza Kibbutz."

## III. ARGUMENT IN OPPOSITION

### A. The government bears the burden of showing admissibility, and a categorical ruling before trial would be premature

The admissibility of evidence is a preliminary question for the Court under Rule 104(a), and the proponent must establish the facts that make it admissible "by a preponderance of proof." *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The government must therefore show what each exhibit is and what it proves.[1]

The government treats the attack as the object of the charged conspiracy and relies on the rule that evidence "inextricably intertwined with or a necessary preliminary to the crime charged" is intrinsic. Gov't Memo at 5 (quoting *United States v. Lugo-Lopez*, 833 F.3d 453, 460 (5th Cir. 2016)). Calling evidence intrinsic answers Rule 404(b), though, and leaves Rule 403 in place, as the government's own standard recognizes. Gov't Memo at 5-6. The question is how much of the attack the jury needs to see and hear, and in what form.

1 The government's legal standard closes with a sentence attributed to "*United States v. Carpenter*, 117 F.4th 841, 849 (6th Cir. 2025)." Gov't Memo at 6. The defense has been unable to locate that quotation at that citation.

The answer depends in part on what else is available. Unfair prejudice includes the tendency of evidence "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," and an item's probative value "may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 180, 184 (1997). The defense accepts that "the prosecution is entitled to prove its case by evidence of its own choice," Gov't Memo at 4 (quoting *Old Chief*, 519 U.S. at 186), and asks only that the Court weigh the offered evidence against the available alternatives, as *Old Chief* directs, 519 U.S. at 184. The narrative value *Old Chief* described also comes from "the evidentiary account of what a defendant has thought and done." *Id.* at 187. The videos and much of the proposed testimony here are accounts of what other men did.

The request is also premature. "Evidentiary rulings should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in proper context." *United States v. Weaver*, No. 3:22-CR-42-SA, 2024 WL 532707, at *4 (N.D. Miss. Feb. 9, 2024) (quoting *King v. Cole's Poultry, LLC*, No. 1:14-cv-00088-MPM-DAS, 2017 WL 532284, at *1 (N.D. Miss. Feb. 9, 2017)) (internal quotation marks omitted). The government has attached six videos, described the rest, and warned that "specific exhibits and some witnesses may change." Gov't Memo at 2. The Court does not yet know whether the death-resulting allegations will survive Doc. 107, which issues will be contested at trial, whether the stipulation offered below will be in the case, or how the government's location evidence will hold

up under cross-examination. The probative value of every item in this motion depends on those answers, and "[o]ne cannot evaluate in a Rule 403 context what one has not seen or read." *United States v. Curtin*, 489 F.3d 935, 958 (9th Cir. 2007) (en banc). The exclusions the defense seeks now are different, because they rest on defects the record already shows.

### B. *Grimes* shows that graphic violence far worse than the conduct on trial is unfairly prejudicial

*United States v. Grimes*, 244 F.3d 375 (5th Cir. 2001), shows how the Rule 403 balance comes out when the offered evidence is far more violent than the conduct on trial. Grimes was charged with possessing child pornography. To prove intent, the government offered two written narratives found in the temporary internet files of his computer, and brief passages were read to the jury. *Id.* at 379 & n.9. The district court noted that the narratives depicted violent rapes and moderate torture while the charged photographs depicted no violence. *Id.* at 385. The Fifth Circuit agreed that the narratives were "highly relevant, even probative as to three issues," but found that the evidence "also was exceedingly prejudicial, because of its inflammatory nature." *Id.* at 384. It vacated the conviction on that ground alone, *id.* at 377, observing: "The narratives are vile in their graphic and violent nature: young girls in chains, a young girl in handcuffs, and references to blood, for example." *Id.* at 385. It warned that on retrial the government "should be wary of introducing gruesome violence, in light of the fact that the charged pictures are non-violent in nature." *Id.*

This case fits the *Grimes* pattern closely. The government has no witness or

video showing Mr. Al-Muhtadi commit violence. Its evidence of what he did consists of calls and cell-site records, and it calls its proof "a circumstantial case." Gov't Memo at 11. The evidence it asks the Court to approve is gruesome violence committed by other men. The *Grimes* narratives at least came from the defendant's own computer, while the government does not claim that any of these videos was found in Mr. Al-Muhtadi's possession or on his social media. *Grimes* left room for graphic evidence where "the government may have no other source of extrinsic evidence to prove elements of the offense." 244 F.3d at 385. The government here has other sources: its expert, survivor testimony limited to what a witness saw, and the stipulation offered below. *Grimes* applied Rule 404(b), but its holding rests on the Rule 403 balance, which the government agrees governs intrinsic evidence too. Gov't Memo at 5-6.

### C. The carrier's coverage map does not reach Kfar Aza, so the Kfar Aza evidence should be excluded

The government's justification for its victim testimony and videos is geographic. It chose Kfar Aza and Nahal Oz as "the two kibbutzim near the cellular tower that connected to the Defendant's phone that morning," Gov't Memo at 2 (footnote omitted), and it also places them near an asserted border breach, *id.* at 2-3, though it cites no evidence locating the breach. It relies on that geographic link to distinguish *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008). Gov't Memo at 8 & n.4. The government's own evidence does not support that link for Kfar Aza.

The carrier, Cellcom, prepared an engineering report on the tower for the Israel National Police, and the government produced it in January 2026. The tower

has three sectors. The phone was traced on Sector 3, whose "antenna transmits westward." The report includes a map of Sector 3's coverage, and the engineer attested that "[t]he attached maps include the site/sector relevant to this opinion." That map, Map 3, is reproduced below.




*Map 3, Cellcom engineering report, (Sector 3 coverage shown in green).*

The green coverage area is centered on Nahal Oz. The black marker at the

green's eastern edge appears to mark the cell tower itself. Kfar Aza lies just northeast of the marker, outside the green, and Sa'ad lies to the east, also outside it. To the west, the green extends past Nahal Oz and across the double line that runs diagonally from the lower left of the map to the upper right. That double line is the boundary between Israel and the Gaza Strip.

The phone did not use the sector that faces Kfar Aza. Kfar Aza lies northeast of the site, while the phone used Sector 3, which transmits west. The map also shows that the phone's use of this tower does not place Mr. Al-Muhtadi inside Israel, because Sector 3's coverage crosses the border into Gaza. The report asks: "In the engineer's opinion, does Cellcom antenna [] cover the area beyond the border with Gaza?" The engineer answered: "Yes, Cellcom site [], and in particular Sector 3, where the subscriber was traced, covers the area described above and reaches toward Gaza." His narrative adds that Sector 3 "[r]eaches the Gaza Strip region (Shuja'iyya, Jabalia, and Zaytun areas)." The engineer also wrote that a phone in Gaza would ordinarily get a stronger signal from its home network, Jawwal, and that this phone dropped from that network as it moved away from Jawwal's antennas. But he explained that a phone in Gaza will attempt to roam to another network when "the radio signal of the Jawwal home network sites falls below the threshold level," and he acknowledged that only Jawwal's engineers know the values to which that network is set. Where the phone was when it used this tower is a contested question for trial.

Without the geographic link, testimony and video about the killings in Kfar

Aza show what other men did in a place the government's evidence does not connect to Mr. Al-Muhtadi. They prove nothing about him beyond the undisputed fact of the attack, which the government's expert will describe and the stipulation offered below would establish. FED. R. EVID. 401, 403. The Court should exclude the testimony of the government's three Kfar Aza witnesses, Gov't Memo at 7, Exhibit 4, whose title places it there, and any MEMRI clip filmed there.

If the Court permits any Kfar Aza testimony, it should apply the limits proposed below for the Nahal Oz testimony. One Kfar Aza witness "identified roughly 60 of her dead neighbors and friends," Gov't Memo at 7, and her FBI interview lists them by name. Another's interview describes the death of her partner in their safe room and its aftermath. The government says that one of its witnesses offers testimony that "primarily concerns the aftermath." Gov't Memo at 9. Testimony about captivity, grief, and the identification of dozens of named dead is cumulative of any fact the government must prove.

### D. The Nahal Oz testimony should be limited to what the disputed issues require

The defense recognizes that some evidence of the attack will come in. In *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011), the Fifth Circuit observed that "[b]ecause this was a case about supporting terrorists, it is inescapable, we believe, that there would be some evidence about violence and terrorist activity." The defense accepts that survivors may testify about Nahal Oz, but the graphic specifics must be weighed against Mr. Al-Muhtadi's right to a fair trial on the contested issues.

The government relies on the Fifth Circuit's practice of allowing "shocking and gruesome photographs to be shown to the jury in murder cases so long as those photos had a nontrivial probative value." Gov't Memo at 7 (quoting *United States v. Perry*, 35 F.4th 293, 325 (5th Cir. 2022)). In *Perry*, defendants on trial took part in the murders the photographs showed. The photographs "depict the dead bodies of Renetta Lowe and Michael Marshall with open wounds, blood and gore," 35 F.4th at 325, and defendants in that trial were convicted of counts associated with each of those killings, *id.* at 315-16. That is why the photographs "helped to prove overt acts committed in furtherance of the conspiracy, they established the violence of the deaths of both Lowe and Marshall, and they lent support to the cooperators' testimony about the details of each shooting." *Id.* at 325.

*Perry* cited *United States v. Gurrola*, 898 F.3d 524 (5th Cir. 2018), as an example of that practice, and *Gurrola* follows the same pattern. Gurrola was convicted of conspiring to have four people murdered in Juarez, and a co-conspirator testified that Gurrola planned the murders. *Id.* at 530-32. The court acknowledged that "[m]any of the photos are, as Gurrola contends, shocking." *Id.* at 538. It upheld their admission because the government's theory was that Gurrola wanted the murders to look like cartel killings: "The cartel is known to commit exceedingly grisly murders. Therefore, to link Gurrola to these murders, it was crucial for the Government to show that the murders involved cartel-like behavior such as excessive gunshot wounds and the use of automatic weapons at close range." *Id.* at 538-39. In

both cases, the shocking proof showed killings the defendant was accused of committing or ordering.

*Perry* did uphold the photographs as to one defendant who "was not involved in the murders shown in the photographs," but it did so because other evidence linked him to the 39ers and "the prosecution's case depended on establishing the existence of the 39ers conspiracy." 35 F.4th at 326 n.21. The existence of the conspiracy was contested there, and the photographs came in at a joint trial of the men charged with the killings. Here, no one disputes that the attack happened or that Hamas led it, and no witness or video attributes any killing to Mr. Al-Muhtadi. The survivors can establish that people died, but they cannot corroborate anything about what he did.

Possession mattered in *El-Mezain*. The evidence of violence there included "images seized from HLF computers," 664 F.3d at 510, and the court held that "evidence of Hamas violence found on the premises of HLF or in the zakat committees tended to rebut the defendants' denial that they supported Hamas and that Hamas controlled the committees," *id.* at 511. The government does not claim that the MEMRI videos or the A.F.A.J. video came from Mr. Al-Muhtadi's devices or accounts, so they cannot serve that purpose.

*El-Mezain* also relied on other evidence of violence as context, *id.*, and the jury here will hear context from the government's expert and from limited survivor testimony. The court distinguished *Al-Moayad* because there "the defendants never denied such knowledge and they had offered to stipulate to that fact." *Id.* In *Al-*

*Moayad*, the Second Circuit held that testimony from a bombing survivor was "a blatant appeal to the jury's emotions and prejudices." 545 F.3d at 161-62. The government distinguishes *Al-Moayad* on the ground that here "the victim testimony and 10/7 event itself is the backdrop for every bit of the Government's case." Gov't Memo at 8 n.4. That is the problem. Testimony that runs through the entire case multiplies the prejudice *Al-Moayad* identified.

The government's case on death resulting does not require a catalog of suffering. Its stated burden "is to prove that any person died as a result of the Defendant's conduct or that of his conspirators or aiders-and-abettors." Doc. 85, at 3. In a prosecution that offered the October 7 attack as context, a federal court in Virginia allowed the government's expert to describe the October 7 attack in general terms and excluded evidence of sexual violence and mutilation because "its graphic and inflammatory nature creates a 'genuine risk that the emotions of a jury will be excited to irrational behavior.'" *United States v. Pahlawan*, No. 3:24cr41 (DJN), 2025 WL 819113, at *17-19 (E.D. Va. Mar. 14, 2025) (quoting *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014)). *Pahlawan* is not binding, and the attack there was context rather than charged conduct, but its reasoning applies to testimony beyond the facts the government must prove.

*United States v. Velasquez*, 881 F.3d 314, 336 (5th Cir. 2018), which holds that a defendant cannot show an abuse of discretion merely by pointing to an alternative the government chose not to use, leaves that weighing to the trial court. To give the

Court a concrete alternative, and if the Court denies Doc. 107, the defense will stipulate that the attack occurred on October 7, 2023, and that people were killed in Kfar Aza and Nahal Oz that day. The stipulation would not concede that any death resulted from Mr. Al-Muhtadi's conduct. It depends on the ruling on Doc. 107 because, if the death-resulting allegations are struck, the question becomes whether evidence of the killings is admissible at all. The defense declined to stipulate before the motion was filed, Gov't Memo at 26, and this offer responds to the evidence the motion has since described.

The Court should require the government to identify its Nahal Oz witness and to file a written proffer of each victim witness's expected testimony. It should limit that testimony to non-graphic accounts of what the witness personally saw in Nahal Oz on October 7, including deaths the witness personally observed, and exclude the recitation of names of the dead, testimony about captivity, and testimony about the lasting effects of the attack.

### E. The MEMRI videos should not be approved as a category

#### 1. The government produced the MEMRI videos the day it filed this motion

The government produced its MEMRI evidence in a production dated September 15, 2026, the day it filed this motion; the defense received the production on September 16. It included the six attached exhibits; the MEMRI archive discussed below, which holds Exhibits 4, 5, and 6; a second MEMRI disc with more than thirty gigabytes of raw security-camera, drone, and GoPro footage. It came more than seven

months after the January 20, 2026, deadline for Rule 16 discovery, Doc. 36, at 2, which the amended scheduling order did not reset, Doc. 66. The defense has not had a fair chance to review that footage, learn who recorded it, or test where and when it was made. Apart from the three exhibits that can be excluded on their face, *see* Part III.E.4, the Court should defer ruling on the MEMRI videos until the defense has done so.

**2. The government has not shown that the footage is what it claims to be**

To authenticate an item, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). The government claims these are "videos depicting 10/7 in Kfar Aza and Nachal Oz." Gov't Memo at 12. A survivor who recognizes her own kibbutz and the events she lived through may be able to authenticate footage of them. FED. R. EVID. 901(b)(1), (4). The problem is the footage that no witness can describe.

For that footage, the government proposes to rely on "a combination of FRE 902(11) records certificates and witness testimony," and represents that "MEMRI authenticates the videos via FRE 902(11) certification." Gov't Memo at 9 n.5, 10 n.6. A records certification can show that MEMRI kept a file, but it cannot show who filmed the footage, where, when, or whether anyone edited it before MEMRI obtained it. For machine-generated records, a certification "establishes only that the output came from the computer." FED. R. EVID. 902(13) advisory committee's note to 2017 amendment. Even with a certification in hand, the government "must still

authenticate the contents of social media posts." *United States v. Dominick*, No. 24-44, 2025 WL 1593077, at *6 (E.D. La. June 5, 2025). MEMRI collects what others record and post, and a MEMRI certification stands on the same footing.

The government's records show why a witness with knowledge is needed. One FBI communication says the FBI received the J.M. videos from The Washington Institute and MEMRI in early 2024, while a later record says the videos were "obtained from the Middle East Research Institute (MEMRI)". Neither lists file names, hash values, or capture dates. The MEMRI archive that holds Exhibits 4, 5, and 6 contains sixty-seven video files. Judging by their file titles, twelve concern the Nova music festival, three Kibbutz Be'eri, one Kibbutz Alumim, and two Gama Junction. Only two refer to Kfar Aza, which the carrier's map does not reach, and none refers to Nahal Oz. The government says it will not offer the most extreme videos in MEMRI's collection, Gov't Memo at 10 n.7, but it has not committed which ones it will offer.

Film offered to show what happened requires "foundation evidence sufficient to show the circumstances under which the film was activated and made, the chain of custody of the film, and the reliability of the process by which the photographs were made from the film." *United States v. Clayton*, 643 F.2d 1071, 1074 (5th Cir. Unit B 1981). The attached exhibits show why. Exhibit 3 is security-camera footage whose on-screen clock jumps from about 7:54 to 8:43 a.m., and someone has added a red arrow. Ex. 3 at 0:12, 1:23. The only location information attached to Exhibits 3 and 5

points away from the two kibbutzim: Exhibit 3's file title places it "in Gaza Strip," and Exhibit 5's places it at "Gama Junction." The defense cites those titles only to show the gap in the foundation, because, offered for their truth, they are hearsay from unknown declarants. FED. R. EVID. 801(c). The government has not produced a Rule 902(11) certification.

#### 3. The government's three reasons for the videos do not outweigh their prejudice

The government offers three reasons for the videos. The first is that "every one of these videos is probative of the material support that the Defendant stands accused of providing because it shows HAMAS perpetrating a terrorist attack." Gov't Memo at 11. That the attack happened, and that Hamas led it, will not be disputed, and the government's expert will describe the attack and its results. *Id.* at 16. Beyond that, footage of killings by unidentified men proves nothing about Mr. Al-Muhtadi, and its remaining force is emotional. The Fifth Circuit has identified "violent acts" as one of the "hallmarks of highly prejudicial evidence." *United States v. Yi*, 460 F.3d 623, 633 (5th Cir. 2006) (quoting *United States v. Hernandez-Guevara*, 162 F.3d 863, 872 (5th Cir. 1998)). The government adds that the videos clear Rule 403 because "the Defendant stands accused of participating in these horrific acts." Gov't Memo at 11. No video shows him. The cell-site evidence places him at no event on these videos.

The second reason is that the videos are needed to prove that death resulted and to meet jurors' expectations. *Id.* at 9, 11 (citing *United States v. Caldwell*, 586 F.3d 338, 343 (5th Cir. 2009); *United States v. Lampley*, 781 F. App'x 282, 286 (5th

Cir. 2019) (unpublished); and *United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007)). Each of those cases involved evidence of the defendant's own crime: contraband the defendant was charged with possessing in *Caldwell* and *Lampley*, and the victim the defendant was charged with killing in *Fields*. Here, survivors will testify to deaths, and the stipulation would establish them. *Lampley* also recognized that when clips are long, "the appropriate remedy to such prejudice is to shorten the clips, not to substitute a stipulation." 781 F. App'x at 286. At a minimum, the Court should require the government to identify the clips it intends to play and to shorten them.

The third reason is that the videos show perpetrators wearing Hamas or National Resistance Brigades (NRB) insignia, which the government calls "essential to proving the identity of the 10/7 perpetrators." Gov't Memo at 11. The identity of the groups that led the attack will not be disputed, and the government's expert will describe "the insignia that HAMAS and NRB are known to wear." *Id.* at 16. Still images would serve that purpose.

#### 4. Exhibits 4, 5, and 6 should be excluded now, and the rest should await identification and review

Three of the six attached exhibits can be excluded now. Exhibit 6 is a nineteen-second clip of the body of a partially unclothed woman in the bed of a pickup truck moving through a crowded urban street. Nothing ties it to either kibbutz, and its display of a woman's body is the kind of evidence *Pahlawan* excluded because of its "graphic and inflammatory nature." 2025 WL 819113, at *18. Exhibit 5's own title

places it at "Gama Junction," outside "the areas in or around Kfar Aza and Nachal Oz" to which the government says its evidence is confined. Gov't Memo at 8. Exhibit 4 is a dashcam recording whose title places it in Kfar Aza, outside the coverage shown on the carrier's map, and it shows no attacker and no violence. FED. R. EVID. 401, 402. Its force comes from English subtitles, added by an unknown person, that convey the words of unidentified callers, and those subtitles are hearsay if offered for their truth. FED. R. EVID. 801(c), 802.

In *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010), the defendant had bought the videos, and even so the trial court "reviewed the films in their entirety before approving only selected excerpts for display to the jury." The government does not claim that Mr. Al-Muhtadi made, possessed, or shared the MEMRI videos. The Court should at least follow the *Abu-Jihaad* practice and resolve authentication of each identified clip outside the jury's presence before any clip is published.

### F. The Court should defer ruling on the A.F.A.J. evidence and, on this record, exclude it

#### 1. The government produced the report behind the A.F.A.J. evidence the day it filed this motion

The government's A.F.A.J. theory rests on an FBI report titled "Mahmoud Al-Muhtadi's Association with Facebook UID [Redacted]," referred to here as the Facebook Association Report. The report is dated August 24, 2026, and it came in the same late production as the MEMRI videos. *See* Part III.E.1. The defense can respond now to records from that production that speak for themselves, such as the witness

interviews. This forty-three-page report is different. It rests on device extractions, selector searches, Facebook search warrant returns, a propaganda video, and comparisons of clothing and physical appearance, and the defense has not had a fair chance to test its sources or consult an expert about the image comparisons. The Court should defer any ruling on the A.F.A.J. evidence until the defense can respond on a full record. The defense addresses the present record below.

**2. The government has not offered evidence from which a jury could find what it alleges about A.F.A.J.**

The relevance of the A.F.A.J. video depends on two facts: that the man in it is A.F.A.J., and that A.F.A.J. was Mr. Al-Muhtadi's co-conspirator. That is a question of conditional relevance, and the Court asks whether a jury could reasonably find the conditional fact by a preponderance. *Huddleston v. United States*, 485 U.S. 681, 690 (1988). The government must still produce the evidence, and "the strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing." *Id.* at 689. The government's showing is thin at every step.

Exhibits 1 and 2 show the attack on J.M., a farm worker at Nahal Oz, and the government relies on four factual predicates to connect it to Mr. Al-Muhtadi. Gov't Memo at 20. The discovery does not support them as stated. First, the government describes "A.F.A.J. being Facebook friends with both the Defendant and the Defendant's wife." *Id.* The Facebook Association Report says only that A.F.A.J.'s Facebook account was "associated with" devices belonging to Mr. Al-Muhtadi and his

wife. It does not describe a friend connection or any communication between the two men. Second, the government describes "a photo stored on the Defendant's phone in which A.F.A.J. stands alongside other NRB comrades." Gov't Memo at 20. The report locates the photo in Mr. Al-Muhtadi's Gmail account, gives it no date, and does not say that he appears in it.[2]

Third, the government promises "clear video showing his face and a pair of shoes that we will match to photos he posted on Instagram." Gov't Memo at 20. In Exhibit 1, the attacker the report identifies is on screen for several seconds, mostly from the side or back, and his face is visible for roughly one second in partial profile. Ex. 1 at 0:06. The report does not rely on his face. It identifies him as a DFLP member by a patch on his vest and the lettering on his rifle sling, links him to a fighter in a separate propaganda video by "near-identical clothing," and links that fighter to A.F.A.J.'s social media accounts "[b]ased on visual and corporeal similarity." The shoe comparison it describes uses a Facebook photo. Fourth, the government says that Nahal Oz is "one of the locations indicated by the Defendant's cell site evidence." Gov't Memo at 20. The carrier's map does include Nahal Oz within the sector's coverage, but the coverage also extends west across the border into Gaza, as the engineer acknowledged. The cell-site evidence does not place Mr. Al-Muhtadi at the attack on

2 The Facebook Association Report also describes photographs that show Mr. Al-Muhtadi with other individuals the FBI associates with the Democratic Front for the Liberation of Palestine (DFLP). The government does not rely on those photographs in Section III.G, and the companion opposition addresses the government's affiliation evidence.

J.M.

The government's own materials also disagree about J.M.'s death. An FBI communication says he was "taken from inside Kibbutz Nahal Oz and then repeatedly stabbed and shot on a road nearby," while an article elsewhere in discovery says he "was kidnapped to the Gaza Strip and murdered." The bill of particulars did not mention A.F.A.J. *See* Doc. 85. The Court should require the government to show, outside the jury's presence, evidence from which a jury could find both the identification and the claimed connection before the video or A.F.A.J. is mentioned at trial.

**3. Evidence that Mr. Al-Muhtadi knew A.F.A.J. is guilt by association**

The government argues that it "will be putting on evidence of the Defendant's connection to this co-conspirator, which is enough to establish association relevant to a conspiracy charge." Gov't Memo at 21. The Fifth Circuit has long held otherwise. "It is well established in this circuit that the government may not attempt to prove a defendant's guilt by showing that she associates with 'unsavory characters.'" *United States v. Polasek*, 162 F.3d 878, 884 (5th Cir. 1998). In *Polasek*, testimony that Polasek had done title work for persons later convicted "was therefore inadmissible guilt by association evidence," because "the government failed to demonstrate that Polasek in fact falsified titles or committed any other crimes in connection with the convicted associates." *Id.* at 885. "That one is married to, associated with, or in the company of a criminal does not support the inference that that person is a criminal

or shares the criminal's guilty knowledge." *United States v. Forrest*, 620 F.2d 446, 451 (5th Cir. 1980).

The government's authorities allow association to be considered only "along with other evidence." *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993). The rule the government draws from *United States v. Jennings*, 527 F.2d 862, 869 (5th Cir. 1976), applies "[o]nce a defendant has been connected with the conspiracy through his own conduct." Gov't Memo at 21 (quoting *Jennings*). And in *United States v. Khatallah*, 41 F.4th 608, 639 (D.C. Cir. 2022), which the government cites as "Abukhatallah," the defendant told the FBI that he had spoken by phone with the associate while the associate stood outside the Mission. Nothing comparable links Mr. Al-Muhtadi to A.F.A.J. The government's evidence ties A.F.A.J. to the NRB, but it offers no evidence that A.F.A.J. and Mr. Al-Muhtadi agreed to anything.

*United States v. Ocampo-Vergara*, 857 F.3d 303, 308 (5th Cir. 2017), marks the line. It held that *Polasek*'s concerns do not arise "where the defendant's offense is connected to others' conduct," and it confined *Polasek* to evidence showing "only that a defendant associates with unsavory characters." *Id.* The government offers a social-media association and an undated group photo, with no claim that Mr. Al-Muhtadi was with A.F.A.J. on October 7 or communicated with him about the attack, and asks the jury to infer that because A.F.A.J. killed someone at Nahal Oz, Mr. Al-Muhtadi's support contributed to that death. Gov't Memo at 21-22. That is the inference *Polasek* and *Forrest* forbid, and it is also the causation question raised in Doc. 107.

#### 4. Rule 403 independently requires exclusion

Even if the association had some relevance, Rule 403 would require exclusion. The video shows a man being beaten and killed. Its probative value depends on a chain of inferences from clothing, to "visual and corporeal similarity," to a social-media association, to a conspiracy, and *Huddleston* allows the Court to weigh the weakness of that chain. 485 U.S. at 689. The prejudice, by contrast, is immediate: the jury would watch a killing and be invited to attribute it to Mr. Al-Muhtadi through a man no evidence places with him.

## IV. Reservation of Objections

Mr. Al-Muhtadi reserves all other objections to this evidence, including under the Confrontation Clause, Rules 701 and 702, the Due Process Clause, and the First Amendment, and to specific exhibits and testimony once identified. Proposing a stipulation or limits in the alternative waives no objection.

## V. Conclusion

For these reasons, Mr. Al-Muhtadi asks the Court to decline the categorical order the government requests in Sections III.A, III.B, and III.G; to exclude the Kfar Aza witnesses, Exhibits 4, 5, and 6, and any MEMRI clip filmed in Kfar Aza; and to limit the remaining victim testimony to non-graphic accounts of what a witness personally saw in Nahal Oz, subject to the proposed stipulation if Doc. 107 is denied. He asks the Court to defer ruling on the remaining MEMRI videos and the A.F.A.J. evidence and, on the present record, to exclude the A.F.A.J. evidence. He also asks

the Court to require the government to identify each clip and witness, with a written proffer of each victim witness's testimony; to review each clip in camera; and to resolve authentication outside the jury's presence.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
First Assistant / Appellate Chief

***s/ Aaron A. Adams***
AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 29, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

***s/ Dustin C. Talbot***