UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

# DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO PERMIT VARIOUS FORMS OF EVIDENCE AT TRIAL: PROPAGANDA AND CLAIMS OF RESPONSIBILITY, PROFESSOR HOFFMAN'S EXPERT TESTIMONY, AND AGENTS' INTERPRETATION OF ARABIC WORDS (SECTIONS III.C, III.E, AND III.J)

[Page intentionally left blank]

# TABLE OF CONTENTS


I. INTRODUCTION .......... 2

II. BACKGROUND .......... 3

III. ARGUMENT IN OPPOSITION .......... 7

A. The propaganda and claims of responsibility are hearsay, and none of the government's four theories makes them admissible .......... 7

1. The government has not connected the unknown authors of public propaganda to any agreement with Mr. Al-Muhtadi .......... 7

2. A public claim of credit is not a statement against penal interest .......... 11

3. The nonhearsay and expert theories do not open a back door .......... 12

4. Rules 401 and 403 independently require exclusion, and the translations are not settled .......... 14

B. Professor Hoffman may explain the organizations' history, structure, and leadership, but three of his proposed topics fall outside Rule 702 .......... 15

C. The agents may not tell the jury what Mr. Al-Muhtadi's words mean .......... 18

1. An interpretation based on upbringing and regional experience is expert testimony .......... 18

2. The meanings the government would have its agents supply are disputed in its own materials .......... 21

3. If the Court permits any interpretation, it should require notice and a hearing .......... 22

IV. RESERVATION OF OBJECTIONS .......... 23

V. CONCLUSION .......... 24

CERTIFICATE OF SERVICE .......... 25

## TABLE OF AUTHORITIES

CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987) .......... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 23

*Diaz v. United States*, 602 U.S. 526 (2024) .......... 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 23

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) .......... 15

*United States v. Akins*, 746 F.3d 590 (5th Cir. 2014) .......... 19

*United States v. Albertelli*, 687 F.3d 439 (1st Cir. 2012) .......... 21, 23

*United States v. Cooks*, 589 F.3d 173 (5th Cir. 2009) .......... 18

*United States v. Cornett*, 195 F.3d 776 (5th Cir. 1999) .......... 10

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .......... 14

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) .......... 8, 11, 15, 17, 19-20

*United States v. Elsheikh*, 598 F. Supp. 3d 363 (E.D. Va. 2022), aff'd, 103 F.4th 1006 (4th Cir. 2024) .......... 10

*United States v. Ghayth*, 709 F. App'x 718 (2d Cir. 2017) (summary order) .......... 10

*United States v. Haines*, 803 F.3d 713 (5th Cir. 2015) .......... 19, 23

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) (en banc) .......... 13

*United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc) .......... 3, 11, 24

*United States v. Kandic*, No. 17-CR-449 (NGG) (RER), 2022 WL 1266431 (E.D.N.Y. Apr. 28, 2022), aff'd, 134 F.4th 92 (2d Cir. 2025) .......... 11, 13

*United States v. Kassir*, No. S2 04 Cr. 356 (JFK), 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009), aff'd sub nom. *United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) (summary order) .......... 16

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .......................................... 13, 17

*United States v. Musaibli*, 42 F.4th 603 (6th Cir. 2022) (quoting *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999)) ...................................................... 9, 11

*United States v. Omar*, 786 F.3d 1104 (8th Cir. 2015) ........................................... 13

*United States v. Saipov*, No. 17-CR-722 (VSB), 2023 WL 4199415 (S.D.N.Y. Oct. 7, 2022)............................................................................................ 10-11

*United States v. Staggers*, 961 F.3d 745 (5th Cir. 2020) (quoting *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015)) ......................................................... 19

*Williamson v. United States*, 512 U.S. 594 (1994) ................................................... 12

CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I ...................................................................................... 23

U.S. CONST. amend. V...................................................................................... 23

U.S. CONST. amend. VI ..................................................................................... 23

RULES

FED. R. CRIM. P. 16(a)(1)(G)(iii) .......................................................... 18, 23-24

FED. R. EVID. 103(b) ........................................................................................ 24

FED. R. EVID. 401 ............................................................................................ 14

FED. R. EVID. 402 ............................................................................................ 14

FED. R. EVID. 403 ........................................................................................ 13-17

FED. R. EVID. 604 ............................................................................................ 22

FED. R. EVID. 701 ............................................................................................ 18

FED. R. EVID. 702 ............................................................................ 15-18, 22-23

FED. R. EVID. 703 ....................................................................................... 13, 17

FED. R. EVID. 704(b) ........................................................................................ 17

FED. R. EVID. 801(d)(2)(E) .......... 7-8, 11, 24

FED. R. EVID. 804(b)(3) .......... 11-12, 24

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

---

**DEFENDANT'S OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO PERMIT VARIOUS FORMS OF EVIDENCE AT TRIAL: PROPAGANDA AND CLAIMS OF RESPONSIBILITY, PROFESSOR HOFFMAN'S EXPERT TESTIMONY, AND AGENTS' INTERPRETATION OF ARABIC WORDS (SECTIONS III.C, III.E, AND III.J)**

---

NOW INTO COURT, through undersigned counsel, comes the defendant, Mahmoud Al-Muhtadi, who files this opposition to the government's motion in limine to permit various forms of evidence at trial, Doc. 100, as it applies to three categories of evidence: propaganda and claims of responsibility that the government attributes to Hamas, the DFLP, and the NRB; the expert testimony of Professor Bruce Hoffman; and FBI agents' interpretations of Arabic words in Mr. Al-Muhtadi's calls and messages. This opposition answers Sections III.C, III.E, and III.J of the government's memorandum, which is cited here as "Gov't Memo" by its internal page numbers. Two companion oppositions answer the remaining sections.

# I. INTRODUCTION

The three categories of evidence this opposition answers share a common feature. Each asks the Court to let someone other than Mr. Al-Muhtadi tell the jury what happened on October 7, 2023, or what his own words meant. Section III.C seeks to admit propaganda and claims of responsibility that unidentified authors posted on Telegram and other media. Section III.E seeks expert testimony from Professor Hoffman, who would vouch for that propaganda, narrate the attack at Kfar Aza and Nahal Oz, and tell the jury how these groups police their insignia. Section III.J seeks to have FBI agents tell the jury what Arabic words in Mr. Al-Muhtadi's calls and messages mean, based on "training and experience as well as upbringing in and near Palestine." Gov't Memo at 2.

The Rules of Evidence guard against each of those shortcuts. Hearsay does not become admissible because the government links an unknown declarant to a group it calls a co-conspirator. An expert may explain the history and structure of a terrorist organization, but he may not tell the jury that the organization's statements are true or retell events he learned about from the same videos. And a witness who interprets foreign words based on upbringing and cultural knowledge is offering expert testimony, whatever label the government gives it.

The government's own cell-site evidence also undercuts the geography this evidence depends on. The carrier's coverage map for the sector that served Mr. Al-Muhtadi's phone does not reach Kfar Aza, and it extends west past Nahal Oz across

the border into Gaza. And much of this evidence depends on English translations that no one has yet tested. The government has proposed a process for resolving translation disputes before trial, Doc. 101, and the defense does not object to it. The Court should not rule on what these words mean until that process has run its course.

The Court should decline to admit the Section III.C materials in advance, reject the government's statement-against-interest theory, order the government to identify each co-conspirator statement it will offer, and hold a hearing under *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc), or reserve ruling until trial. It should exclude Exhibit 8, any claim that NRB fighters took part in the assault on Kfar Aza, and any narration of that attack. It should permit Professor Hoffman to explain the organizations' history, structure, and leadership, but exclude the three topics addressed in Part III.B. And it should deny Section III.J now, while the translations remain unsettled, or in the alternative require expert notice and a hearing outside the jury's presence.

## II. BACKGROUND

This background covers the charge, the exhibits, Professor Hoffman's notice, the cell-site evidence, and the translation process. Count One charges a conspiracy to provide material support to Hamas "[o]n or about October 7, 2023." Doc. 60. In its bill of particulars, the government told the defense that "[t]here are no unindicted co-conspirators whom the Government intends to call as a witness or who will otherwise be providing testimony at trial," and added that it "may also introduce evidence such

as public-facing propaganda and other materials from the organizations to which the Defendant belonged that qualify as co-conspirator statements." Doc. 85, at 4 & n.4.

Section III.C covers "propaganda materials published by DFLP, NRB, and HAMAS through their Telegram channels and other media before, during, and shortly after 10/7." Gov't Memo at 12. The government attached three examples. Exhibit 7 is a 49-second video bearing the logo of the National Resistance Brigades' media office. Its title card, as the defense reads it pending review by a linguist, names no place; the words "nahal_oz" appear only in the government's file name. Doc. 100-7. Exhibit 8 is a video just under two minutes long, watermarked by the media office of Hamas's military wing. Its title card, as the defense reads it, describes an assault on a military site near Kfar Aza and the killing and capture of soldiers. Doc. 100-8. Exhibit 9 is a set of three translated Telegram posts from the morning of October 7. Doc. 100-9. Mr. Al-Muhtadi does not appear in any of them. The government has produced an export of the Telegram channel on which the Exhibit 9 posts appear, but it has not identified the individual author of any exhibit or the person who captured the screenshots.

Professor Hoffman's expert notice lists topics, not opinions. Among them are "the importance of the accuracy of propaganda and the ways that terrorist organizations police misinformation such as people claiming credit for acts they did not commit"; "the groups' policing of people fraudulently using their insignia"; and the attacks "occurring in Kfar Aza and Nahal Oz." Doc. 95, at 3. The notice does not

state any opinion he will give on those topics or the basis for it.

The government's geographic theory rests on one cell-site record and an asserted border breach. It chose Kfar Aza and Nahal Oz as "the two kibbutzim near the cellular tower that connected to the Defendant's phone that morning." Gov't Memo at 2 (footnote omitted). The FBI's cell-site analysis reports that between 9:49 and 10:01 a.m. on October 7, the phone "utilized a cell site inside Israel, approximately two miles east of the border," and that "[a]ll transactions utilized the cell site sector facing west towards Gaza." The carrier, Cellcom, prepared an engineering report on that site for the Israel National Police. Of the site's three sectors, the phone used Sector 3, whose antenna is set at 260 degrees, and "the antenna transmits westward." The engineer attested that "[t]he attached maps include the site/sector relevant to this opinion." His Map 3, a close-up of Sector 3's coverage, appears on the next page.

The green coverage area surrounds Nahal Oz. The black marker at its eastern edge appears to mark the cell tower site. The streets of Kfar Aza lie just northeast of that marker, outside the green, and Sa'ad lies to the east, also outside it. To the west and northwest, the green extends past Nahal Oz and across the double line that runs diagonally across the map, into an area where the map shows no roads or place names. That double line is the boundary between Israel and the Gaza Strip. And the engineer wrote that Sector 3 "[r]eaches the Gaza Strip region (Shuja'iyya, Jabalia, and Zaytun areas)," and that it "reaches toward Gaza."




*Map 3, Cellcom engineering report (Sector 3 coverage shown in green).*

The sector where the phone connected points west, extends well into Gaza, and does not include the Kfar Aza community. On this record, the phone could have been in Gaza when it used the tower, and nothing in the carrier's map places it in Kfar Aza.

The words the government wants its agents to interpret come from

translations whose accuracy is disputed, as Part III.C.2 explains. *See* Doc. 1-1 ¶¶ 64-65. The government has moved for an order setting a process to resolve those disputes before trial. Doc. 101. It proposes deadlines of November 30 and December 14, 2026, for the parties' transcripts and translations and a hearing at the December 21 pretrial conference. Doc. 101, at 1. The defense does not object to that process. It will review the government's transcripts and translations on that schedule, including the English renderings of the propaganda exhibits.

## III. ARGUMENT IN OPPOSITION

### A. The propaganda and claims of responsibility are hearsay, and none of the government's four theories makes them admissible

The government offers the propaganda for what it says. By its own description, the materials "will identify HAMAS and NRB as perpetrators of the attack, and will display HAMAS and NRB as co-conspirators," and they are probative because they connect Mr. Al-Muhtadi "with NRB insignia." Gov't Memo at 12. Those are assertions offered for their truth, so the government must establish an exception by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). It cannot do so on any of the theories it advances.

#### 1. The government has not connected the unknown authors of public propaganda to any agreement with Mr. Al-Muhtadi

Rule 801(d)(2)(E) requires the proponent to show "(1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was

made in furtherance of the conspiracy." *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011). The statement alone is not enough: "there must also be independent evidence establishing the factual predicates for Rule 801(d)(2)(E)." *Id.* The government has not tried to make these showings for any statement. Its bill of particulars treats "the organizations to which the Defendant belonged" as the co-conspirators, so that anything they published becomes his statement. Doc. 85, at 4 n.4. That substitutes membership for agreement.

*El-Mezain* also frames the question the government must answer. The court agreed with circuits "which have also held that anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue." 664 F.3d at 505. Anonymity alone therefore does not bar these statements. What matters is how the government connects the declarant to the conspiracy. In *El-Mezain*, the documents were internal records found in two participants' homes, and they "were of a kind unlikely to be found in the hands of persons outside the enterprise." *Id.* at 506-07. The court was therefore "satisfied that the documents were drafted by insiders participating in the venture." *Id.* at 507. Public propaganda is the opposite. It is written for outsiders, anyone can repost or capture it, and its content says nothing about who wrote it or whether that person shared any agreement with Mr. Al-Muhtadi.

The Sixth Circuit has explained why membership in a broad movement is not enough. "There must be a 'unity of interests,' not just analogous identities, before

statements of alleged co-conspirators can speak in one's name." *United States v. Musaibli*, 42 F.4th 603, 618 (6th Cir. 2022) (quoting *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999)). *Musaibli* is adverse in other respects. The court reversed the exclusion of ISIS personnel and payroll records, including exhibits that did not name the defendant, because "statements which identify the participants and their roles in the conspiracy" are made in furtherance of it. *Id.* at 616. But those were the internal administrative records of a bureaucratic organization, and the district court ruled only after "[f]our days of evidentiary hearings." *Id.* at 610. The government has made no comparable showing, and it offers public posts and videos by unknown authors that say nothing about Mr. Al-Muhtadi.

The government tries to bridge that gap by redefining the conspiracy. It points to Mr. Al-Muhtadi's reported statement in an 8:42 a.m. call that if "things go the way they should, Syria will take part, Lebanon will take part," and calls the propaganda a set of statements in furtherance of a "conspiracy to ignite a regional conflagration and recruit others to their cause." Gov't Memo at 12-13. The indictment charges no such conspiracy. It charges a conspiracy on or about October 7, 2023. Doc. 60. And one person's prediction about how others might react does not show that anonymous media officers in Gaza agreed with him about anything. The government adds that creating propaganda can itself be material support, Gov't Memo at 12-13, but that proposition, even if correct, does not turn one group's propaganda into Mr. Al-

Muhtadi's statement.[1]

The after-the-fact claims of responsibility also fail the timing and furtherance requirements. Statements that "are mere narratives of past conduct are not in furtherance of the conspiracy." *United States v. Cornett*, 195 F.3d 776, 783 (5th Cir. 1999). A claim of responsibility posted after an attack reports what happened. As for material published "before" October 7, Gov't Memo at 12, the government has not identified any item, and it bears the burden of showing that each one was made during and in furtherance of the charged conspiracy. The Exhibit 9 posts, which speak in the present tense on the morning of October 7, present a different problem: nothing connects whoever typed them to any agreement with Mr. Al-Muhtadi. Doc. 100-9, at 2.

The only case the government cites that admitted claims of responsibility as co-conspirator statements is a district court case that does not fill these gaps. In *United States v. Saipov*, No. 17-CR-722 (VSB), 2023 WL 4199415, at *4-5 (S.D.N.Y. Oct. 7, 2022), the court admitted ISIS claims of responsibility as co-conspirator statements and statements against penal interest.[2] But *Saipov* was a prosecution for

[1] The government cites *United States v. Elsheikh*, 598 F. Supp. 3d 363, 380 (E.D. Va. 2022), *aff'd*, 103 F.4th 1006 (4th Cir. 2024), and *United States v. Ghayth*, 709 F. App'x 718, 722 (2d Cir. 2017) (summary order), for that proposition. Gov't Memo at 12-13. The cited page of *Elsheikh* is part of a ruling applying the forfeiture-by-wrongdoing exception, and *Ghayth* addressed the sufficiency of the evidence that the defendant himself delivered speeches. Neither addresses the admission of third parties' propaganda against a defendant.

[2] The government cites *Saipov* as "2023 U.S. Dist. LEXIS 93114, at *10-14 (S.D.N.Y. May 23, 2023)." Gov't Memo at 13. The Westlaw version bears a different date but appears to be the same ruling.

murder in aid of racketeering in which ISIS was the charged enterprise, and the court found the materials relevant "as proof of the enterprise." *Saipov*, 2023 WL 4199415, at *4. No enterprise element exists here, and the ruling contains no statement-by-statement analysis of the kind *El-Mezain* and *Musaibli* performed. *Id.* at *5. *Saipov* was not in the Fifth Circuit, where the precedent holds that the preferred order of proof calls for that analysis before the jury hears the statements: "The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator." *James*, 590 F.2d at 582. The Court should order the government to identify each statement it intends to offer under Rule 801(d)(2)(E), along with its declarant (or the evidence tying an unknown declarant to the charged conspiracy) and the evidence that it furthered the conspiracy, and then hold a *James* hearing on any disputed statement. If a pretrial hearing proves impracticable, the Court should reserve ruling, as the court did in *United States v. Kandic*, No. 17-CR-449 (NGG) (RER), 2022 WL 1266431, at *5 (E.D.N.Y. Apr. 28, 2022), *aff'd*, 134 F.4th 92 (2d Cir. 2025), "until trial, at which the government must establish by a preponderance of the evidence each requirement under Rule 801(d)(2)(E)."

**2. A public claim of credit is not a statement against penal interest**

Rule 804(b)(3) applies only if the declarant is unavailable, FED. R. EVID. 804(b), and the government cannot show that an unknown declarant is unavailable. The rule also covers only a statement that "a reasonable person in the declarant's position

would have made only if the person believed it to be true" because it tended so strongly to "expose the declarant to civil or criminal liability," and when offered in a criminal case as tending to expose the declarant to criminal liability, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." FED. R. EVID. 804(b)(3)(A)-(B). The rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600-01 (1994).

An organization's claim of credit for an attack is made to win recruits and prestige. A claim of credit serves the organization's interest, which is why false claims are common enough that the government's own expert proposes to testify about them. Doc. 95, at 3 (describing the need to "police misinformation such as people claiming credit for acts they did not commit"). A media office's statement that one faction's fighters stormed a site exposes no identifiable declarant to anything, and the parts of the statements the government cares about, which identify which groups took part and where, are exactly the collateral assertions *Williamson* excludes. Because the government can show neither unavailability nor a statement against interest, the Court should reject this theory now.

**3. The nonhearsay and expert theories do not open a back door**

The government next says the materials show "that the 10/7 attack materially supported HAMAS's recruiting efforts and the Defendant's intent, knowledge, and

motive." Gov't Memo at 13. Whether the attack helped Hamas recruit is not an element of any charged offense. And propaganda can show a defendant's intent only if the defendant saw or kept it. Without that link, the materials can bear on his state of mind only through the truth of what they say about who attacked where. The government's authorities follow that pattern. The tapes in *United States v. Hammoud*, 381 F.3d 316, 340-41 (4th Cir. 2004) (en banc), were "seized from Hammoud's home." The government quotes *Kandic* for the proposition that "the Second Circuit has regularly allowed terrorist propaganda to be admitted in material support cases." Gov't Memo at 13. But the propaganda in *Kandic* came from the defendant's own phone and accounts. 2022 WL 1266431, at *5. The government offers no evidence that Mr. Al-Muhtadi ever saw Exhibits 7 through 9, and it must make that link before it can offer them on this theory.

The expert theory fares no better. *United States v. Omar*, 786 F.3d 1104, 1112-13 (8th Cir. 2015), resolved a relevance and Rule 403 challenge and did not hold that an expert may relay a group's hearsay to the jury. Rule 703 allows an expert to rely on inadmissible facts, but the proponent "may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." FED. R. EVID. 703. An expert "may not, however, simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). When an expert does so, he is "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules

prohibiting hearsay." *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003).

#### 4. Rules 401 and 403 independently require exclusion, and the translations are not settled

The exhibits do not match the government's description of the case. Exhibit 9's three posts describe NRB fighters "storming the border fence," being "present in more than one location," and fighting "inside Karam Abu Salim site, east of Rafah." Doc. 100-9, at 2. None places NRB fighters in Kfar Aza or Nahal Oz. Exhibit 7 names no location at all. Each exhibit invites the jury to infer that because fighters wearing NRB insignia took part in the attack somewhere, Mr. Al-Muhtadi must have been among them. That is the inference the hearsay rule and Rule 403 forbid, and a limiting instruction would not undo it. The inference is especially unfair here, because the cell-site records show that his phone could have been in Gaza when it used the tower.

Exhibit 8 should be excluded for an additional reason. The government offers it as evidence about Kfar Aza: its file name is "Hamas Propaganda kfar_aza," Doc. 100-8, and its title card, as the defense reads it, describes an assault on a military site near Kfar Aza. It is Hamas's own account of that assault, and it includes what appears to be a casualty. The government ties Kfar Aza to the tower and to an asserted border breach, Gov't Memo at 2-3, 8, but it cites no evidence locating the breach, and the carrier's map for the sector that served the phone does not reach Kfar Aza. An attack at a place the government's own records do not connect to Mr. Al-Muhtadi says nothing about his conduct, FED. R. EVID. 401, 402, and any slight value

is substantially outweighed by the danger of unfair prejudice and of misleading the jury, FED. R. EVID. 403. The same is true of any claim that NRB fighters took part in the assault on Kfar Aza.

The Court also cannot weigh these exhibits yet, because their English renderings have not been tested. The defense's preliminary comparison with the Arabic in the channel export suggests that the words rendered "Gaza Strip" in the first Exhibit 9 post may instead refer to the Israeli area bordering Gaza, and that "at Ground Zero" may render an Arabic idiom meaning point-blank range. *See* Doc. 100-9, at 2; FBI-535775-994. A qualified linguist must review those passages and the Exhibit 7 title card, and the defense offers them only as examples. These exhibits belong in the translation process the government proposed in Doc. 101, and the Court should not rule on their probative value before that process ends.

**B. Professor Hoffman may explain the organizations' history, structure, and leadership, but three of his proposed topics fall outside Rule 702**

The defense does not generally oppose expert testimony about the history, structure, and leadership of Hamas, the DFLP, and the NRB, subject to a complete disclosure and the Court's gatekeeping. The Fifth Circuit has reviewed a trial in which an expert gave an overview of "the rise of Hamas," though it noted that this part of his testimony "has not been challenged." *El-Mezain*, 664 F.3d at 515. The government's other authorities stand for no more. *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017), was a civil appeal in which the court would not accept a defaulting sovereign's belated challenge to admissibility unless the evidence was

"clearly inadmissible," and *United States v. Kassir*, No. S2 04 Cr. 356 (JFK), 2009 WL 910767, at *4 (S.D.N.Y. Apr. 2, 2009), *aff'd sub nom. United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) (summary order), described the permissible field as expert testimony on "the history, structure, leadership and methods" of terrorist organizations.

Several other noticed topics reach further, and the defense reserves its Rule 403 and Rule 702 objections to them until the government discloses the opinions it will elicit. They include the history of the State of Israel, Hamas's 1988 charter, the intifadas, the DFLP and NRB's "prior acts of terrorist violence," the Joint Operations Room, and a "second wave of attacks" that the notice attributes to "such factions as the DFLP / NRB." Doc. 95, at 3. The last two topics assume the answer to a disputed question about the NRB's role on October 7. Three other topics call for a ruling now.

The first is his proposed opinion that these groups "place a premium upon putting out truthful information about their activities and associations." Gov't Memo at 16. That is an opinion that the propaganda is true. Coming from an expert, it would supply the trustworthiness that the hearsay rules require the government to prove, and it would do so for statements whose authors no one can cross-examine. The government's own notice concedes that people make false claims of credit, Doc. 95, at 3, which is reason enough to leave the reliability of any particular claim to the jury.

The second is his proposed narration of the attack in Kfar Aza and Nahal Oz, using "photographs, videos, and demonstrative exhibits," and identifying "the indicia

that HAMAS and NRB were involved." Doc. 95, at 3. The government asks that he "use the aforementioned videos along with other evidence" to address "10/7's chronology, geography, and involved groups," Gov't Memo at 16. Professor Hoffman was not there. His account of who attacked where would come from the same videos and propaganda addressed above, which is the conduit problem Rule 703 addresses. An expert who does that becomes, "rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *Mejia*, 545 F.3d at 190. At a minimum, the Court should exclude any narration of the attack at Kfar Aza for the reasons given in Part III.A.4.

The third is his testimony about "the way in which these groups police the use of their insignia by people not formally inducted into the group." Gov't Memo at 16. *El-Mezain* permitted testimony associating headbands in a video with Hamas, where two experts "testified that the headbands were associated with Hamas." 664 F.3d at 514. The objection here is to the policing opinion, which the government wants because it says the propaganda connects Mr. Al-Muhtadi "with NRB insignia." Gov't Memo at 12. The intended inference is that anyone who wore NRB insignia was a formally inducted member, and therefore a member on October 7. That is a disputed question the jury must decide on evidence about him. *Diaz v. United States*, 602 U.S. 526, 535-36 (2024), arose under Rule 704(b), but its reasoning is instructive under Rules 702 and 403: an expert may describe what most people in a group know, but an

opinion that "all people in the defendant's shoes" share a mental state amounts to an opinion about the defendant. The notice gives no indication of how categorical Professor Hoffman's opinion will be or what data support it.

The notice invites the defense to "advise as to what further information is necessary to prepare for trial." Doc. 95, at 4. This opposition is that response. Rule 16 requires "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief" and "the bases and reasons for them." FED. R. CRIM. P. 16(a)(1)(G)(iii). A list of topics does not meet that standard, and the Court cannot decide whether an opinion is reliable under Rule 702 without knowing what it is. The Court should order a complete disclosure of the opinions on the three topics above and on the reserved topics, without prejudice to the challenges Mr. Al-Muhtadi will raise in the separate filing described in Part IV.

### C. The agents may not tell the jury what Mr. Al-Muhtadi's words mean

#### 1. An interpretation based on upbringing and regional experience is expert testimony

A lay opinion must be "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(c). "[A]ny part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701." *United States v. Cooks*, 589 F.3d 173, 180 (5th Cir. 2009). The government describes the basis for the testimony it seeks as the undercover employee's "training and experience as well as upbringing in and near Palestine," Gov't Memo at 2, and as "training and experience working with

Palestinians and working in that region," *id.* at 25. It wants the agents to explain "code, slang, and common terms understood by Palestinians." *Id.* Knowledge of a regional dialect and culture acquired through upbringing is specialized knowledge that the average juror does not share. That is what makes the testimony useful to the government, and it is what makes it expert testimony.

The Fifth Circuit cases the government cites confirm the point. They permit agents to interpret code words when the interpretation comes from the agent's own work in the case. *United States v. Akins*, 746 F.3d 590, 599-600 (5th Cir. 2014) ("a lay witness with extensive involvement in the underlying investigation"). Agents may "draw upon their familiarity with a particular case—not 'expertise with the drug trade' generally—to provide lay opinion testimony regarding 'the meaning of specific words and terms used by the particular defendants' in the case." *United States v. Staggers*, 961 F.3d 745, 761 (5th Cir. 2020) (quoting *United States v. Haines*, 803 F.3d 713, 729 (5th Cir. 2015)). And an agent's interpretations offered "without explaining the basis of interpretation" were partly "admitted in error," though harmless. *Haines*, 803 F.3d at 732.

In *El-Mezain*, agents explained "the difference between 'inside' and 'outside' the Palestinian territories as used in some exhibits." 664 F.3d at 513. The court acknowledged that an average juror would not know some of what the agents said, but it upheld the testimony because the agents' opinions rested on their own investigation of the case. *Id.* at 513-14. The court added that the agent's explanation

of those terms "was cumulative of similar testimony from Dr. Levitt," the government's expert witness on Hamas. *Id.* at 515. *El-Mezain* thus permits interpretations grounded in an investigation, and the government grounds these interpretations in a witness's upbringing instead.

The investigation does not supply a settled meaning here either. The government asks the Court to "permit the FBI agents such as the FBI UC to testify" about "code, slang, and common terms understood by Palestinians and used by the Defendant, including references to geographical locations." Gov't Memo at 25. The affiant read "Malaka" as "a reference to the Malaka region in Gaza," Doc. 1-1 ¶ 65, and an Israeli source later described a "zone or polygon rather than a single fixed coordinate." A case agent who picked one of those readings would be choosing between competing accounts, which is the jury's job. And where Mr. Al-Muhtadi was that morning is contested. The affiant rendered one of his statements as "I went inside [Israel]," Doc. 1-1 ¶ 63, but the cell-site records show that his phone could have been in Gaza when it used the tower.

The undercover employee has no investigation-based knowledge of the October 7 calls. His recorded conversations with Mr. Al-Muhtadi took place between July and September 2025 in Louisiana, almost two years after the calls, and the word "Malaka" does not appear in any of the undercover transcripts produced to the defense. Whatever meaning he would give that word, or the word "inside," would come from his background rather than from anything he learned in this case. The First Circuit,

which the government cites, identified the risk of such testimony: "that the witness may be unable to point to any rational basis for the interpretation offered or be doing nothing more than speculating." *United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012).

**2. The meanings the government would have its agents supply are disputed in its own materials**

"Inside" and "Malaka" are ordinary words whose meaning depends on the speaker, the listener, and the context, and the jury can weigh them with the help of accurate translations and the parties' arguments. The undercover employee acknowledged in a recorded conversation that "when someone talks in a different dialect, you don't get it." An agent who learned his Arabic in one place is in no better position than the jury to say what a speaker from Gaza meant by an ordinary word.

The translations themselves are also in dispute. The affiant's translations insert bracketed interpretations into the text, including a gloss on "inside" and bracketed identifications of the National Resistance Brigades and of the former Hamas leader Yahya Al-Sinwar in a September 2024 Facebook exchange. Doc. 1-1 ¶¶ 52-53, 63, 78. The FBI produced two English versions of Mr. Al-Muhtadi's own message in that exchange. One renders it as "If you post Al-Sinwar's picture, no one will tell you anything." The translator's note to that version concedes that "[a]ny deviations from the original text are for the purpose of cohesion and bridging any semantic gaps between source and target languages." The other version, labeled "Symphony TRANSLATION," which suggests software translation, renders the same

message as "If I had the picture of the scanner, no one would tell you anything." An agent's testimony about what a phrase "means" cannot resolve a dispute about what the phrase is.

Translation belongs to a qualified interpreter. "An interpreter must be qualified and must give an oath or affirmation to make a true translation." FED. R. EVID. 604. The government has noticed a language analyst who "may also testify to the meaning of certain Arabic idioms." Doc. 94, at 2. Mr. Al-Muhtadi reserves his objections to that witness's qualifications, which he will raise in the separate filing described in Part IV, and to any idiom testimony. Under the Doc. 101 process, the parties will bring their translation disputes to the Court at the December 21 pretrial conference. Until then, no one can say which words the agents would be interpreting. That alone warrants denying Section III.J now, without prejudice to a renewed request once the translations are settled. A lay gloss from an agent would also bypass Rules 604 and 702. And if the agent were the undercover employee, a witness whose identity and role are already the subject of Doc. 102 would be telling the jury what the evidence means.

Subject to the authentication objection in Doc. 99, the jury may hear Mr. Al-Muhtadi's words; the defense asks only that no agent tell the jury what those words mean on the strength of the agent's background.

**3. If the Court permits any interpretation, it should require notice and a hearing**

If the Court is inclined to permit some interpretive testimony, it should impose

three conditions. First, any witness whose interpretation rests on language, culture, upbringing, or regional experience should be noticed as an expert under Rule 16(a)(1)(G), with each opinion and its basis disclosed, and qualified under Rule 702. Second, any lay interpretation by any agent should be confined to terms the witness learned in this investigation, and the government should identify in advance each word or phrase each agent will interpret and the basis for each interpretation. *See Albertelli*, 687 F.3d at 450; *Haines*, 803 F.3d at 732. Third, the Court should test each interpretation at a hearing outside the jury's presence before the witness offers it. *See Albertelli*, 687 F.3d at 450.

## IV. Reservation of objections

Mr. Al-Muhtadi has not yet filed his challenges under Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to the government's noticed experts, including Professor Hoffman and the FBI language analyst. He intends to file them with the defense expert disclosures, and he reserves the right to challenge each expert's qualifications, methods, and opinions in that separate filing. He also reserves all other objections to this evidence, including objections under the Confrontation Clause, the Due Process Clause, and the First Amendment, objections to the authentication and translation of any recording or document, and objections to specific exhibits and testimony once the government identifies them. He does not waive any objection by proposing limits, a hearing, or a limiting instruction in the

alternative.

## V. CONCLUSION

For these reasons, Mr. Al-Muhtadi asks the Court to deny an advance ruling admitting the Section III.C materials, reject the Rule 804(b)(3) theory, and order the government to identify each Rule 801(d)(2)(E) statement and hold a *James* hearing or reserve ruling until trial. He asks the Court to exclude Exhibit 8, any claim that NRB fighters took part in the assault on Kfar Aza, and any narration of that attack. He asks the Court to exclude Professor Hoffman's opinions on the accuracy of propaganda, his narration of the October 7 attack, and his insignia-policing opinion, or else to order a complete Rule 16 disclosure of those opinions, and to order disclosure of his opinions on the reserved topics. He asks the Court to deny Section III.J without prejudice until the translations are settled or, in the alternative, to impose the three conditions in Part III.C.3. Because only a definitive ruling preserves a claim of error for appeal without a renewed objection, *see* FED. R. EVID. 103(b), he also asks the Court to state whether each ruling is definitive.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: *s/ Dustin C. Talbot*
DUSTIN C. TALBOT
First Assistant / Appellate Chief

*s/ Aaron A. Adams*
AARON A. ADAMS
Assistant Federal Public Defender

Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 29, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*