UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA
v.

CRIMINAL NO. 6:25-CR-00285
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant
_____________________________________________/

**GOVERNMENT'S REPLY IN SUPPORT OF MOTION *IN LIMINE* TO PERMIT VARIOUS FORMS OF EVIDENCE AT TRIAL (VICTIM TESTIMONY, MEMRI VIDEOS AND A.F.A.J. EVIDENCE)**

**INTRODUCTION**

The Government filed a Motion in Limine to permit various forms of evidence at trial. [Doc. 100] ("Mem."). In response, the defense filed three separate oppositions, with each brief addressing parts of the Government's motion. *See* [Docs. 128, 129, 130]. This reply addresses Document 129 ("Opp."), in which the defense responds to three of the ten topics on which the Government moved: Victim testimony, Middle East Media Research Institute ("MEMRI") videos, and evidence pertaining to the Defendant's co-conspirator, fellow Democratic Front for the Liberation of Palestine ("DFLP") member, and Facebook friend "A.F.A.J.," who was captured on video killing an agricultural student from Tanzania in the Nahal Oz area on October 7, 2023.

Make no mistake: the conspiracy that Defendant attempted to join and did join was the very definition of violence and depravity, and the Defendant knew it. Any

attempt to sanitize the evidence should be rejected. The Government will be judicious about the number of videos it plays and the violence they depict. But the Court should reject Defendant's attempt to impose artificial restrictions on the Government's presentation. The video evidence and victim testimony that the Government will present will be commensurate with the crimes with which the Defendant is charged.

## ARGUMENT

### I. Video Evidence is Not Unduly Prejudicial

Defendant cannot claim undue prejudice on the grounds that the "government has no witness or video showing Mr. Al-Muhtadi commit violence." Opp. at 6-7. The Defendant knowingly joined a violent conspiracy. When he learned that "[t]he borders are open" and he sped "east" toward the "inside," he asked his associates to bring rifles, magazines, ammunition, hand grenades, tactical vests, and a motorcycle for his comrade "to come inside." [Doc. 101, Exh. 16-21]. These are not the tools of an innocent bystander, unaware of the violent nature of his undertaking. This is someone eager to fully participate with "our guys" who were "celebrating inside." *Id.* at Exh. 17. The jury is entitled to see what happened that day, and what activity Defendant sought to undertake.

As the Government explained, "[t]errorist propaganda, including images and videos depicting graphic violence, is regularly admitted in trials involving terrorism and material support of an FTO to show the defendant's motive and intent." *United States v. Mohamed*, No. 19-02162, 2024 U.S. Dist. LEXIS 134038, at *5 (D. Ariz. Jul. 30, 2024) (collecting cases). *See also United States v. Abu-Jihaad*, 630 F.3d 102, 132-34 (2d Cir. 2010) (affirming district court's admission of graphic jihadist propaganda

videos in case involving transmission of national defense information to terrorist group). Nevertheless, the Government will be selective in which video evidence to present. For example, it will not show the jury video evidence of rape, skeletons bound together and burnt, infants in their cribs riddled with bullets, beheadings and attempted beheadings – all of which HAMAS and their co-conspirators filmed with go-pros and cameras and posted to social media.

Defendant claims that *United States v. Grimes* is the appropriate Rule 403 benchmark, but its reliance on that case is entirely misplaced. Opp. at 6-7. In *Grimes*, the defendant was charged with possessing child pornography that was "non-violent in nature." *United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001). By contrast, the government had introduced computer narratives that were "vile in their graphic and violent nature." *Id.* The court found that the probative value of the narratives was outweighed by undue prejudice under Rule 403 due to the mismatch between the non-violent nature of the charged crime and violent content of the narratives that were introduced. *See id.* There is no such mismatch in this case. The Defendant here is charged with assisting in one of the most violent terror attacks in recent history. And contrary to the Defendant's repeated protestations that the Defendant himself is not captured on tape, *e.g.*, Opp. at 7, he is captured on telephone calls preparing to join the violence and gathering the weaponry with which to do so.[1]

---

[1] Defendant concedes that the Fifth Circuit in *Perry* upheld the admission of violent images as to a defendant who "was not involved in the murders shown in the photographs" because that person was connected to the underlying conspiracy. Opp. at 12; *United States v. Perry*, 35 F.4th 293, 325-26 (5th Cir. 2022). So too here. While Defendant is willing to admit that the "attack happened" and "Hamas led it," Opp. at

Defendant's attempt to distinguish *El-Mezain* similarly fails. There, the Fifth Circuit approved the admission of violent images not just from the defendants' computers; in other words, it was not the defendants' "[p]ossession" that mattered. Opp. at 12. Rather, the court also permitted the Government's expert to provide context to the jury about the kinds of violence in which HAMAS engaged. *See United States v. El-Mezain*, 664 F.3d 467, 510 (5th Cir. 2011). In that case, the defendants were alleged to have provided financial support to HAMAS by sending money to charitable organizations that HAMAS controlled – a connection that the defendants denied. The Fifth Circuit still found the images were "probative of the motive or intent of the committees and HLF to support Hamas." *Id*. Here, the Defendant is not accused of sending money to HAMAS, but of joining HAMAS in the violence of the day. The connection between what happened on October 7 and the crimes with which Defendant is charged is direct and inescapable, and the jury is entitled to understand it.

As noted, the Government will not show the jury the worst of the violence from that day. But the Government will show two brief video segments depicting the murder of J.M., an agricultural student from Tanzania living at Nahal Oz. J.M. was murdered by a DFLP Facebook friend of the Defendant at a time when cell site evidence and the Defendant's phone calls placed Defendant in the vicinity. The

---

12, Defendant resists his connection to the charged conspiracy, just as the defendant did in *Perry*. As the Fifth Circuit explained in *Perry*, evidence existed tying the defendant to the co-conspirators (the "39ers" gang). *Perry*, 35 F.4th at 325-26, n.21. The evidence here will similarly tie Defendant to his co-conspirators DFLP, National Resistance Brigades ("NRB") and HAMAS.

Government is also entitled, through the testimony of experts and victims, to show selected video depicting the range of activities that HAMAS and its co-conspirators engaged in on October 7, 2023, including kidnappings, shootings, and the use of hand grenades, all activities and weapons referenced in the Defendant's phone calls. The Defendant cannot dictate how the Government will present its case, *Old Chief v. United States*, 519 U.S. 172, 186 (1997), so long as the evidence is relevant and not unduly prejudicial. *See also Perry,* 35 F.4th at 326 (The "abuse of discretion standard for a Rule 403 decision is not satisfied by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon.") (citations omitted). The Rule 403 bar is easily met here.

## II. Victim Testimony from Kfar Aza is Obviously Relevant

Defendant suggests that evidence from any area outside the Kfar Aza cell phone tower's westward-facing reach is not relevant because Defendant's phone pinged that tower facing westward within that specific range. Opp. at 7-11. Nonsense. The cell tower at issue is located in the fields of Kfar Aza. The Defendant's last call was at 9:33 am on morning of October 7, during which he says, "I swear by God, I'm inside." He then says, "Turn your phones off, boys." Doc. 101, Ex. 21. The Defendant's cell phone then pinged off the Kfar Aza cell tower at 10:01 a.m., suggesting that Defendant was on the move.

It defies common sense that during the time Defendant spent marauding through Southern Israel, in a car, he would not have driven the short distances between the border, Nahal Oz and Kfar Aza. The cell phone location was evidence of

Defendant's presence at that moment; it does not constitute an imaginary force field through which Defendant could not have passed. The reasonable inference is that once "inside" with his car, and unaccounted for during the course of the day, Defendant could have reached any part of Israel. And that is consistent with the Defendant's motive to join the fight; why would he stop his progress to stay within an area defined by a cell site capture of which he was unaware? He did not. Indeed, the Government will present video evidence that DFLP publicly claimed credit for being present within the Kfar Aza kibbutz, evidence that victims from Kfar Aza will recognize and identify. In short, while the Government is presenting victim testimony only from the two communities closest to Defendant's crossing – that in no way concedes that Defendant went nowhere else.[2]

Nor will the victims' testimony be cumulative. One victim from Nahal Oz will recount her experience in a safe room on October 7; one victim from Kfar Aza will recount her experience hiding with her fiancé, who was killed by a grenade; one victim was a first responder from Kfar Aza who battled terrorists on the grounds of the kibbutz; and the final victim will establish the death resulting element of the charges, as she personally observed the corpses of over sixty members of her community.

[2] Defendant spends much time discussing the contents of the Cellcom report documenting the location of his phone, Opp. at 7-10, but cites to not one case holding that a single snapshot of location data constitutes the outer boundary of relevance. Nor does Defendant cite authority for the proposition that a snapshot of location data captures every nuance of a person's movement. For good reason. Both propositions defy common sense.

The Court should also reject Defendant's proposal to confine victim testimony to "non-graphic" accounts and provide written proffers in advance of trial. The victims will recount what happened to them from first-hand experience. The jury is entitled to hear about the object of the conspiracy that Defendant joined.[3]

### III. MEMRI Records Are Admissible

Federal Rule of Evidence 902 provides that various categories of records are "self-authenticating[:] they require no extrinsic evidence of authenticity in order to be admitted." The Government has obtained from the Middle East Media Research Institute ("MEMRI") a certification of authenticity of domestic records under 902(11) and (13). MEMRI's business model is to capture and translate media from outlets in the Middle East and South Asia. As the events of October 7, 2023, unfolded in real time, MEMRI captured videos and images on accounts belonging to HAMAS and DFLP, among other organizations. They also captured images and videos from open sources such as Telegram. These videos and images were kept in the ordinary course of business at MEMRI and were not altered in any way. *See* Doc. 99, Exh. 1. Because MEMRI has executed the requisite certificate, no further evidence of authentication is required – the records are self-authenticating under Rule 902. Nevertheless, a witness from MEMRI will also testify at trial in support of authentication.

[3] The Government is not presenting testimony from hostages who survived HAMAS captivity.

## IV. The A.F.A.J. Evidence is Relevant and Admissible

In its opening memorandum, the Government explained that courts in terrorism trials have approved of evidence showing a defendant's "comrades" participating in attacks as tending to show motive, intent, and opportunity. *United States v. Abukhatallah*, 41 F.4th 608, 639 (D.C. Cir. 2022) (discussing evidence connecting defendant to "third attacker from that night, a comrade of his known as Jamaica"); *United States v. Hassan*, 742 F.3d 104, 140 & n.33 (4th Cir. 2014) (noting with approval district court's instructions including "a defendant's relationship with other conspirators" as circumstantial evidence) (citations omitted); *United States v. Farah*, 107 F. Supp. 3d 996, 1001 (D. Minn. 2015) ("the Defendant is being prosecuted for conspiracy to provide material support to a foreign terrorist organization. His associations and the statements he made may be used by the government to prove a pertinent fact, such as motive or intent.").

At issue is a video during which A.F.A.J. is seen with several co-conspirators dragging a 21-year-old Tanzanian student, J.M. out of his dormitory, screaming at him. A second clip shows the same individuals stabbing the student to death and stomping on his body. J.M. had been in Israel for three weeks before he was murdered. J.M.'s body was taken to Gaza and held hostage until his remains were returned in November 2025. The FBI has identified A.F.A.J. – who was wearing a DFLP patch on his shirt during the murder and distinctive footwear -- and connected him to the Defendant's Facebook account. An FBI agent will testify at trial about the identification and connection to Defendant.

Defendant claims this is "guilt by association," and that no evidence shows that A.F.A.J. "agreed to anything." Opp. at 20-23. But the actions of Defendant's co-conspirator in furtherance of the conspiracy, particularly one with a close nexus to the Defendant, are acutely relevant. "Once a defendant has been connected with the conspiracy through his own conduct, all acts and statements of his co-conspirators during the pendency and in furtherance of the conspiracy are admissible against him." *United States v. Jennings*, 527 F.2d 862, 869 (5th Cir.1976). That is precisely the case here. Defendant is free to cross-examine the testifying agent about perceived flaws in the identification of A.F.A.J., but the admissibility of the evidence is beyond dispute.

## V. The Court Should Not Defer to Trial Evidentiary Rulings

Defendant repeatedly asks that the Court to defer ruling on the admissibility of the evidence on which the Government moved in limine. *See., e.g.*, Opp. at 18-20. But this Court ruling pre-trial will facilitate an efficient case presentation and avoid protracted disputes over the admissibility of evidence. Indeed, the reason the Court's pre-trial Order included a motions deadline well in advance of trial was to afford the parties and the Court time to engage with relevant case law. In that way, legal issues can be decided sufficiently in advance of trial to enable the parties to prepare with full knowledge of the evidentiary landscape.

**CONCLUSION**

For all these reasons, and those in its opening Memorandum, Court should enter an order permitting the Government to introduce the aforementioned evidence as part of its case-in-chief at trial in this matter.

Dated: October 9, 2026

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: *<u>/s/ Elizabeth J. Shapiro</u>*
ZACHARY A. KELLER
JOHN W. NICKEL
U.S. Attorney's Office – WDLA
Special Bar No. 803262 (Keller)
LA Bar No. 37819 (Nickel)
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Tel: (337) 262-6618
Email: Zachary.keller@usdoj.gov

ELIZABETH J. SHAPIRO
D.C. Bar No. 418925
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-5302
Email: Elizabeth.Shapiro@usdoj.gov

D. ANDREW SIGLER
Ala. Bar No. 5175-I72D
Trial Attorney, Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: 202-514-0849
Email: Andrew.sigler@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 9, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Elizabeth J. Shapiro*___
Elizabeth J. Shapiro