UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

v.

MAHMOUD AMIN YA'QUB AL-MUHTADI,

Defendant
/

CRIMINAL NO. 6:25-CR-00285
JUDGE JOSEPH
MAGISTRATE JUDGE WHITEHURST

**GOVERNMENT'S REPLY IN SUPPORT OF MOTION TO SHIELD THE IDENTITY OF CERTAIN WITNESSES AND FOR OTHER PROTECTIVE MEASURES TO ENSURE WITNESS SAFETY**

On September 15, 2026, the Government filed a Motion *In Limine* requesting protective measures for certain government witnesses, along with a supporting memorandum of law. [Doc. 102] ("Mem."). The defendant filed a response in opposition on September 29, 2026. [Doc. 131] ("Opp."). The Government now files this reply.

## INTRODUCTION

The Government is tendering for trial at least two foreign government witnesses and an FBI undercover employee at great risk to their personal safety. Defense counsel underscore this risk by conceding that outsiders are in fact tracking one such witness and are offering information about him. In order to protect each of the witnesses, the Government has asked for certain protective measures, including the use of pseudonyms and a partially closed courtroom. As courts including the Fifth Circuit have held, these measures are compatible with the Defendant's confrontation rights and ability to conduct an effective cross-examination.

Defendant largely dodges the requisite legal test. Instead, counsel request security clearances so that they can receive the witnesses' true names. But clearances would not permit the disclosure of the witnesses' true names to defense counsel, and there is no need for clearances in this case where there is no classified discovery, unlike in *El-Mezain*, where there was years' worth of classified surveillance. In any event, the protective measures are warranted irrespective of any classification concerns, as numerous courts have held under similar circumstances. The Court should adopt them here as well.

## ARGUMENT

### I. The Requested Protective Measures Are Justified Because the Risk to the Witness' Safety is High and the Impairment to Defendant's Confrontation Rights is Minimal

#### A. The Risk to the Witnesses' Safety is Undisputed

Defendant accepts the legal framework that the Government set forth in its opening brief, as it must under governing Fifth Circuit precedent. *See* Opp. at 6. But Defendant fails to seriously engage in the legal balancing that precedent requires, including the Government's stated concerns for these witnesses' safety.

##### 1. ISA Witnesses

With respect to the Israeli Security Agency ("ISA") witnesses, the Government explained:

> Here, the safety and attendant national security concerns are very real because Israel's adversaries, including HAMAS, specifically seek to publicize the identities and identifying features of ISA personnel in order to compromise them and their families, and their ability to effectively carry out their sensitive national security duties. *See El-Mezain*, 664 F.3d at 492 (HAMAS and other terrorist organizations seek out the true identities of ISA agents and their

families and publish descriptions of ISA officers on websites so that they can be targeted).

Mem. at 12-13. The Defendant's sole response is "[t]hat showing concerned different witnesses in different roles almost twenty years ago," Opp. at 7, as though the controlling Fifth Circuit law doesn't matter.

But it does matter, and as the Government explained in the Motion, *see* Mem. at 8-9, it squarely approves the relief the Government seeks. The Defendant in this case is charged with a conspiracy to join HAMAS in murdering Israeli citizens, a massacre in which dozens of Americans also died. The ISA witnesses set to testify work for an intelligence agency that operates to thwart HAMAS. Defendant does not and cannot seriously dispute that ISA agents are prized targets for terrorist organizations sympathetic to HAMAS, or that post October 7 and the Gaza war, the motive to harm Israelis, far from ebbing in the last twenty years, is at a zenith. Just a week ago a suicide mission to murder a plane load of Israelis was barely averted. *See* Alexander Cornwell, Federico Maccioni, & Pesha Magid, *Passengers foil bid to crash Dubai-Tel Aviv flight, Israel says, after co-pilot stabs pilot,* Reuters (Sept. 30, 2026) https://www.reuters.com/world/middle-east/diverted-flydubai-flight-israel-was-not-hijacking-incident-israeli-prime-2026-09-30/.

But if there were any doubt, the Defendant has provided all the necessary proof. As Defendant reveals, "[o]utside sources have approached the defense team claiming to have information about Avi. The defense has so far declined to accept, consider, or vet that information." Opp. at 17-18. In other words, according to the defense, unnamed outside sources, for unknown motives, are looking to expose Avi's

identity. That alone is reason for the Court to issue every available protective measure to ensure that these witnesses' identities and safety are protected.[1]

**2. The IDF Witness**

The Israeli Defense Forces ("IDF") witness, should the Government call one to authenticate the Battlefield Documents, is no differently situated than those witness from the ISA from a threat perspective. The defense has no answer, other than to incorrectly cite *Holy Land* for the proposition that protective measures were not in that case implemented with respect to the IDF witness. Opp. at 19. But the court in *Holy Land* reconsidered its original decision and applied the same protective measures to the IDF witness that it applied to the ISA witness. *See United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240-G (N.D. Tex), ECF No. 709 (July 11, 2007) (granting government's motion for reconsideration); *United States v. El-Mezain*, 664 F.3d 467, 490-94 (5th Cir. 2011) (upholding the use of pseudonym with respect to both ISA and IDF witnesses). The IDF witness is entitled to the same protective measures as the witnesses from the ISA.

**3. FBI Undercover Employee (FBI UC)**

The Government explained in its opening memorandum that the FBI UC in this case, known to the defendant as Samir Khader, is entitled to the same protective measures as the Israeli government witnesses:

[1] The defense continues mistakenly to insist, Opp. at 5-6, 18, that Avi is part of the prosecution team -- a proposition this Court has already rejected. *See* Doc. 114 at 87-88. But even were it true that would have no bearing on the threat to his safety. That threat is real, reinforced by the defense revelations, and needs to be mitigated through the protective measures the Government has proposed.

> Under U.S. law, like under Israeli law, disclosing classified information that identifies covert agents, informants and sources constitutes a crime. *See* 50 U.S.C. § 3121(a). As the statute recognizes, there are both serious safety and law enforcement reasons for not disclosing the FBI UC's true name. Disclosure of the FBI UC's true identity and appearance would compromise any prior or ongoing investigations. Moreover, due to the politics of the regional conflict, were the FBI UC's true identity discovered, it would expose the FBI UC and his family to grave danger.

Mem. at 17.

The defense does not dispute that there are both serious safety and law enforcement reasons for not disclosing the FBI UC's true name, or that such disclosure would compromise any prior or ongoing investigations. Nor does it dispute the consequences that could befall the FBI UC and his family should HAMAS or like-minded supporters learn his true name. Defendant complains only that the Government "offers only its own assertion," and that his ability to obtain *Giglio* material is impaired. Opp. at 14. As explained below and in its opening memorandum, however, the Government has committed repeatedly – with respect to all witnesses -- to fulfilling its obligations under *Giglio*, *Brady* and Jencks Act. *See infra*, I.B; Mem. at 15, 18.

**B. The Defense Can Conduct Meaningful Cross-Examination**

Each of the witnesses discussed above will appear at trial, live, and subject to cross-examination by the defense. The Defendant and defense counsel will be in the room and able to see and confront the witnesses. And the Government has explained why the defense will be well-armed to conduct meaningful cross-examination of all the witnesses for whom it requests protective measures. Because these witnesses

use pseudonyms in their daily work, investigation using their true names would be futile. Nor are true names necessary to probe bias. *See generally* Mem. at 15-19.

The only specific objection the defense raises is that unnamed sources have offered to provide information about Avi that would enable the defense to conduct a more meaningful investigation. But with respect to Avi, the defense already has far more information than it would for most witnesses. It has Avi's prior testimony in *Holy Land*, including his *Daubert* hearing. That is in addition to an opportunity to probe Avi's credentials at a hearing scheduled for November 3. Maya and the IDF witness are authentication witnesses only. And the FBI UC will simply identify the Defendant's voice based on hours of conversations between the defendant and the UC that were recorded and produced to the defense. Each witness will be present in court and subject to cross-examination. There is little question that the defense will have more than adequate "opportunity to place the witness in [their] proper setting and put the weight of [their] testimony and [their] credibility to a test." *El-Mezain*. 664 F.3d at 493-94 (citation omitted). And to repeat, the Government will abide by all *Giglio*, *Brady* and Jencks Act obligations, including for the foreign witnesses.

In short, the defense offers little more than general complaints about wanting to investigate the witnesses using their true names. It pays lip service to the requisite legal balancing test but does not seriously engage in any balancing that considers the witnesses' safety. That balance comes out decidedly in favor of applying the protective measures that the Government has requested.

## II. Security Clearances Would Not Entitle Counsel to the Witnesses' True Names

Defendant spends many pages arguing for a security clearance on the grounds that the Government's motion is predicated on classification. But he ignores the undisputed legal standard on which this motion is based, which has nothing to do with classification. Instead, as outlined above, it has to do with the safety of the witnesses balanced against the Defendant's right to conduct a meaningful cross-examination. And many of the cases that the Government cited applied this standard even when classified identities were not at issue.

*El-Mezain* is directly on point. Defendant attempts to distinguish it by arguing that defense counsel in that case had security clearances. *See* Opp. at 9-10. Counsel in that case were cleared, but only because their clients were subject to years-long surveillance under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq*. *See El-Mezain*, 664 F.3d at 563. Security clearances were required so that defense counsel could review their clients' own statements, which were produced in classified form during discovery. Calls that the defense wanted to use at trial were then declassified. But contrary to Defendant's apparent understanding, *see* Opp. at 9-10, defense counsel in *El-Mezain* – despite their clearances – never received the true names of the Israeli witnesses, nor were they included in any affidavit. Security clearances would put defense counsel here in no different position than they are now.

Nor are defense counsel here entitled to a security clearance. The determination of whether to classify information, and the proper classification thereof, is a matter committed solely to the executive branch and is not subject to

judicial review. *See El-Mezain,* 664 F.3d at 523 n.16. *Accord United States v. Moussaoui,* 591 F.3d 263, 281 n.15 (4th Cir. 2010) (the government's right to protect classified "information is absolute, and we do not second guess such determinations"); *United States v. Abu Ali,* 528 F.3d 210, 253 (4th Cir. 2008) ("[W]e have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security." (citation omitted)).

Likewise, the prosecution team, fully cognizant of its obligations under *Brady, Giglio,* and the Jencks Act, made a good faith determination that there was no need for classified discovery in this case. Whatever classified information remains, it is before the Court in a classified, *ex parte,* sealed filing, and the Court is the ultimate arbiter of whether the prosecution team's conclusions were sound. The defense's request to involve itself in classified aspects of the investigation would defeat the very purpose of the Classified Information Procedures Act ("CIPA"). Where "the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." *United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir. 1988) (quoting H.R. Rep. No. 96-831, 96th Cong., 2d Sess. at 27 n.22 (1980)).

## III. The Specific Protective Measures Requested Are Reasonable

Apart from pseudonyms, the Government has requested additional modest measures to ensure the witnesses' safety and to protect against the spillage of classified information. The defense objects to most of them.

- *Partial Courtroom Closure*. The Government has no objection to Defendant and defense counsel remaining in the courtroom. It does object to defense investigators and experts. The purpose of partially closing the courtroom is to limit the number of people who can see the witness, and Defendants' definition of "defense team" includes a large swath of people who are not defense counsel. In addition, no one remaining in the courtroom can have a telephone or other device that could capture the witness' image. The Government is willing to work with defense counsel to negotiate parameters, or at least to narrow the issue for the Court.

- *Official Transcript*. The Government agrees that the witnesses' testimony would be part of the official transcript and has never suggested otherwise. It asked only that these witnesses' testimony be recorded separately so that in the event of a spill of classified information, the transcript is more easily isolated and sealed. That said, the court reporter may have a more modern method of ensuring that spills are easily isolated and sealed, and the Government is willing to discuss with the Court and defense counsel how that is best achieved.

- *Consultation*. There is no legal reason why a legal advisor from Israel cannot sit in the courtroom. *See* Opp. at 21. The Government understands Defendant's objection to be not mere presence in the courtroom, but consultation with the witness. But the consultation is only to protect against the inadvertent disclosure of classified information. In the example that Defendant cites from *Holy Land,* that lone consultation (during the *Daubert* hearing) resulted in the witness being advised that he could answer the question the defense asked about his military service, which

he did. In addition, prior to the witness testifying in the *Daubert* hearing, defense counsel sent a list of topics that it intended to probe and the Government was able to confirm that the witness could answer the vast majority. The Government does not object to a similar process here, which, together with any CIPA orders, should minimize or eliminate the need for consultation. That said, if something unanticipated arises, and the witness does not know whether a response would elicit classified information, there must be a mechanism for the Israeli legal advisor to answer the classification question and a mechanism by which the Court can receive the information necessary to rule on any objections implicating orders issued under CIPA.[2]

- *Cross-examination.* The Government has no objection to cross-examination that is appropriately governed by the Federal Rules of Evidence and any protective order that the Court may issue under the CIPA.

[2] The Government objects to Defendant's suggestion for a live hearing for each witness prior to deciding this motion. *See* Opp. at 23. Such a procedure finds no precedent in the case law and would be unreasonable for witnesses based overseas who are already risking their personal safety by traveling to the United States for these proceedings. As for a *Daubert* hearing, which applies only to experts, the Government's understanding is that hearing will occur for Avi on November 3, 2026.

## CONCLUSION

For all the foregoing reasons, and those in the Government's opening Memorandum, the Court should grant the government's motion for protective measures for each of the Protected Witnesses.

Date: Oct. 9, 2026

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: *__/s/ Elizabeth J. Shapiro__*

ZACHARY A. KELLER
JOHN W. NICKEL
U.S. Attorney's Office – WDLA
Special Bar No. 803262 (Keller)
LA Bar No. 37819 (Nickel)
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Tel: (337) 262-6618
Email: Zachary.keller@usdoj.gov

ELIZABETH J. SHAPIRO
D.C. Bar No. 418925
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-5302
Email: Elizabeth.Shapiro@usdoj.gov

D. ANDREW SIGLER
Ala. Bar No. 5175-I72D
Trial Attorney, Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone: 202-514-0849
Email: Andrew.sigler@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 9, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Elizabeth J. Shapiro*
Elizabeth J. Shapiro