UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

---

# REPLY IN SUPPORT OF MOTION TO SUPPRESS THE PRODUCTS OF ISRAELI WARRANTLESS SURVEILLANCE

---

NOW INTO COURT comes the defendant, Mahmoud Al-Muhtadi, through undersigned counsel, who files this reply to the government's opposition (Doc. 123) and in further support of his motion to suppress the products of Israeli warrantless surveillance (Doc. 109).

## I. INTRODUCTION

The opposition rests on three premises: that the only search took place in October 2023, that this Court has already rejected the claim that the Israeli Security Agency acted for the FBI, and that Mr. Al-Muhtadi forfeited any connection to this country by the way he obtained his visa. The record and the government's own authorities answer each of them. Mr. Al-Muhtadi asks the Court to grant the motion or, at a minimum, to hold an evidentiary hearing before ruling.

The search that matters happened in June 2025, when the FBI asked the

Israeli Security Agency for the calls it had saved of Mr. Al-Muhtadi and the agency's listeners filtered them and selected six. (Defense Exhibit 1). The FBI made that request while Mr. Al-Muhtadi was living and working in Lafayette, nine months after he entered this country on an immigrant visa, and before the July and August 2025 treaty requests. (Doc. 114 at 65:2-5).

The opposition does not address where the servers holding these calls were located or the reasonableness of a search defined only by what a suspicionless archive held. (Doc. 109-1 at 10, 17-18). It agrees that the summaries stand or fall with the recordings. (Doc. 123 at 7-8 n.2). Mr. Al-Muhtadi stands on his memorandum on every point not discussed here and concedes none.

## II. ARGUMENT

### A. The Court has not decided whether the June 2025 retrieval was a search attributable to the United States

The government's lead theme is that the Court "already considered and rejected" the agency theory. (Doc. 123 at 1; *see id.* at 3-4, 14-15, 23). The August 4 hearing was on Mr. Al-Muhtadi's motion to compel discovery (Doc. 89; Doc. 114 at 4:6-18), which argued that the Israeli agencies' cooperation brought their materials "within the prosecution's disclosure obligation to the extent they acted as part of the prosecution team." (Doc. 74-1 at 6). The Court answered that question. It did "not find that Israeli intelligence or police forces were part of the prosecution team," and so did "not find that the Government's discovery obligations include anything in the possession of Israeli agencies." (Doc. 114 at 87:13-20).

Whether Israel's files belong to the prosecution for discovery purposes is a different question from whether one search was carried out at an American request. The ruling does not mention the Fourth Amendment, the June 2025 request, or the selection of six calls.[1]

The testimony addressed the FBI's requests only in general terms. The only witness, Agent Grimes, left the task force in October 2025 and had never seen the report of the interview describing the June 2025 request. (Doc. 114 at 15:4-7, 55:5-9). Asked whether the FBI had anyone embedded in the Israeli Security Agency, he answered, "No, sir, not that I'm aware of." (*Id.* at 60:25-61:1). The motion does not depend on such an agent; it rests on the request and on the selection made to answer it.

### B. The June 2025 retrieval was a separate search, and the United States set it in motion

The government treats October 7, 2023 as the only search and everything afterward as a transfer (Doc. 123 at 9-14), an account that leaves out June 2025. Whatever the agency did with these calls in 2023, in June 2025 its listeners filtered the saved calls and selected six to answer the FBI's request. (Defense Exhibit 1).

That act is a search in its own right. The Second Circuit concluded that the Fourth Amendment implications of querying stored communications "counsel in favor

[1] A ruling on that question would not bind the Court in any event. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010).

of considering querying a separate Fourth Amendment event that, in itself, must be reasonable," because "lawful collection alone is not always enough to justify a future search." *United States v. Hasbajrami*, 945 F.3d 641, 670 (2d Cir. 2019). The court singled out "the FBI requesting that the NSA query its far larger archive." *Id.* at 672. The government distinguishes *Hasbajrami* as a case about a United States citizen (Doc. 123 at 12), but Hasbajrami "was a legal permanent resident located in the United States." 945 F.3d at 658. Choosing six calls from the calls the agency had saved for an American prosecution was such a query, a new examination for a new purpose.

The government's other distinction, that the NSA is an American agency (Doc. 123 at 12), cuts the other way: the concern in *Hasbajrami* was an archive open to FBI requests, and that concern grows when the archive belongs to a foreign service that no American law governs. The conduct that exclusion would deter is American: the FBI's decision to ask for evidence it could not lawfully have gathered. (Doc. 109-1 at 18). *Lustig* agrees that a search "is not completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense." *Lustig v. United States*, 338 U.S. 74, 78 (1949) (plurality opinion). The June 2025 request, filtering, selection, and delivery were one such transaction. *Rojas*, where no later retrieval was at issue, measured connections "at the time of the intercepts," *United States v. Rojas*, 812 F.3d 382, 397 (5th Cir. 2016), and it called the joint-venture question "irrelevant in this case," *id.* at 398-99.

A violation is "fully accomplished" at the time of the intrusion, *id.* at 398 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990)), and the intrusion here was the June 2025 query, made while Mr. Al-Muhtadi lived in Lafayette.

The United States set this search in motion. The request came from the FBI. (Defense Exhibit 1). Agent Grimes testified that the FBI sends its own requests to foreign agencies and that prosecutors send treaty requests later to obtain permission to use information in court. (Doc. 114 at 7:17-9:4, 31:12-21). The treaty requests here went out in July and August 2025, after the June request (*id.* at 65:2-5), and the FBI "requested all recorded calls that the Government of Israel had" (*id.* at 56:17-18). The government calls the June request a mutual legal assistance treaty (MLAT) request (Doc. 123 at 10-11, 15), but the record shows an FBI request, routed through the FBI's legal attaché to the agency (Doc. 114 at 17:11-13), with no foreign judicial process identified, followed weeks later by treaty requests from prosecutors.[2]

The government's own authority found a joint venture on facts that included an American request and immediate forwarding. In *Barona*, "American agents requested the wiretaps, information obtained was immediately forwarded to them,"

[2] The government warns that the motion would require a warrant for "virtually any MLAT request involving phone calls." (Doc. 123 at 13). The motion argued that a foreign search attributable to the United States must be reasonable (Doc. 109-1 at 17), the standard of *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 171 (2d Cir. 2008) (searches of United States citizens). The government also quotes *United States v. Cardenas*, 9 F.3d 1139, 1157 n.8 (5th Cir. 1993) (Doc. 123 at 11), but that is a "We note" footnote, supported only by a citation to *Verdugo-Urquidez*, about a hotel room in Mexico searched by Mexican police. Good faith requires reliance on foreign assurances of legality, and none has been identified. (Doc. 109-1 at 18 n.5). The government's description of Maya's certificate as reflecting "lawful intercept processes" (Doc. 99 at 1) does not fill that gap, because the certificate is dated September 10, 2026 (Doc. 99-1 at 2), more than a year after the June 2025 request.

and the Ninth Circuit upheld the finding of a joint venture; the next question was whether the search was reasonable, beginning with the law of the foreign country. *United States v. Barona*, 56 F.3d 1087, 1094 (9th Cir. 1995). The government's other cases involved formal treaty requests carried out under foreign judicial process, *see, e.g.*, *United States v. Getto*, 729 F.3d 221, 226 (2d Cir. 2013) (Israeli court authorization).

The Fifth Circuit's tip cases are not to the contrary. In *Morrow*, American involvement was a "single telephone call," after which American officials "played no further part." *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976). In *Heller*, the defendant "was detained and the treasury bills seized before any American agents arrived." *United States v. Heller*, 625 F.2d 594, 600 (5th Cir. 1980). In each case American contact preceded a foreign operation, and neither involved a request defining what a foreign agency would retrieve and select for American use.

### C. Mr. Al-Muhtadi's admission on an immigrant visa and nine months of residence are substantial connections, and unproven charges cannot erase them

The government argues that Mr. Al-Muhtadi could not form substantial connections because he obtained his visa by fraud. (Doc. 123 at 17-21). The fraud is only an allegation: Counts 3 and 4 charge that his visa application and his August 2024 interview falsely denied membership in the Democratic Front for the Liberation of Palestine, firearms or explosives training, and participation in the October 7 attack. (Doc. 60 at 4-7). That is the conduct Counts 1 and 2 charge, and these calls

are central to the government's proof of it. (Doc. 99 at 1-2). The government asks the Court to treat the charges as proven in order to deny suppression of the evidence it needs to prove them.

The Seventh Circuit has rejected that kind of reasoning on a point that does not depend on its Second Amendment holding. Applying *Verdugo-Urquidez*'s description of "the people," it held that a noncitizen's brushes with the law did not show he had failed to accept the obligations of American society: "we see no hint in *Verdugo–Urquidez* that this is a relevant consideration." *United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015). If the Court weighs the alleged fraud at all, it can do so only on evidence taken at a hearing, and the opposition offers only the charges.

On the record that exists, his connections are substantial. He entered the United States on an immigrant visa through Dallas Fort Worth International Airport on September 12, 2024, settled in Tulsa, held an Oklahoma driver's license, and by June 2025 was living and working in Lafayette. (Doc. 1-1 at 40-41, 43 ¶¶ 77, 79, 82). *Verdugo-Urquidez* drew its line at entry and residence: rights attach "once an alien lawfully enters and resides in this country." *Verdugo-Urquidez*, 494 U.S. at 271 (emphasis omitted) (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring))).

The government's circuit authority does not hold otherwise. *Martinez-Aguero* accepted the plaintiff's argument that "her regular and lawful entry of the United

States pursuant to a valid border-crossing card and her acquiescence in the U.S. system of immigration constitute her voluntary acceptance of societal obligations," and held for her. *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (footnote omitted). *Portillo-Munoz*'s statement about the Fourth Amendment was dictum about a man who "entered and remained in the United States illegally," and the court did not "speak to" the "privacy" rights of noncitizens. *United States v. Portillo-Munoz*, 643 F.3d 437, 440, 442 n.3 (5th Cir. 2011). Mr. Al-Muhtadi entered on an immigrant visa and held a state driver's license in his own name.

### D. The government's shocks-the-conscience cases do not reach suspicionless, unauthorized collection

The government says the exception is reserved for torture (Doc. 123 at 21), but its own case asks whether conduct is "egregious" rather than "simply illegal." *Getto*, 729 F.3d at 228. *Getto* held that a claim that Israeli officials "may not have obtained a warrant under Israeli law prior to conducting some searches or surveillance" did not meet that standard. *Id.* at 229. That claim arose from an investigation of identified suspects, which included court authorization to bug a single room, *id.* at 226, and *Barona* involved wiretaps that foreign courts "purported to authorize," 56 F.3d at 1091. The collection here was different in kind. Israel recorded phone calls made by people in Gaza before October 7 (Doc. 114 at 60:13-16), no warrant, court order, or other specific authorization has been identified, and nothing in the record shows that any finding singled out Mr. Al-Muhtadi before his calls were captured (Doc. 109-1 at 17). *Payner* barred suppression of evidence "seized unlawfully from a

third party not before the court," *United States v. Payner*, 447 U.S. 727, 735 (1980), but Mr. Al-Muhtadi challenges the capture of his own calls.

**E. The Court should hold an evidentiary hearing before ruling**

The question is whether the motion's allegations "are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient and factual issues are raised, a hearing is required." *United States v. Poe*, 462 F.2d 195, 197 (5th Cir. 1972) (approving and quoting the guidelines of *Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967)). The government attributes the "substantial claim" standard to *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (Doc. 123 at 22), which does not use the phrase, but the standard comes from *Poe*, and the motion meets it. In this circuit, "where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

The government calls the collection "routine data collection authorized by Israeli law" while conceding that "the details" are "unknown to American law enforcement or the prosecution team." (Doc. 123 at 2). No witness with knowledge of the June 2025 retrieval has testified, but one is available. The government offers the certificate of "Maya," "a supervisor at the Gaza desk of the Israel Security Agency," and describes the calls as maintained "in the regular course of its conducting lawful intercept processes in the State of Israel." (Doc. 99 at 1). She is the branch manager

whose interview describes the June 2025 request. (Defense Exhibit 1). Having vouched for the lawfulness of the collection through her, the government should produce her to testify about it. The hearing would resolve specific, disputed facts on which the government bears the burden: the terms of the June 2025 request, how the six calls were selected, and where the servers sat. The CIPA and witness-protection procedures already before the Court can govern how Maya testifies.

## III. Conclusion

Mr. Al-Muhtadi respectfully asks the Court to grant the motion and enter the proposed order (Doc. 109-2). In the alternative, he asks the Court to hold an evidentiary hearing before ruling and to order the government to produce witnesses with firsthand knowledge of the surveillance program and the June 2025 retrieval.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: *s/ Dustin C. Talbot*
DUSTIN C. TALBOT
First Assistant / Appellate Chief

*s/ Aaron A. Adams*
AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 13, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*