UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 25-00285-1 |
| VERSUS | JUDGE JOSEPH |
| MAHMOUD AMIN YA'QUB AL-MUHTADI | MAGISTRATE JUDGE WHITEHURST |

---

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF SPECIAL AGENT KEVIN P. HOYLAND, OR, IN THE ALTERNATIVE, FOR A HEARING UNDER *DAUBERT*

---

NOW INTO COURT comes the defendant, Mahmoud Al-Muhtadi, through undersigned counsel, who, for the reasons set forth below, moves this Court under Federal Rules of Evidence 702 and 403 to exclude or limit the testimony of the government's proposed cellular-analysis expert, FBI Supervisory Special Agent Kevin P. Hoyland, or, in the alternative, to hold a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), before Special Agent Hoyland testifies.

### I. Introduction

The government intends to call FBI Supervisory Special Agent Kevin P. Hoyland to tell the jury that, at about 10:00 a.m. on October 7, 2023, the phone it attributes to Mr. Al-Muhtadi "was very likely located in Israel." Doc. 93, at 2. The

opinion rests on seven records showing that the phone, which ran on the Gazan carrier Jawwal, used one sector of one Israeli cell site. Doc. 93-3, at 6-9. That sector points west, toward Gaza. *Id.* at 9. And the engineer who prepared the carrier's engineering report, answering questions the United States supplied, says the sector "reaches toward Gaza" and "[r]eaches the Gaza Strip region (Shuja'iyya, Jabalia, and Zaytun areas)." Cellcom Engineering Report, Ex. A (filed under seal), at 12, 21 ("Eng'g Rep.").

Historical cell-site analysis can show the general area a sector serves. It cannot say where within that area a phone was, and courts that admit it insist that the expert not claim more precision than the data allows. Special Agent Hoyland's opinion places the phone on one side of a border that runs through the sector's coverage area, without the network data, coverage modeling, or testing that could support it. The Court should exclude his opinion that the phone was "very likely" in Israel, or any other opinion that Israel is the more likely location; his opinion that the 2G handset makes Israel more likely; and his premise that cell towers "operate in the same way worldwide" as a basis for any location opinion; and it should bar testimony about how Jawwal configured its network or set its roaming thresholds absent a disclosed basis. It should limit any remaining location testimony to the sector and the general area it covers or, in the alternative, hold a *Daubert* hearing.

## II. THIS MOTION IS TIMELY; ALTERNATIVELY, GOOD CAUSE EXISTS TO CONSIDER IT

The scheduling order set no separate deadline for expert challenges. Doc. 66,

at 2-4. The government noticed Special Agent Hoyland on August 24, 2026, three weeks before the September 15 deadline for "All Other Motions." *Id.* at 3; Doc. 93, at 1. At the October 13 status conference, the government suggested that the deadline for *Daubert* challenges had run. To the extent this motion falls under the September 15 deadline, Mr. Al-Muhtadi asks for leave to file it. The Court may extend or reset that deadline "[a]t any time before trial." FED. R. CRIM. P. 12(c)(2); *cf.* FED. R. CRIM. P. 12(c)(3) (permitting a court to consider an untimely Rule 12(b)(3) motion "if the party shows good cause").

Good cause exists for reasons specific to this expert. His opinion turns on how a Palestinian carrier's phones roam onto an Israeli network at the Gaza border, and the defense could not responsibly test it without its own cell-site expert, whose disclosure the scheduling order set for October 30. Doc. 66, at 3. Mr. Al-Muhtadi told the Court that he would file his challenges to "the government's noticed experts" with those disclosures, Doc. 130, at 28, and the disclosure of his cell-site expert, Eric M. Grabski, was filed on schedule. The government has known since July that the defense would test the cell-site evidence, *see* Doc. 82, at 17, and at the August 4 hearing it confirmed that its FBI agent would rely on the Israeli carrier's data, "specifically the raw data," Doc. 114, at 79:13-23. With trial set for January 25, 2027, Doc. 66, at 4, hearing the motion now will not prejudice the government and will spare the Court a mid-trial hearing on the same question.

## III. BACKGROUND

### A. The notice and the PowerPoint

The government noticed Special Agent Hoyland "as an expert in cellular analysis," and it states that his opinions and their bases "are contained in the PowerPoint" attached to the notice. Doc. 93, at 1-2. The notice previews two case-specific opinions. First, because the phone used a Gazan provider "that would preferentially communicate with Jawaal [*sic*] cellular towers," it "was very likely located in Israel to have communicated with the Cellcom cellular tower located near K'Far Aza whose data SA Hoyland has analyzed." *Id.* at 2. Second, the phone's "appearing to be assigned to a '2G' cellular phone increases the likelihood that the phone was in Israel to be communicating with the Cellcom tower near K'Far Aza." *Id.* at 2-3. Special Agent Hoyland will also testify "that cell phone towers operate in the same way worldwide." *Id.* at 2.

The PowerPoint maps one cell site. It reports that between 9:49 and 10:01 a.m., the phone "utilized a cell site inside Israel, approximately two miles east of the border," and that "[a]ll transactions utilized the cell site sector facing west towards Gaza." Doc. 93-3, at 9. It identifies the handset as "a 2G handset." *Id.* at 8. The PowerPoint does not say that the phone was "very likely" in Israel, assign any likelihood to the handset, map any other cell site, or describe any coverage model, drive test, or other measurement of the sector's reach. *See id.* at 2-12.

**B. The carrier's engineering report found that the sector reaches into Gaza**

In discovery, the government produced a Cellcom engineering report; Cellcom is the Israeli carrier whose records Special Agent Hoyland analyzed. Eng'g Rep. at 1-28. The request for the report came from the Israel National Police, which explained that "the American law enforcement authorities gave us the questions listed in this request (the Israeli expert will not have to testify in an American court)." *Id.* at 26. The report was prepared by Roni Avrahami, a radio and communications engineer and senior technical expert at Naris Ltd. *Id.* at 1, 3. He matched the call records "with the geographical location of the radio sites appearing in these records" and with "technical data related to . . . the propagation of radio waves." *Id.* at 9.

The engineer reported that Sector 3 of the "Kfar Aza Kibbutz" site, which served the phone, is aimed at 260 degrees and that "the antenna transmits westward." *Id.* at 21. The sector "[r]eaches the Gaza Strip region (Shuja'iyya, Jabalia, and Zaytun areas), and covers the streets, roads, and surrounding areas." *Id.* at 12. Asked whether the antenna covers the area beyond the border with Gaza, he answered: "Yes, Cellcom site 425023352005093, and in particular Sector 3, where the subscriber was traced, covers the area described above and reaches toward Gaza." *Id.* at 21. Asked whether a phone could connect to it from inside Gaza, he answered: "While the subscriber is physically located in Gaza, the home network, Jawwal, has priority. Only when the radio signal of the Jawwal home network sites falls below the threshold level, and if another network's radio signal appears at a reasonable level,

the cell phone will attempt to roam to another network." *Id.* And "[o]nly *Jawwal* engineers know the values to which they set the network." *Id.* at 23.

On the other hand, the engineer wrote that "a Jawwal subscriber located in Gaza would receive the local radio signal at a higher signal strength," *id.* at 21; that the subscriber here, "as he got farther away from Jawwal antennas spread throughout the Gaza Strip, received a low intensity radio signal and dropped from the Jawwal network," *id.* at 19; and that he "assume[s] with high probability that the Jawwal Network radio engineering staff set their network to the minimum," *id.* at 23. None of these statements places the phone in Israel. The home network's priority yields whenever its signal falls below a threshold no one in this case knows; Jawwal's antennas are inside Gaza, so moving away from them does not mean crossing the border; and an assumption about another company's settings is a guess, not a measurement.

On the handset, the engineer explained that the Kfar Aza site transmits on 2G (GSM) while the nearby Nahal Oz site transmits using 3G, so a GSM phone "was therefore traced at the 'Kfar Aza Kibbutz' site." *Id.* at 13. He concluded that the phone "received service while it was present in the 'Kfar Aza Kibbutz' Cellcom site's coverage area, 0509-3, which covers the area as described above." *Id.* at 19. He did not say that the phone was in Israel.

Although the government says its expert reviewed the engineering report, Doc. 82, at 17, the PowerPoint does not mention it. *See* Doc. 93-3. And the government has

no Cellcom or Jawwal roaming, registration, coverage, propagation, or network-engineering records in its possession beyond the report and data already produced. Doc. 82, at 23.

### C. The defense expert

Mr. Grabski, an experienced cell-site analyst, Doc. 159-1; Doc. 159-2, will testify that a call detail record identifies the sector that served a phone, not where the phone was; that Sector 3's coverage extends into northern Gaza; that nothing in the records narrows the phone's position within the sector; that the phone's home-network preference and 2G-only design do not make Israel more likely; and that Special Agent Hoyland's analysis lacks a drive test or other radio-frequency survey, coverage modeling, Jawwal network data, and timing-advance or neighboring-cell data. Doc. 159, at 1-3.

## IV. ARGUMENT

### A. Rule 702 requires each opinion to stay within what the data and the method can support

An expert may testify only "if the proponent demonstrates to the court that it is more likely than not that" the testimony will help the jury, "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702. The government bears that burden. *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004). The 2023 amendment rejected the view that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's

methodology," are "questions of weight and not admissibility," and it amended Rule 702(d) "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." FED. R. EVID. 702 advisory committee's note to 2023 amendment.

An expert relying on experience must bring "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). And a court need not admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**B. The opinion that the phone was "very likely" in Israel cannot be admitted**

Mr. Al-Muhtadi does not ask the Court to reject historical cell-site analysis. The Fifth Circuit has affirmed the admission of that kind of testimony against a challenge to the field as a whole, reasoning that "[t]estimony established that the field is neither untested nor unestablished." *United States v. Schaffer*, 439 F. App'x 344, 347 (5th Cir. 2011) (unpublished). The problem here is not the field. It is that this opinion asks the field to do something it cannot do, and it depends on network settings no one in this case has.

**1. Sector data cannot place a phone within a sector**

Courts admit historical cell-site analysis to show the general area a sector serves, on the condition that the expert not claim more precision than the sector data allows. In *United States v. Hill*, the Seventh Circuit affirmed the admission of an FBI

agent's testimony even though he did not know the tower's power or antenna direction and had not tested its coverage, because the agent "emphasized that Hill's cell phone's use of a cell site did not mean that Hill was right at that tower or at any particular spot near that tower." 818 F.3d 289, 298 (7th Cir. 2016). "This disclaimer saves his testimony," the court held, *id.*, and it cautioned that admitting cell-site evidence "that overpromises on the technique's precision—or fails to account adequately for its potential flaws—may well be an abuse of discretion," *id.* at 299. In *United States v. Medley*, the court allowed a "consistent with" opinion only if the agent first explained on direct that "the phone can only be placed in the general area of the cell tower sector that it connected to near the time of the carjacking, and that it cannot be placed any more specifically within that sector." 312 F. Supp. 3d 493, 503 (D. Md. 2018). Other courts have admitted FBI cell-site testimony where the government disclaimed any effort to fix the phone's exact location. *United States v. Jones*, 918 F. Supp. 2d 1, 6 (D.D.C. 2013); *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 57 (D.D.C. 2013). And the Sixth Circuit distinguished city-to-city tracking from the question whether a phone was inside or outside a particular sector, and, in a footnote, it found forfeited and in any event "irrelevant" an argument that a radio survey was needed, because the agent there was not "pinpointing" locations. *United States v. Pembrook*, 876 F.3d 812, 824, 825 n.17 (6th Cir. 2017).

Special Agent Hoyland's opinion goes past that line. The records show only that the phone used Sector 3, Doc. 93-3, at 6-9, and the engineering report says Sector

3 reaches across the border into Gaza, Eng'g Rep. at 12, 21. An opinion that the phone was "very likely" on the Israeli side, Doc. 93, at 2, is an opinion about where within the sector the phone was, a placement the data cannot support: *Medley* required the agent to explain that the phone "cannot be placed any more specifically within that sector," 312 F. Supp. 3d at 503, and *Hill* cautioned against overpromising precision. It would suggest to the jury that the conclusion follows from the method when it goes "beyond what the expert's basis and methodology may reliably support." FED. R. EVID. 702 advisory committee's note to 2023 amendment.

The PowerPoint confirms the problem rather than solving it. It concedes that its wedge "does not reflect the actual RF footprint or coverage area of that sector." Doc. 93-3, at 5. It acknowledges "less coverage" in rural areas, *id.* at 3, where sites may be miles apart, *Hill*, 818 F.3d at 295, so each sector typically serves a larger area. And though the notice describes the method as accounting for "the cellular network environment in terms of the other towers in the area," Doc. 93, at 2, the PowerPoint maps no other tower. *See* Doc. 93-3, at 9-11.

**2. The opinion depends on Jawwal network settings no one in this case has**

The "very likely" opinion assumes that a Jawwal phone's use of an Israeli tower means it was outside Jawwal's reach. Doc. 93, at 2. Whether that is true at a particular spot depends on how Jawwal set its network, and "[o]nly *Jawwal* engineers know the values to which they set the network." Eng'g Rep. at 23. The engineer's statements about Jawwal's priority and his assumption about its settings confirm

that this data is missing; they do not supply it. *Id.* at 19, 21, 23. The government has no Jawwal roaming, coverage, or propagation records in its possession beyond the engineering report and the data already produced. Doc. 82, at 23. Nothing in the disclosure shows that Special Agent Hoyland used the propagation data the engineer considered, *see* Eng'g Rep. at 9, or any drive test or other measurement of Sector 3's reach; the government told the Court he would rely on "the raw data," Doc. 114, at 79:18-19.

Without that data, the opinion rests on experience alone, and courts have excluded cell-site coverage opinions for that reason. In *United States v. Evans*, the court admitted traditional cell-site analysis but excluded an FBI agent's "granulization" estimate of two towers' coverage, explaining that "[e]stimating the coverage area of radio frequency waves requires more than just training and experience, however, it requires scientific calculations that take into account factors that can affect coverage." 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012). Applying New Jersey's net-opinion rule, the New Jersey Supreme Court likewise held inadmissible an FBI agent's "rule of thumb" estimate of a tower's range because it "was based on nothing more than Special Agent David's personal experience." *State v. Burney*, 298 A.3d 1080, 1094 (N.J. 2023). Special Agent Hoyland's opinion is weaker still. He does not estimate how far Sector 3 reaches. He concludes which side of a border the phone was on, without addressing the engineering report's finding that the sector reaches across it.

The notice itself shows the gap. It discloses no basis for the degree of probability it assigns. Rule 16 requires the government to disclose each expert opinion and "the bases and reasons for them." FED. R. CRIM. P. 16(a)(1)(G)(iii). The notice says the bases are "contained in the PowerPoint," Doc. 93, at 2, but the PowerPoint never says "very likely" and never explains how one would get there. The opinion is connected to the data only by Special Agent Hoyland's say-so. *Joiner*, 522 U.S. at 146.

**C. The 2G opinion does not fit the question**

The notice's second opinion is that the 2G handset "increases the likelihood that the phone was in Israel." Doc. 93, at 2-3. But a 2G-only phone can use only a 2G cell, and the engineer adds that the handset explains why the phone was served by the Kfar Aza site: that site transmits on 2G (GSM), the nearby Nahal Oz site transmits using 3G, and the phone "has GSM technology and was therefore traced at the 'Kfar Aza Kibbutz' site." Eng'g Rep. at 13; *see* Doc. 159, at 3. The handset explains why the phone used this sector. It says nothing about where within the sector's coverage the phone was, so it will not help the jury decide that question. FED. R. EVID. 702(a), (d).

**D. The premise that towers work the same way worldwide does not answer the question here**

Special Agent Hoyland's carrier-specific training came from "engineers from the following cellular telephone providers: AT&T, Sprint, T-Mobile, Verizon, and US Cellular," and every court on his testimony list is in the United States. Doc. 93-1, at

2; Doc. 93-2. The notice bridges the gap with the premise that towers "operate in the same way worldwide." Doc. 93, at 2. That may be true of radio physics, but the question here is how one carrier's phones roam onto another carrier's network across an international border, and that turns on thresholds only Jawwal's engineers know. Eng'g Rep. at 23. "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Hill*, 818 F.3d at 297 (quoting *Kumho Tire*, 526 U.S. at 150) (internal quotation marks omitted).

**E. Any remaining testimony should be limited**

Even admissible expert testimony may be limited when its probative value is substantially outweighed by the danger of unfair prejudice or of misleading the jury. FED. R. EVID. 403. *Hill*'s concern "that the jury may overestimate the quality of the information provided by this analysis," 818 F.3d at 299, is at its height here. The government relies on this tower, together with the recorded calls, to place Mr. Al-Muhtadi near the killing on which it bases the death-resulting allegations. Doc. 139, at 4-6. On the most serious allegation in the case, an FBI agent's statement that the phone was "very likely" in Israel would carry weight the data cannot bear.

If Special Agent Hoyland testifies, the Court should limit him to identifying the site and sector that served the phone and the general area that sector covers, and it should require him to explain, before giving any location testimony, that the records cannot place the phone anywhere more specific within that area. *Medley*, 312 F. Supp. 3d at 503. The Court should also bar testimony about how Jawwal configured its

network or set its roaming thresholds, absent a disclosed basis.

### F. In the alternative, the Court should hold a *Daubert* hearing

If the Court is not prepared to rule on the papers, it should hold a hearing under Federal Rule of Evidence 104(a) before Special Agent Hoyland testifies, where the government must establish the basis for each location opinion and Mr. Grabski may testify. The Court must "create a record of its *Daubert* inquiry." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016).

## V. RESERVATION OF OBJECTIONS

This motion is limited to Rules 702 and 403. Mr. Al-Muhtadi reserves all other objections to the Cellcom records and to Special Agent Hoyland's testimony, including his Confrontation Clause objection to any testimony conveying the engineer's statements for their truth and his objections to any summary under Federal Rule of Evidence 1006 and to the attribution of the phone number to him.

## VI. CONCLUSION

For these reasons, Mr. Al-Muhtadi asks the Court to (1) grant leave to file this motion to the extent leave is required; (2) exclude Special Agent Hoyland's opinion that the phone was "very likely" or otherwise more likely to have been in Israel than in Gaza; (3) exclude his opinion that the phone's 2G handset increases the likelihood that it was in Israel; (4) exclude his premise that cell towers operate the same way worldwide as a basis for any location opinion, and bar testimony about Jawwal's network configuration or roaming thresholds absent a disclosed basis; (5) limit any

location testimony to the site and sector that served the phone and the general area that sector covers, preceded by an explanation that the records cannot place the phone more specifically within that area; and (6) in the alternative, hold a *Daubert* hearing before Special Agent Hoyland testifies.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
First Assistant / Appellate Chief

***s/ Aaron A. Adams***
AARON A. ADAMS
Assistant Federal Public Defender
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 30, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

***s/ Dustin C. Talbot***